**Albert N. Kennedy**, OSB No. 82142
    Direct Dial:  (503) 802-2013
    Facsimile:    (503) 972-3713
    E-Mail:      al@tonkon.com
**Timothy J. Conway**, OSB No. 85175
    Direct Dial:  (503) 802-2027
    Facsimile:    (503) 972-3727
    E-Mail:      tim@tonkon.com
**Michael W. Fletcher**, OSB No. 01044
    Direct Dial:  (503) 802-2169
    Facsimile:    (503) 972-3869
    E-Mail:      michaelf@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204

Attorneys for Tort Claimants Committee

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 04-37154-elp11 |
| ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON, AND SUCCESSORS, A CORPORATION SOLE, dba the ARCHDIOCESE OF PORTLAND IN OREGON, | **DECLARATION OF JON R. CONTE, Ph.D.** |
| Debtor. | |

       I, Jon R. Conte, Ph.D., under penalty of perjury under the laws of the State of Washington, hereby declare as follows:

       1.    I am a Professor at the School of Social Work, University of Washington, Seattle, Washington, am over the age of 18, and am competent to testify as follows:

       2.    I have been on the faculty at the University of Washington since 1990. In that capacity, I teach courses on social work practice, child abuse and trauma, and psychotherapy. Attached hereto is a copy of my curriculum vitae.

**Page 1 of 21 -**   DECLARATION OF JON R. CONTE, Ph.D.

1         3.     I am currently on the Editorial Board of <u>Child Abuse and Neglect</u>. I

2 am the Editor of the <u>Journal of Interpersonal Violence</u> and the Editor of <u>Trauma, Violence,</u>

3 <u>and Abuse: A Review Journal</u>.

4         4.     I am the Immediate Past President and was the first President of the

5 American Professional Society on the Abuse of Children. I am on the Board of Councilors

6 of the International Society for the Prevention of Child Abuse and Neglect.

7         5.     I am the author of approximately 50 scientific and academic

8 publications in peer-reviewed journals or book chapters. Over my career, I have lectured

9 frequently at national or international professional and scientific meetings before

10 multidisciplinary audiences of psychologists, physicians, attorneys, social workers and other

11 professionals.

12         6.     I have been qualified to testify as an expert on various aspects of

13 childhood sexual abuse, trauma and other forensic issues. I have testified as an expert in the

14 following states and countries: Washington, Oregon, California, Illinois, Wisconsin, Florida,

15 Virginia, New Hampshire, Colorado and Canada.

16         7.     Until recently, I have maintained a small private practice on Mercer

17 Island, Washington where I specialized in psychotherapy with individual youth and adults. I

18 currently am engaged in the practice of forensic mental health. In this capacity, I have

19 evaluated over 4,000 individual children, teens and adults who allege psychological damages

20 from sexual abuse in childhood. I have evaluated several hundred males and some females

21 since the mid-1980s alleging sexual abuse in childhood at the hands of clerics or others in the

22 religious life.

23         8.     I have been retained by the Tort Claimants Committee (the

24 "Committee") to provide the Court with information that may be helpful in evaluating the

25 proposal from the Archdiocese of Portland relating to notice to claimants. I have reviewed

26 Debtor's Motion For An Order (1) Fixing a Bar Date for Filing Tort Proofs of Claim and

**Page 2 of 21** -    DECLARATION OF JON R. CONTE, Ph.D.

1   (2) Approving a Tort Proof of Claim Form, Bar Date Notices, Actual Notice Procedure, and

2   Media Notice Program; and the Declaration of Paulette Furness In Support of Debtor's

3   Motion.

4           9.      Debtor's proposal outlines a procedure for notice to potential

5   claimants that provides for a 90-day period in which potential claimants and their lawyers

6   may complete and return claim forms. Debtor further claims to plan to undertake an

7   "extensive mailing and publication procedure" (p. 4) to provide notice of the claims bar date

8   to actual and potential claimants. Debtor suggests December 31, 2004, 5 p.m. Pacific

9   Standard Time, as the last date and time by which claim forms must be received at the

10   headquarters of the Archdiocese. The proposed Claim Form requests identifying information

11   from the individual, including information about the persons involved, the timing and nature

12   of the activities for which the claimant is asserting a claim, information about the injuries,

13   when the claimant first realized that he or she had sustained an injury, information about the

14   extent of damages and losses sustained, and information about professionals and others

15   consulted by the claimant regarding the injury and claim. Debtor proposes a two-fold notice

16   program. This involves a "plain English" notice which states "If you were abused or suffered

17   any injury by a priest or other person working in ministry for the Archdiocese of Portland in

18   Oregon or for a Catholic parish/school of the Archdiocese, you must act now to preserve

19   your rights." Debtor proposes to disseminate the Notice in newspapers, diocesan

20   publications, church bulletins, special websites, press releases and other media publicity.

21   Basing an argument on the fact that 90 percent of current claimants reside in Oregon and

22   10 percent in Washington, Debtor appears to plan to target Oregon and Washington,

23   although Debtor makes vague and unspecified efforts to undertake a nationwide notice and

24   general publicity effort as well. Debtor proposes to publish the Publication Notice as 1/8

25   page advertisements in west coast newspapers once a week for four consecutive weeks.

26   Debtor also proposes to publish the Notice in Catholic Diocesan publications, post notice in

**Page 3 of 21 -**   DECLARATION OF JON R. CONTE, Ph.D.

Case 04-37154-tmb11   Doc 613   Filed 11/15/04

1  124 parishes and 24 missions of the Archdiocese, a Debtor Chapter 11 website, and in the

2  alumni newsletters of three Catholic high schools.  Debtor also indicates it will attempt to list

3  the Notice on the websites of two cleric abuse victim advocacy groups.

4      10.    The procedure outlined by Debtor fails to recognize well established

5  facts about the nature of childhood sexual abuse, its impact on child victims when they

6  become adults, the complexity of the processes involved in individuals making a connection

7  between historical events such as abuse and the ultimate injury, the nature of abuse by

8  Catholic priests and its impact on claimants, and process and procedures which would

9  reasonably and fairly give notice to potential claimants.  I will outline information on these

10 issues below.

11     a.    <u>Nature of childhood sexual abuse</u>.  Many aspects of childhood

12 sexual abuse and its negative impacts on abused individuals as children and when they later

13 become adults, challenge popular myths and misconceptions in the public about abuse and

14 how children respond to it.

15     Estimates vary about the percentage of the population that is exposed to

16 sexual abuse in childhood.  Indeed the reasons for this variation in incidence or prevalence

17 are a matter directly of relevance to the Court in understanding what a fair notice procedure

18 would consist of.  It appears that about 22 percent of females and 8 percent of males are

19 sexually abused while children. (Bolen, R. and Shankpiece, 1999, Prevalence of Child Sexual

20 Abuse: A Corrective Meta-Analysis, <u>Social Service Review</u>, 93(3), 281-313.)  Boys are more

21 likely to be abused by persons unrelated but known to the family.  Only about 30 percent of

22 abuse takes place one time.  Most cases of childhood sexual abuse are never reported to

23 authorities. (*See e.g.* Saunders, B.E., Kilpatrick, D. G., Resnick, R.A. & Lipvosky, J. A.,

24 Epidemiological Characteristics of Child Sexual Abuse; Results from Wave II of the

25 National Woman's Study).

26     For many victims of sexual abuse, the abuse begins at an age when the victim

**Page 4 of 21 -**    DECLARATION OF JON R. CONTE, Ph.D.

1    is too young to appreciate the wrongfulness or harm it can cause.  The vast majority of sexual

2    abuse is undertaken by a person in authority over the child and often by someone who is

3    generally trusted or respected by the child or family.  Most sexual abuse takes place in the

4    context of an ongoing relationship between victim and offender where many or even most

5    aspects of the relationship are viewed as positive to the victim.  Most, but not all, offenders

6    engaged children in a "grooming process" where the child is gradually but systematically

7    conditioned into sexual contact; is bribed, threatened or manipulated into not disclosing the

8    abuse; and is made to feel a participant in his/her own abuse.  (Conte, J.R., Wolf, S. & Smith,

9    T,  1989, What sexual offenders tell us about prevention, Child Abuse and Neglect, 13(2),

10   293-302 and Berliner, L. & Conte, J. R., 1990. The process of victimization: The victim's

11   perspective, Child Abuse & Neglect, 14(1), 29-40.)

12            Far from being an impulsive act by offenders, sexual abuse of children is most

13   typically undertaken by individuals who have long histories of practicing their predilections

14   and identify vulnerable children; take efforts to use their authority, position or relationship

15   with adults who would otherwise protect children to lull parents into believing that their

16   children are safe with the offender; and by using their position, authority and the relationship

17   with the child to gain sexual access to the child and maintain secrecy.

18            The negative effect of sexual abuse on human beings has been a topic of

19   professional interest from at least the time of Sigmund Freud, who in the late 1880s

20   postulated a connection between his patients' reports of childhood sexual contact with adults

21   and the illnesses that brought them to see Dr. Freud.

22            In an authoritative summary of trauma effects (Briere, J., Child Abuse

23   Trauma, 1992, Sage Publications, Newbury Park, CA), University of Southern California

24   Professor John Briere, Ph.D., has pointed out that child abuse can lead to the following

25   psychological symptoms:  post-traumatic effects such as intrusive recollections of sexual

26   abuse incidents; cognitive distortions such as beliefs that individual is only good for having

**Page 5 of 21** -    DECLARATION OF JON R. CONTE, Ph.D.

1  sex or that the world is unsafe; altered emotionality, including depression and anxiety;
2  dissociation, impaired self-reference or a profoundly negative view of oneself and one's
3  skills and abilities; disturbed relatedness such as the inability to maintain healthy
4  relationships or a sense of isolation and separation from others; intimacy disturbances which
5  include altered sexuality, assumptions regarding aggression in relationships, a tendency
6  toward adversariality, manipulation, and aggression in relationships; and avoidance as seen
7  in the abuse of drugs or alcohol, suicidality or other tension-reducing behaviors.

8          The symptoms of trauma and abuse tell only part of the story about trauma
9  effects. It is not well understood why symptoms develop. Some symptoms (effects) may
10  serve a functional purpose in the survivor's life. For example, some symptoms may
11  represent learned behaviors (*e.g.*, that you can use sexuality to deal with negative feelings).
12  Some symptoms may serve different individual purposes. One individual may engage in
13  self-injurious behavior (such as cutting himself) to express rage, while another may engage in
14  the same behavior to stop dissociation. It is not always possible to understand the specific
15  function a symptom serves in an individual's life.

16          Nor it is clear why symptoms appear when they do. Some children are
17  symptomatic while the abuse is taking place. Others may not become symptomatic until
18  after disclosure. Many victims of childhood sexual abuse may be symptomatic for years but
19  do not recognize the origins of the symptoms. Some victims of childhood sexual abuse may
20  not become symptomatic until years into adulthood. Some of these find the beginning of
21  difficulties in their lives come when they are reminded of the child abuse (*e.g.*, by media
22  accounts of cleric abuse) or when they are no longer driven by focus on families, careers and
23  early adulthood issues. Clinically, I have evaluated individuals who appear to have lived
24  relatively successful lives and then suddenly after the place where they were abused (*e.g.*, a
25  children's home) or the person who abused them became public, experienced considerable
26  deterioration in functioning (*e.g.*, becoming alcoholic, losing a job, experiencing a divorce).

**Page 6 of 21 -**   DECLARATION OF JON R. CONTE, Ph.D.

It is a truism in mental health that many adverse childhood events, such as family breakup, parental alcoholism or childhood sexual abuse, do not become issues which some children deal with until much later in life. The child whose parents divorce may be sad at the time but not exhibit profound inability to maintain healthy, adult relationships until much later in adulthood, when relationships become a central aspect of development. At the time difficult or traumatic experiences are taking place, child development pushes the child to bury, hide from or separate from the stressing event. This is especially true for events such as sexual abuse that most typically are associated with feelings of guilt, shame and confusion. Even when the child knows that the sexual abuse is wrong, the child feels a sense of duplicity in having engaged in a "bad behavior." When the abuse is undertaken by a person in authority, especially God's representative on earth in the person of the Catholic priest, the child is unable or unwilling to tell others about the abuse. In some cases the priest who has abused the child has then instructed the child to make a confession to him for the abuse as if the child were the person who had sinned.

At the same time, occasionally in my evaluation of individuals abused by priests, the individual reports having told someone, such as a parent, and not having been believed or having been punished for saying such bad things about a man of God. Like all mental skills, denial, minimization, avoidance and rationalization become ways that the child victim pushes the sexual abuse from conscious memory. Many people I have evaluated report that they did not think about the sexual abuse for years, even decades, after the last incident of sexual abuse. These ideas illustrate why a fair notice procedure will be complex and require considerable investment of expertise, time and funds to accomplish.

b. <u>The processes involved in an individual making a connection between historical events, such as abuse and injury.</u> It is a truism of psychotherapy and mental health that most individuals come into therapy only after years of suffering. Denial and minimization of the nature and level of one's problematic functioning is common.

**Page 7 of 21 -** DECLARATION OF JON R. CONTE, Ph.D.

1  Projecting or making the problem belong to someone else is also common.  For example, the
2  individual who drinks to intoxication every day of the week believes he is not an alcoholic
3  because he only drinks beer and not whiskey.  Likewise, the domestically violent man
4  believes that his actions are appropriate responses to his partner's failure to have dinner ready
5  when he wants it.

6  As the outline of the effects of sexual abuse above illustrates, these are not
7  symptoms or aspects of functioning that people take pride in.  Being depressed all the time,
8  having sexual difficulties, drinking to excess or becoming enraged when your boss gives you
9  a work assignment (*i.e.*, troubles with authority) are aspects of living that may be linked to
10  sexual abuse in childhood.  But they are often mental health problems that the carrier of the
11  problem does not understand, avoids thinking about, or blames on someone or something
12  else.

13  Many people who suffer conditions such as these place erroneous causality on
14  factors that are actually unrelated to the condition.  The depressed person blames feelings on
15  a lousy job.  The alcoholic claims a physical addiction.  The angry person blames his
16  unskilled boss and not the fact that he has problems with authority flowing from having been
17  abused in childhood by an authority figure.

18  Feelings that some victims of childhood sexual abuse experience, such as
19  anger or guilt, are not injuries.  Feelings are complex emotional and physical reactions that
20  may have automatic and largely unconscious cognitive correlates.  An adult victim of sexual
21  abuse in childhood may be generally angry at all authority or use alcohol to keep from
22  feeling angry and have no realization of the original event which first produced the anger.

23  Emotional reactions become injuries when the individual uses behaviors to
24  manage those feelings.  For example, guilt is an emotional reaction that becomes an injury
25  when the sufferer drinks alcohol to excess to keep from feeling guilt.  Anger becomes an
26  injury when it leads to unreasonable outbursts of anger that interfere with daily living or in

**Page 8 of 21 -**   DECLARATION OF JON R. CONTE, Ph.D.

1  acts of violence. For example, the angry person alluded to in the previous paragraph

2  illustrates this point. Anger becomes an injury when it impacts behavior, such as in domestic

3  violence or depression. The angry male may consciously but erroneously believe that his

4  anger is from how his boss talks to him and not understand that the behavior of his boss

5  reminds him of being told by an adult to be sexual when he was a child.

6        Understanding the connection between an event and an injury requires a level

7  of psychological mindedness. It requires some level of insight or appreciation that behavior

8  and other psychological processes are causally associated with events that may not have been

9  thought about for years. It requires a degree of openness or willingness to forgo cognitive

10  processes such as defenses (*e.g.*, denial) that serve to protect the individual from

11  acknowledging the thoughts that cause anxiety (*e.g.*, "my drinking really is a problem and I

12  am causing my wife and children worry when I drink").

13        Debtor faces quite a challenge in constructing a notification procedure that

14  will target individuals who are in the midst of defending against painful memories of abuse

15  or who do not yet understand the nature of the origins of their symptoms or problems. It is a

16  particular problem since so little is understood about when people come to make such

17  connections or what conditions are associated with making such connections.

18        Fair notice requires that first the potential claimant be in fact exposed to the

19  Notice. Then it requires that the potential claimant identify himself as a person belonging to

20  the group of people for whom the Notice is intended. Then the individual must consider

21  whether he in fact had the experience of being "harmed," that it did in fact cause problems in

22  his life, and in order to do any of this he must be able to overcome the natural avoidance and

23  defense which has protected him over a life time from dealing with the pain and negative

24  effects of the abuse. Finally, he has to come to a decision that making a claim will outweigh

25  all the negative costs (*e.g.*, feelings of guilt or shame, or demands on psychological energy

26  and time) of acknowledging and being identified as a victim of childhood sexual abuse.

**Page 9 of 21 -**    DECLARATION OF JON R. CONTE, Ph.D.

I believe that fairness would require a notification procedure that is distributed in the places mostly likely to identify potential claimants. It would need to be made often enough to be noticed by potential claimants. It needs to be made in ways that increase the likelihood or would aid the potential claimant in making a connection between childhood sexual abuse and psychological damage done by the abuse and present in their lives at the time of the notice. Fair notice would require a process that helps the individual understand what conduct Debtor or its agents engaged in and what types of behavior or functioning may constitute an injury. Notice would have to be given in a way to get the attention of possible claimants and at a time that they might be receptive to hearing such a message.

        c.      <u>Debtor's Proposed Notice Process</u>. Debtor proposes a process that is particularly problematic and unlikely to lead to the identification of a substantial number of claimants. The problems in the proposed process are as follows:

        (1)     <u>Plain English Notice</u>. The proposed Notices employ two broad, general terms of "**abuse**" and "**suffered injury**." Contrary to popular misconception, many victims do not call or understand what happened to them as "abuse." For example, a boy victim might have been genitally fondled but hold a belief that only girls are abused or that abuse only involves oral-genital contact. "Suffering" and "injury" are particularly abstract terms. An individual may be angry but believe that injury refers only to physical damage, such as broken bones or infectious diseases. It is very likely that the general public fails to understand that the term "injury" is used by the Centers for Disease Control and Prevention to refer to both physical and psychological injury. Furthermore, gender role stereotypes and some cultural norms dictate stoicism. For that reason, many people will not admit to "suffering," although they have experienced abuse, and furthermore may not understand that suffering and injury may refer to psychological impacts such as alcohol abuse or sexual dysfunction.

        The issue of the definition of the target behavior has been one that the field of

**Page 10 of 21** - DECLARATION OF JON R. CONTE, Ph.D.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  sexual abuse has long dealt with.  For example, early sexual abuse researchers tried to

2  understand why different studies of the prevalence of childhood sexual abuse in the general

3  population ranged from 15 percent to 62 percent of woman. (Wyatt, G. E. and Peters, S. D.,

4  1986, Methodological considerations in research on the prevalence of child sexual abuse,

5  Child Abuse & Neglect, 10, 241-251.)  As noted by the authors:

> "A feature common to Wyatt's and Russell's studies is the
> emphasis on questions pertaining to particular types of sexual
> behavior.  The use of behaviorally specific questions may
> facilitate recollection of abuse incidents by clarifying for the
> subject the nature of the experiences being inquired about or by
> triggering memories that might not be retrieved in association
> with more general question." (p. 248.)

10  In another research report, the use of more behaviorally specific questions

11  increased the rate of identification of victims by 14 percent (Wyatt, G. E. and Peters, S. D.,

12  1986, Issues in the definition of child sexual abuse in prevalence research, Child Abuse &

13  Neglect, 10, 231-240.).  In a study with college student subjects, Fisher et al., 2000,

14  compared behaviorally specific questions against the type of general items used in the

15  National Crime Victimization Survey and found 20 times more sexual assault was revealed

16  in a formal experimental design.

17  Caution to researchers and practitioners about not using broad, vague

18  questions to identify individuals who have had certain abusive experiences has been well

19  known for some time in the abuse field.  An early and interesting study confirms this general

20  rule.  Berger and colleagues (Berger, A.M., Knutson, J.F., Mehm, J.G, Y Perkins, K.A.,

21  1990, The self-report of punitive childhood experiences of young adults and adolescents,

22  Child Abuse & Neglect, 1900, 12, 251-262) employed a questionnaire to study childhood

23  disciplinary practice in a sample of over 4,500 college students.  The authors note "The

24  present study also indicates the importance of assessing discrete discipline events rather than

25  asking whether persons had been abused.  Most of the persons in the present study who met

26  the more stringent abuse criterion failed to describe themselves as having been abused"

**Page 11 of 21** -  DECLARATION OF JON R. CONTE, Ph.D.

1     (p. 260).

2         In a study of 153 adult women who had been seen in the 1970s as children in

3 a large hospital with medical findings consistent with sexual abuse, the women were

4 re-interviewed in 1990 and 1991. Thirty-eight percent did not recall the abuse that they had

5 reported 17 years earlier. As noted by Bolen and Shankpiece (1999, Prevalence of child

6 sexual abuse: a corrective metanalysis. Social Service Review, 73, 281-313) the nature of the

7 question asked in the re-interview effected how many women disclosed the abuse. Eighty

8 percent disclosed after four general questions and 90 percent after eight questions. Of

9 interest, after all 14 questions, 12 percent of the women still did not report abuse that had

10 been medically confirmed in their childhood.

11         The Court will want to note that there is clear research evidence that some

12 victims of childhood sexual abuse will fail to confirm the abuse when asked later in

13 development. Several studies conducted in the early years of modern interest in childhood

14 sexual abuse have pointed to this harsh reality. For example, Lawson and Chaffin (Lawson,

15 L. & Chaffin, M., 1992, False negatives in sexual abuse disclosure interviews, Journal of

16 Interpersonal Violence, 1992, 7, 532-542) report on a sample of children positive for STI

17 infections who were interviewed by trained child interviews and found that about 40 percent

18 did not report the sexual contact.

19         In another study of particular relevance to the issue before the Court, Femina

20 and colleagues (Femina, D.D., Yaeger, C.A. & Lewis, D.O., 1990, Child abuse: adolescent

21 records vs. adult recall, Child Abuse & Neglect, 1990, 14, No. 2, 227-231) compared

22 information about physical abuse obtained during psychiatric evaluations during adolescence

23 with information obtained during follow-up interviews in a sample of adults and found that

24 38 percent of subjects provided discrepant information as adults from what they had reported

25 as teens. Of particular note for our purposes here is the reasons given by some of the

26 subjects for why they provided different information as adults then they did as teens. The

**Page 12 of 21** - DECLARATION OF JON R. CONTE, Ph.D.

1 authors note "embarrassment, a wish to protect parents, a sense of having deserved the abuse,

2 a conscious wish to forget the past, and a lack of rapport with the interviewer" were reasons

3 given (p. 229). It would not be hard to imagine that adult victims of childhood sexual abuse

4 by clerics would not want to report their abuse for the same reasons or because they did not

5 wish to cause distress to their own aging parents who remain devoted Catholics and have no

6 knowledge of the abuse of their now adult child.

7         The issue of fairness seems to require that Debtor give adequate notice and

8 give it over a sufficiently long period of time that potential claimants will have an

9 opportunity to fully consider whether or not to bring a claim forward.

10         The importance of asking behaviorally specific questions about a range of

11 specific sexual behaviors rather than global questions is consistent with assessment of

12 traumatic events in general. For example, in a just published chapter on assessment of

13 trauma, Schlenger and colleagues (Schlenger, W. E., Jordan, R. K, Caddell, J. M., Ebert, L

14 and Fairbank, J.A., Epidemiological methods for assessing trauma and PTSD in John Wilson

15 and Terence Keane (eds), <u>Assessing Psychological Trauma and PTSD</u>, 2004, Guilford Press,

16 New Work, 226-261) advise the following:

17         (a)     Begin by providing a context for the assessment by

18 explaining the nature of the extreme events so that the intent of specific questions will be

19 clearer and will focus the respondent's attention on the kinds of events of interest.

20         (b)     Include behaviorally specific, operational questions

21 (*e.g.*, asking a series of detailed questions about specific sex acts, such as "has anyone ever

22 made you have anal sex by force or threat of harm?" rather than a global question such as

23 "have you ever been sexually assaulted?"). You might use less severe levels of abuse to be

24 less shocking.

25         A related problem to the definitional one is that many of the symptoms caused

26 by the conduct of Debtor and its agents' behavior serves the purpose of making potential

**Page 13 of 21** - DECLARATION OF JON R. CONTE, Ph.D.

1   claimants unaware of the injury at all or tend to make claimants under-report injury.

2   Nationally recognized trauma researcher, John Briere, Ph.D. notes this in his recent book

3   Psychological Assessment of Adult Posttraumatic States (1997, American Psychological

4   Association, Washington, D.C.):

5       "Because all living organisms tend to withdraw from noxious
        stimuli, it is not surprising that traumatic events can motivate
6       the development of avoidance strategies. This may take the
        form of emotional or cognitive suppression, denial,
7       dissociation, memory distortion, substance abuse, or
        involvement in activities that numb or distract." (P. 63-4.)
8

9       The implication of this seems obvious. Notice must be sufficiently powerful

10  and frequent to overcome the damage done by the abuse that serves to make potential

11  claimants avoidant, unaware, dissociative, or fails to trigger remembering of relevant

12  experiences. Certainly small advertisements in newspapers are going to be inadequate.

13  Repeated notice in behaviorally specific language will be necessary before potential

14  claimants understand that it is in fact what happened to them in childhood that is being

15  addressed in the Notice.

16      Stimulated or cued recall is likely to increase recall. Pictures of known

17  pedophile priests as they looked at the time of the abuse, names of specific parishes or

18  schools or other institutions where Debtor knows sexual abusing priests were or where

19  numerous allegations have already arisen and the time periods over which abuse was likely to

20  have taken place will increase the ability of potential claimants to know what conduct, taking

21  place in what setting, and by what individuals is the focus of the Notice. For example, one

22  preamble to the specific abuse questions might read "If you where a student at (Name of

23  School) during the years X to Y and had contact with Father W, this information may apply

24  to you."

25      (2)     Means of Notice. Debtor proposes to disseminate the Notice in

26  newspapers, diocesan publications, church bulletins, special websites, press releases and

**Page 14 of 21** - DECLARATION OF JON R. CONTE, Ph.D.

1  other media publicity. Basing an argument on the fact that 90 percent of current claimants

2  reside in Oregon and 10 percent in Washington, Debtor appears to plan to target Oregon and

3  Washington. There are several problems with this plan.

4          As noted immediately above, the Notice has to be powerful and relatively

5  persistent for it to come to the awareness or attention, and then be understood, by potential

6  claimants. It can be argued that the most deserving claimants are those most significantly

7  damaged by the abuse and therefore more likely to suffer symptoms that make seeing and

8  understanding the Notice most difficult.

9          The proposed means of notice is problematic for other reasons. First, only a

10  small percentage of the adult population gets information from newspapers. One of the

11  effects of abuse by clerics, in my experience in evaluating several hundred such victims, is

12  that they reject the Catholic Church and often religions altogether. It is unlikely that

13  publication of the Notice in church bulletins or alumni newsletters is likely to reach many

14  potential claimants. I am not an expert on population mobility, but I understand that out-

15  migration is significant in the western states. Certainly the Court can obtain estimates of out-

16  migration from the Archdiocese of Portland over the years since 1945 or so, which will assist

17  the Court in this regard. It has been my experience that often victims of clerics do in fact

18  move away from home communities in an effort to reduce or eliminate exposure to the

19  reminders such as driving past their old school or church or other places where the abuse

20  took place. The use of current case data to argue that most potential claimants reside in the

21  Northwest is not useful since it may well be that the most significantly damaged potential

22  claimants moved farther away to get away from reminders of the abuse.

23          Certainly Debtor is correct that publication of a revised Notice is important.

24  Certainly newspapers and periodicals are potential sources of publication, although it would

25  appear that either direct mailings or a concerted media campaign would be more effective in

26  reaching potential claimants. A media expert will be helpful in identifying what types of

**Page 15 of 21** -  DECLARATION OF JON R. CONTE, Ph.D.

media are most likely to reach the most people and how frequent that exposure has to be to reach what percentage of the population. A well-known and respected spokesperson for these announcements would also be helpful. Additionally, adult victims of cleric abuse who can talk about the process of understanding the "injury" done by the abuse and the consequences of disclosing may be the most credible individuals to talk to potential claimants via a range of Notice procedures.

A professionally designed public service campaign to provide notice to potential claimants is more likely than notices in newspapers to result in actually identifying potential claimants harmed by the abuse. It is clear, however, that this will not take place over the short term as media advertising space is consumed with local and national election advertisements. Additionally, it is clear that such Public Service Announcements will need to be frequent and widespread. As noted PSA expert Charles Atkin and colleague (Atkin, C. and Schiller, L., <u>Shouting To be Heard</u>):

> "So how much (media) is enough? Again, it depends. As a general rule, it might only take seeing a message a few times before the most receptive people can recognize the catchiest slogan, or learn a new fact, or perform a relatively easy task. However, if a public service campaign wants to achieve the same effect with half of the audience members, the message probably needs to reach them about ten times * * *'a person needs to hear the message between eight and eleven times to have it register." (P. 25)

I would also argue that the Christmas holiday period is problematic for many reasons. People are terribly busy and preoccupied, and family gatherings may reactivate old patterns and memories. For that reason, I would suggest a notice process and end date that avoids holidays; especially holidays with religious significance.

Fair notice should be worded in ways that potential claimants can understand and that speak to some of the reasons that the adult victim of childhood abuse by clerics have not come forward. Language in the notice should address feelings of responsibility, confusion, embarrassment, guilt, shame and other reasons for not disclosing (*e.g.*, to protect

**Page 16 of 21** - DECLARATION OF JON R. CONTE, Ph.D.

1 aged parents or because the individual is pretending not to have any difficulties).

2       (a)   Who is the target audience?  Debtor faces an
3 interesting problem similar to that confronted by epidemiologists who study disease states in
4 the general population or other researchers.  This problem involves how the potential
5 claimant group is defined and how best to go looking for that group.

6       No one knows how many children over the last 70 years have been abused by
7 clerics or other agents of the Archdiocese.  Current experiences in litigation of claims
8 indicate that most claimants are males, although some are females.  Most were Catholic at
9 the time of the abuse, although some were not.  Most were abused in local parishes, although
10 some were abused in juvenile correctional facilities, residential treatment homes, hospitals or
11 other locations.

12      If only 9 percent of males in the general population is abused, and a smaller
13 percentage of these are Catholic, then in relative terms the true number of potential claimants
14 is a very small percentage of the general population.  In research terms, sexual abuse of
15 Catholic children is a rare event in the general population.  It may be a somewhat less rare
16 event in Catholic communities, although it certainly appears to me to be a relatively rare
17 event even in those parishes that suffered under a pedophile priest or priests.

18      An adequate sampling procedure for a rare event in a large population requires
19 a great deal of work (attempts at contacting the potential claimants) for a relatively weak
20 yield (*e.g.*, many non-Catholics or Catholics who were not abused are going to be
21 "contacted" or exposed to the Notice in order to find the relatively small number of
22 claimants).  It will require multiple efforts by a range of methods to actually identify
23 claimants.  It would certainly require more of an effort than that proposed by Debtor.  Indeed,
24 if one wants not to really locate claimants, then one looks in the wrong place with little
25 effort.

26      Several mechanisms are available to Debtor that would have a higher

**Page 17 of 21** -  DECLARATION OF JON R. CONTE, Ph.D.

1 | likelihood of actually identifying potential claimants in the general population:

2 | Debtor must have the employment histories of priests and other agents who
3 | have been the subject of complaints over the years. Locations where these individuals
4 | worked and resided could be especially targeted for notice. Debtor certainly has the names
5 | of parish families and children who attended parish schools, church camps and other
6 | facilities, and these families and individuals could be targeted for Notice.

7 | A major problem in fair notice is that many, if not most, of the claimants are
8 | now adults and likely to be living in their own households. Parish and church records that
9 | most likely contain the family names of potential claimants are for the parents of potential
10 | claimants, not claimants. There are many reasons that aging Catholic parents of potential
11 | claimants cannot, are unable to or are unwilling to entertain the idea that their child(ren) were
12 | harmed in the past by a Catholic cleric. An alternative method for providing a revised notice
13 | would be to send the notice to every household in whatever geographic area the Court
14 | ultimately decides is appropriate and fair. In my opinion, the western states is a fairer target
15 | pool than just the coastal states or the entire United States, although potential claimants are
16 | likely to reside throughout the United States.

17 | (b)     Adverse reactions to Notice. Debtor and the
18 | Court face an ethical situation that is quite akin to that of university professors who teach
19 | about trauma or child abuse. Some students in classes dealing with trauma or abuse, and
20 | indeed many people in the community who will be exposed to the revised notice, will have
21 | trauma histories. Estimates of the lifetime exposure to trauma of all kinds vary, with some
22 | reports indicating that between 36 percent to 87 percent of females and 43 percent to
23 | 92 percent of males have exposure to at least one traumatic event. One estimate is that one
24 | out of 12 adults meet diagnostic criteria for post traumatic stress disorder sometime in
25 | adulthood. For some number of these individuals a fair notice procedure for potential
26 | claimants will destabilize or remobilize their own trauma histories causing, at a minimum,

**Page 18 of 21** -  DECLARATION OF JON R. CONTE, Ph.D.

1 emotional distress and for some cases significant deterioration in functioning. As noted by

2 Martin and colleagues (Martin, J.L., Perrott, K., Morris, E.M. & Romans, S. E., Participation

3 in retrospective child sexual abuse research: beneficial or harmful? What women think six

4 years later, Linda M. Williams and Victoria L. Banyard, Editors, 1999, Sage Publications,

5 Thousand Oaks) in a discussion on the ethics of research on childhood sexual abuse in the

6 general community:

7     "One potential ethical criticism of CSA research * * * is that a
community sample will probably include a large number of

8     potential participants with negative experiences who would not
talk about their experiences by choice—the implication being

9     that asking them to do so may be harmful. This is related to
another possible criticism, that inviting participation is going

10     against the suppression or denial that abused women frequently
use as a coping strategy." (P. 157.)

11

12     While this does not mean, in my opinion, that fair notice cannot be given, it

13 does mean that procedures and processes for dealing with adverse reactions to notice must be

14 anticipated. This can include: information contained within the notice about community

15 resources for help or the identification of victim advocate or support groups, and a special

16 web site constructed as part of the notice procedure that contains information for potential

17 claimants and non-claimants who are distressed or traumatized by the notice procedure.

18     11.   <u>Recommendations</u>. Based on my knowledge and expertise in

19 childhood sexual abuse and research methodology, I respectfully urge the Court to consider

20 the following as a fair and adequate means of Notice.

21     a.   A notice/flyer should be designed by a panel of experts on

22 childhood sexual abuse, advertising and epidemiology using behaviorally specific language

23 to describe the specific conduct of Debtor and Debtor's agents that is of concern and the

24 potential injuries that may result. It would be extremely important that this notice be

25 evaluated by panels of adult victims, especially victims of Catholic clerics, to obtain their

26 insights about how effective such a Notice would have been to them. This panel may include

**Page 19 of 21** - DECLARATION OF JON R. CONTE, Ph.D.

1    experts who have had no role in previous litigation as experts for plaintiff or Debtor.

2             b.      This revised notice should be printed as not less than half-page

3    advertisements in target area newspapers and other periodicals at a frequency of publication

4    based on latest data on the number of times publication is necessary to elicit the highest

5    response rate.

6             c.      A Public Service Announcement (PSA) based on the revised

7    notice should be prepared and aired in target markets at a rate and for a duration that the

8    latest market research indicates necessary to reach potential claimants who are likely to be

9    difficult to reach.

10            d.      The revised notice should be sent to every family whose name

11    appears on parish registries, parish schools' lists or other lists between 1945 and the present.

12    The notice should be mailed to these addresses with address correction requested not less

13    than three times over a six-month period.

14            e.      The Court should set a bar date consistent with expert advice

15    about the length of time that development of a revised notice, and the development and

16    implementation of a public service campaign, will require to reach not less than 80 percent of

17    the potential claimant pool.

18            f.      The Court should establish an independent panel of mental

19    health professionals who can screen claimants and who can answer questions about sexual

20    abuse and its injury on individuals.

21            g.      It must be recognized that potentially those claimants who are

22    the mostly likely, able or willing to come forward have already done so. Potential claimants

23    who have not yet come forward may require some period of time to consider the

24    consequences of coming forward. This process of evaluation can certainly be aided by

25    information provided by Debtor in brochure and web-based formats, but the process of

26    deciding to disclose will nonetheless be a difficult one for some potential claimants and

**Page 20 of 21** - DECLARATION OF JON R. CONTE, Ph.D.

1  fairness would seem to require that they be given some substantial amount of time to make

2  such a once-and-for-all decision with such profound consequences.

3          DATED this **8th** day of October, 2004.

4

5

6                          _____
                           JON R. CONTE, Ph.D.

7  032545\00001\593310 V001

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 21 of 21 -** DECLARATION OF JON R. CONTE, Ph.D.

**Tonkon Torp** LLP

# CERTIFICATE OF SERVICE

     I hereby certify that I served the foregoing **DECLARATION OF JON R. CONTE, Ph.D.** on the parties on the attached List of Interested Parties by:

     ☒ mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to each party's last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below;

     ☐ causing a copy thereof to be hand-delivered to each party at each party's last-known address on the date set forth below;

     ☐ sending a copy thereof via overnight courier in a sealed, prepaid envelope, addressed to each party's last-known address on the date set forth below;

     ☐ faxing a copy thereof to each party at such party's last-known facsimile number on the date set forth below; or

     ☐ e-mailing a copy thereof to each party at such party's last-known e-mail address on the date set forth below.

     DATED this 15th day of November, 2004.

     TONKON TORP LLP


By _____
     ALBERT N. KENNEDY, OSB No. 82142
     Attorney for Tort Claimants Committee

032545\00001\593310 V001

**Page 1 of 1** -   CERTIFICATE OF SERVICE

# LIST OF INTERESTED PARTIES

## In re Roman Catholic Archbishop of Portland in Oregon, and Successors, a corporation sole
U.S. Bankruptcy Court Case No. 04-37154-elp11

Thomas W. Stilley
William N. Stiles
**Sussman Shank LLP**
1000 S.W. Broadway, Suite 1400
Portland, OR 97205-3089
    Attorneys for Debtor **Roman**
    **Catholic Archbishop of**
    **Portland in Oregon**

Pamela J. Griffith
**U.S. Trustee's Office**
620 S.W. Main Street, Room 213
Portland, OR 97205

**Donn Christiansen**
c/o Michael S. Morey
Michael S. Morey P.C.
8 N. State Street, Suite 301
Lake Oswego, OR 97034
    Chairman, Tort Claimants
    Official Committee

Scott Beckstead
Attorney at Law
P. O. Box 700
Waldport, OR 97394
    Attorneys for Tort Claimant
    **Peter F. Carlich**

**John Pincetich**
P. O. Box 2023
Gearhart, OR 97138
    Interested Party

**REQUESTS FOR NOTICE:**

Joseph A. Field
Field & Associates
610 S.W. Alder Street, Suite 910
Portland, OR 97205
    Attorneys for **ACE Group and**
    **ACE Property & Casualty**
    **Company**

Kevin P. Kamraczewski
Robert Millner
Sonnenschein, Nath & Rosenthal, LLP
8000 Sears Tower
Chicago, IL 60606
    Attorneys for **ACE Group and**
    **ACE Property & Casualty**
    **Company**

Richard T. Anderson, Jr.
**Anderson & Monson, P.C.**
Park Plaza West - Suite 460
10700 SW Beaverton-Hillsdale Hwy.
Beaverton, OR 97005
    Interested Party

Peter C. McKittrick
Tara J. Schleicher
Farleigh, Wada & Witt, P.C.
600 Bank of America Financial Center
121 S.W. Morrison Street
Portland, OR 97204-3192
    Attorneys for Tort Claimants
    **C.B.**, John Doe 104, John
    Doe 105 and John V. Doe

Kevin K. Strever
William A. Barton
Barton & Strever P.C.
214 S.W. Coast Highway
P. O. Box 870
Newport, OR 97365
    Attorneys for Tort Claimant **C.B**

Richard C. Josephson
Stephen A. Redshaw
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, OR 97204-1268
    Attorneys for **Catholic Charities**
    **of Oregon, Inc. and Catholic**
    **Youth Organization/Camp**
    **Howard**

David B. Levant
Stoel Rives LLP
Suite 3600, One Union Square
600 University Street
Seattle, WA 98101-3197
    Attorneys for **Catholic Charities**
    **of Oregon, Inc. and Catholic**
    **Youth Organization/Camp**
    **Howard**

Gary A. Bisaccio
Attorney at Law
2125 S.W. Fourth Avenue, Suite 600
Portland, OR 97201
    Attorneys for **Matthew J.**
    **Clemens**

Karl I. Mullen
Attorney at Law
8225 S.W. Fairway Drive, Suite 100
Portland, OR 97225
    Attorneys for Creditors **Nathan**
    **and Deborah DuFresne**

**Paul E. DuFresne**
5135 S.W. 85th Avenue
Portland, OR 97225

**G.G., RWF, DC and David Coombs**
c/o Michael S. Morey
Michael S. Morey P.C.
8 N. State Street, Suite 301
Lake Oswego, OR 97034

**Cameo L. Garrett**
4875 Harnden Road
Cashmere, WA 98815
    Creditor Pro Se

Russell D. Garrett
John A. Bennett
Bullivant, Houser, Bailey, P.C.
805 Broadway Street, Suite 400
Vancouver, WA 98660-2962
    Attorneys for **General Insurance**
    **Co. of America**

Debra A. Dandeneau
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153
    Attorneys for **General Insurance
    Co. of America**

Charles R. Markley
**Greene & Markley, P.C.**
1515 S. W. Fifth Avenue, Suite 600
Portland, Oregon 97201
    Interested Party

**Gary W. Hahn**
Hahn and Associates, Inc.
Environmental Consultants
434 N. W. Sixth Avenue, Suite 203
Portland, OR 97209-3651
    Unsecured Creditor

**Holy Family Catholic Church**
3732 S.E. Knapp Street
Portland, OR 97202

Kelly W.G. Clark
O'Donnell & Clark, LLP
1706 N.W. Glisan Street, Suite 6
Portland, OR 97209
    Attorneys for Priest Abuse
    Claimants SNB, **JC**, AGY and
    REC, JCM, **John Doe 1**, John
    Smith, LD, DM, FM, HS and
    MM, GM, RM, CM, BG and MJ

Neil T. Jorgenson
Attorney at Law
520 SW Sixth Avenue, Suite 820
Portland, OR 97204-1514
    Attorneys for **Priest Abuse
    Claimants** SNB, **JC**, AGY and
    REC, JCM, **John Doe 1**, John
    Smith, LD, DM, FM, HS and
    MM, GM, RM, CM, BG and MJ

Catherine S. Travis
Lane Powell Spears Lubersky LLP
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204-3158
    Attorneys for **KeyBank N.A.**

Margaret M. Anderson
Patrick M. Jones
Lord, Bissell & Brook LLP
115 South LaSalle Street
Chicago, IL 60603
    Attorneys for Certain
    Underwriters at **Lloyd's London**

Thomas W. Brown
Cosgrave Vergeer Kester LLP
805 S.W. Broadway, 8th Floor
Portland, OR 97205
    Attorneys for Certain
    Underwriters at **Lloyd's London**

**Craig McMillin**
Mills & McMillin, P.C.
715 Commercial Street, N.E.
Salem, OR 97301

Thomas C. Sand
Jerry B. Hodson
Teresa H. Pearson
**Miller Nash LLP**
111 S.W. Fifth Avenue, Suite 3400
Portland, OR 97204
    Special Counsel for Debtor

Robert J. Vanden Bos
Vanden Bos & Chapman, LLP
Suite 520, The Spalding Building
319 S.W. Washington Street
Portland, OR 97204-2690
    Attorneys for **Michael S. Morey**

Dana Shelton
Recovery Specialist - Recovery Dept.
**NOVA Information Systems, Inc.**
7300 Chapman Highway
Knoxville, TN 37920

**Phoebe Joan O'Neill**
1500 S.W. Fifth Avenue, Unit 703
Portland, OR 97201

Aaron Munter, Executive Director
**Oregon Educational
  Technology Consortium (OETC)**
8995 S.W. Miley Road, Suite 101
Wilsonville, OR 97070-5485

John L. Langslet
Scott A. Kamin
Martin, Bischoff, Templeton,
  Langslet & Hoffman
900 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204
    Attorneys for **Oregon Insurance
    Guaranty Association**

Steven M. Hedberg
Douglas R. Pahl
Perkins Coie LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209-4128
    Attorneys for **Parishes and
    Parishioners Committee**

**Marilyn Podemski**
Attorney at Law
2477 S.W. Arden Road
Portland, OR 97201

James A. Hayes, Jr.
Cummins & White, LLP
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660
    Attorneys for **Roman Catholic
    Bishop of Orange (California)**

L. Martin Nussbaum
Eric Hall
**Rothgerber Johnson & Lyons LLP**
Wells Fargo Tower, Suite 1100
90 South Cascade Avenue
Colorado Springs, CO 80903
    Special Counsel for Debtor

Jonathan E. Cohen
Jonathan E. Cohen, P.C.
1450 American Bank Building
621 S.W. Morrison Street
Portland, OR 97205
    Attorneys for **St. Mary's Home**

Steven C. Berman
Stoll Stoll Berne
  Lokting & Shlachter, P.C.
209 S.W. Oak Street, Suite 500
Portland, OR 97204-2798
    Attorneys for **St. Mary's Home**

**Page 2 of 3** – LIST OF INTERESTED PARTIES

(11/15/2004)

Eric J. Neiman
Heather J. Van Meter
Williams, Kastner & Gibbs PLLC
333 S.W. Taylor Street
Portland, OR 97204-2496
 Attorneys for **Saint Paul**
 **Mercury Indemnity Company**
 **and St. Paul Fire and Marine**
 **Insurance Company**

Scott L. Jensen
Brownstein, Rask, Sweeney, Kerr,
 Grim, DeSylvia & Hay, LLP
1200 S.W. Main Street
Portland, OR 97205-2040
 Attorneys for **St. Therese Parish**
 **and Reimers & Jolivette, Inc.**

Thomas V. Dulcich
Margaret Hoffman
**Schwabe Williamson & Wyatt PC**
1600-1800 Pacwest Center
1211 SW Fifth Avenue
Portland, OR 97204
 Special Counsel for Debtor

Linda Boyle
**Time Warner Telecom Inc.**
10475 Park Meadows Dr., #400
Littleton, CO 80124

Mary Ann Kilgore
General Attorney
**Union Pacific Railroad Company**
1400 Douglas Street, MC 1580
Omaha, NE 68179

Fred C. Ruby
Assistant Attorney General
Department of Justice
1162 Court Street, N.E.
Salem, OR 97301-4096
 Attorneys for **State of Oregon,**
 **Department of Human**
 **Resources, Oregon Youth**
 **Authority and MacLaren**
 **School for Boys**

Erin K. Olson
Law Office of Erin Olson, P.C.
806 SW Broadway, Suite 800
Portland, OR 97205-3310
 Attorneys for Tort Claimants
 **Gary Mitts**, **Kenneth Nail**,
 **Stephen Walsh**, MJD, CS, GP,
 James Devereaux, MY and SL

Brad T. Summers
Daniel R. Webert
Ball Janik LLP
1100 One Main Place
101 S.W. Main Street
Portland, OR 97204-3219
 Attorneys for **Central Catholic**
 **High School**

David L. Slader
David Slader Trial Lawyers P.C.
Jackson Tower - Suite 400
806 SW Broadway
Portland, OR 97205
 Attorneys for **Tort Claimants**
 **S.L., G.P., H.S.2, J.C.1, J.D.,**
 **S.W., M.J.D. and M.Y.**

032545\00001\582996 V001