CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF OREGON

NOV 1 8 2005

LODGED_____ REC'D✓_____
PAID_____ DOCKETED_____

David Slader Trial Lawyers P.C.
806 S.W. Broadway, Suite 400
Portland, OR 97205
Telephone: 503-243-6336
Facsimile: 503-242-0958
E-mail: dslader@spiritone.com

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In Re:

ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON, AND SUCCESSORS, A CORPORATION SOLE, dba the ARCHDIOCESE OF PORTLAND IN OREGON,

Debtor.

Case No.: 04-37154-e1p11

**DECLARATION OF DAVID SLADER**

David Slader declares as follows:

1. I am over 18 years of age and if called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge and based on my communications with others.

2. I am one of the attorneys representing several of the claimants in their claims against Debtor.

3. I make this declaration in support of the Tort Claimants' Objections to Topic Listings for Pattern and Practice Witnesses (non-Levada).

Page 1 - DECLARATION OF DAVID SLADER

DAVID SLADER
TRIAL LAWYERS
A PROFESSIONAL CORPORATION
806 SW BROADWAY FOURTH FLOOR PORTLAND, OREGON 97205
TEL (503) 243-6336 FAX (503) 242-0958

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

4. The pages attached to this declaration are true copies of excerpts of a volume entitled "New Commentary on the Code of Canon Law" published by the Paulist Press. This is one of two standard and accepted English language translations and commentaries on the code. This is the only commentary that I have been able to locate that is published in the United States. The only other English language commentary is published in the United Kingdom. The American commentary was commissioned by the Canon Law Society of America, and it uses the translation published by that organization (CODE OF CANON LAW, LATIN-ENGLISH EDITION, © 1998). The Paulist Press is the foremost American publisher of Roman Catholic scholarship.

I declare under penalty of perjury under the laws of the United States of America and the State of Oregon that the foregoing is true and correct.

Dated: November 16, 2005

_____
DAVID SLADER

Page 2 - DECLARATION OF DAVID SLADER

DAVID SLADER
TRIAL LAWYERS
A PROFESSIONAL CORPORATION

806 SW BROADWAY FOURTH FLOOR PORTLAND, OREGON 97205
TEL (503) 243-6336  FAX (503) 242-0958

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

# NEW COMMENTARY ON THE CODE OF CANON LAW

COMMISSIONED BY
THE CANON LAW SOCIETY OF AMERICA

EDITED BY
**JOHN P. BEAL**
**JAMES A. CORIDEN**
**THOMAS J. GREEN**



PAULIST PRESS
*New York, N.Y./Mahwah, N.J.*

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

*Exercise of Pontificals*

**Canon 390** — A diocesan bishop can perform pontifical functions in his entire diocese but not outside his own diocese without the express, or at least reasonably presumed, consent of the local ordinary.

The diocesan bishop can perform pontifical functions everywhere in his diocese.[117] Outside his diocese, however, the diocesan bishop may perform them only with the express (or at least reasonably presumed) consent of the local ordinary.[118] "The pontifical insignia belonging to a bishop are: the ring, the pastoral staff, and the miter, as well as the pallium, if he is entitled to its use."[119]

*Aspects of Bishop's Governmental Role*

**Canon 391** — §1. It is for the diocesan bishop to govern the particular church entrusted to him with legislative, executive, and judicial power according to the norm of law.
§2. The bishop exercises legislative power himself. He exercises executive power either personally or through vicars general or episcopal vicars according to the norm of law. He exercises judicial power either personally or through the judicial vicar and judges according to the norm of law.

Every bishop is a minister of governance (c. 375, §1).[120] He has all the ordinary, proper, and immediate power he needs for the exercise of his pastoral office, unless some matter is reserved by the Supreme Pontiff to the supreme authority of the Church or to some other authority, such as the episcopal conference (c. 381, §1). He also leads by his own personal example of holiness in charity, humility, and simplicity of life (c. 387).

The first paragraph[121] of canon 391 says the diocesan bishop governs his particular church with legislative, executive, and judicial power.[122] His power of governance, however, is not absolute or arbitrary: he must act "according to the norm of law." He must respect laws stemming from higher authority (c. 135, §2) and can dispense from them only in accord with the laws of the code (see cc. 85–93). This power of governance is given to the diocesan bishop to enable him to serve the faithful in the particular church who are in communion with the universal Church.

The second paragraph explains how the diocesan bishop exercises his governing powers.[123] He is the sole legislator of the diocese; he exercises legislative power alone.[124] His legislative authority cannot be delegated validly to another, and he cannot issue a law contrary to a higher law (c. 135, §2).[125] He may legislate through a diocesan

---

place of divine worship for the benefit of one or more physical persons (c. 1226). Since all sacred functions can be performed by law in an oratory (c. 1225), and since the bishop's chapel has the same rights as an oratory, Mass and other sacred functions can be celebrated within it.

[117] *CIC* 337; *CCEO* 200; *Directory* 81.
[118] For specifics on pontifical functions, see *CB, passim*.
[119] *CB* 57, which continues: "The *ring* is the symbol of the bishop's fidelity to and nuptial bond with the Church, his spouse, and he is to wear it always" (58). The other pontificals are worn during liturgies: 59–62. See *CIC* 337, §2, which indicates that the pontifical insignia are the staff and miter.
[120] See Herranz, 22–27; Green, "The Pastoral Governance Role of the Diocesan Bishop," 483–490.
[121] See *CIC* 335, §1, which identifies three kinds of power: legislative, judicial, and coercive. The 1983 code speaks of executive power rather than coercive. See *CCEO* 191, §1; *Directory* 32–38.
[122] Canon 135, §1 teaches that the power of governance in the Church is distinguished as legislative, executive, and judicial.
[123] *CIC* 362; 366, §1; 368; 369; 1572; 1573; *CCEO* 191, §2.
[124] Wijlens suggests that a coadjutor or auxiliary bishop would be able to exercise legislative power if he had been granted such special faculties, as mentioned in c. 403, §§2–3 (71, n. 11).
[125] Wijlens comments that many canonical institutions exist to assist the bishop not only in his pastoral ministry but also in his legislative task (e.g., the presbyteral council,

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

tal records which may be retained in the diocesan archive, decrees which affect individuals' personal status such as a decree establishing an ecclesiastical office which they hold, and rescripts such as laicization documents. Individuals may exercise this right personally or through a proxy.

Lest there be any inference of preferential treatment or an infringement of a right to access, a bishop should establish a diocesan policy describing what records shall be considered under the canon's category of "documents which by their nature are public and which pertain to.... personal status." In the absence of such a policy, individual decisions would be in the hands of the chancellor. It can be argued that all sacramental records are public in nature, since those sacraments for which records are kept are all public in nature and affect one's ecclesiastical status. However, questions can be raised regarding which of these records pertain to the individual's personal status. Given an increased interest in genealogical studies, more requests for sacramental records of ancestors have been forwarded to chanceries. Some researchers maintain that one's ancestors' records do, by extension, affect one's own personal status. Others hold that general access to sacramental records could result in violations of the right to privacy and personal reputation[189] given the forthrightness with which some annotations in records, such as illegitimacy, have been made. To avoid conflicts, it would be helpful for dioceses to establish policies on access which address potentially conflictual matters.[190]

### Removal of Documents

**Canon 488 — It is not permitted to remove documents from the archive except for a brief time only and with the consent either of the bishop or of both the moderator of the curia and the chancellor.**

[189] Canon 220.
[190] For issues to be addressed, see M. Breitenbeck, "Practical Addendum on Policy-Making," in *Confidentiality in the United States* (Washington, D.C.: CLSA, 1988), 163–165.

The holdings of the archive are to be maintained in their integrity. Therefore, documents generally are not to be removed. However, this canon does provide standards by which documents can temporarily be removed from their usual place of storage. The time constraints on such removal are not specified beyond the reference to a "brief time." Local policy and custom should determine the length of time. The chancellor should establish a system of tracking documents temporarily out of their usual place of storage; requiring an "out-card" specifying the document removed, the date of removal, and the person into whose custody it was transferred is a simple system to utilize.

Authorization for removal of documents parallels authorization for access to the archive. The same principles noted above regarding permissions can be applied here.

### The Secret Archive

**Canon 489 — §1. In the diocesan curia there is also to be a secret archive, or at least in the common archive there is to be a safe or cabinet, completely closed and locked, which cannot be removed; in it documents to be kept secret are to be protected most securely.**

**§2. Each year documents of criminal cases in matters of morals, in which the accused parties have died or ten years have elapsed from the condemnatory sentence, are to be destroyed. A brief summary of what occurred along with the text of the definitive sentence is to be retained.**

In addition to the general archive, each diocese must maintain a secret archive. The documents contained in the secret archive are held under even greater security than those in the general archive. This security is ensured through special means used to store the material and special norms authorizing access to the secret archives.

The secret archive can be a distinct site or a specially secured portion of the general archive. A permanent safe or other type of self-contained and

Case 04-37154-tmb11　　Doc 2445　　Filed 11/18/05

securely locked depository is to be used if there is no separate site.

The first paragraph of this canon provides a general description of the contents of the secret archives, "documents to be kept secret," but does not list such documents. One example of its contents, "documents of criminal cases in matters of morals," is found in the second paragraph of this canon. An illustrative list could be constructed by reference to other parts of the code. For example, a book or registry for recording dispensations from occult marriage impediments in the non-sacramental internal forum is to be maintained in the secret archive (c. 1082). Likewise, the secret archive is to contain a register for noting of secret marriages (c. 1133). Proofs of rebukes or warnings issued in the form of a penal remedy are to be kept in the secret archive (c. 1339, §3) as are pre-investigative and investigative materials or documents relating to any penal process (c. 1719). In addition to those items delineated in the code, the diocesan bishop may determine that other materials or documents[191] be stored there because of their sensitive or secret nature or because dissemination or revelation of them could seriously damage an individual's reputation or cause scandal within the community.[192] While it is the responsibility of the chancellor to maintain the secret archive, it is the diocesan bishop who in part determines the contents. He may delegate the chancellor to share this task.

Certain documents maintained in the secret archive have a distinct retention schedule (§2). Any documents relating to criminal cases involving matters of morals are to be destroyed under two circumstances: the death of the accused or the lapse of ten years from the condemnatory sentence. However, even though the full documentation is destroyed, a summary of the acts and a copy of the sentence are to be retained.[193]

### Access to the Secret Archive

**Canon 490 — §1. Only the bishop is to have the key to the secret archive.**
**§2. When a see is vacant, the secret archive or safe is not to be opened except in a case of true necessity by the diocesan administrator himself.**
**§3. Documents are not to be removed from the secret archive or safe.**

Because the secret archive contains documents which are of their nature confidential or highly sensitive, access to it is extremely guarded. The bishop alone holds the key or, in the case of a separate vault or safe, the combination or electronic access (§1). The canon does not specify who may use this key but, in keeping with the chancellor's responsibilities, the bishop could logically allow him or her access to the secret archive as necessary to store documents, make notations in the registers retained there, and destroy documents (c. 489). The diocesan bishop would not seem to be personally responsible for discharging these functions but would need to make such access possible.

---

[191] Examples of documents not required by law to be stored in the secret archive include records of dispensation from impediments or irregularities for orders (cc. 1047–1048) or decrees of dismissal from religious institutes (c. 700). See J. Alesandro, in *CLSA Com*, 397 and E. Rinere, "The Confidentiality of Written Documents in Canon Law," in *Confidentiality in the United States*, 131.

[192] Pagé, 104–105.

[193] Relying on a 1941 reply from the code commission (*CLD* 2, 132), Read concludes that the retention of a summary of the acts and a copy of the sentence applies only to the ten-year provision, not the death of the accused (*CLSGBI Com*, 273). The ten-year peremptory time limit for a complaint of nullity against a sentence (c. 1621) appears to be the basis for the retention of the full acts during that time period. If that were the only basis for the retention, then complete destruction would seem to be appropriate at that time. The fact that they are retained, even in summary form, beyond the ten-year period would seem to indicate that their retention also has a value for historical purposes, even though access to such records is tightly controlled. Therefore, an argument can be made for keeping a summary of the acts even upon the death of the accused.

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

# INTRODUCTION

*Thomas J. Green*

During the post-1983 code period, the tragedy of clerical sexual abuse of minors among other things has highlighted the significance of a well-ordered and pastorally responsible ecclesiastical penal system. First of all the following introductory observations consider the phenomena of delicts, or offenses, against the Church's faith or order and its response in the form of penalties. The commentary will then briefly consider the 1917 code and its postconciliar revision to contextualize the subsequent reflections on Book VI.

While the Church is a graced community empowered by the Spirit, its members are sinners reflecting the limitations of the human condition.[1] Occasionally their attitudes are contrary to the faith (e.g., heresy) or their behavior contradicts the Christian way of life (e.g., clerical sexual abuse of minors). This disturbs the community of faith and brings such persons into conflict especially with those in authority whose responsibility is to foster the integrity of the community's faith, communion, and service.

Hence there needs to be a framework to restore ecclesial peace and order and reintegrate the offending party within the community. This challenge to resolve conflicts arising from breaches of public order is common to Church and State; hence there are certain similarities between ecclesiastical and civil penal law. However, the Church's salvific purpose gives its penal order a unique character which must constantly be remembered.

## Delicts against the Community

The Church's penal order does not refer primarily to the individual's relationship with the Lord in conscience. This is largely inaccessible to church authority and hence beyond its competence. Rather, what is principally envisioned is a public act or omission adversely affecting the community. However, ecclesiastical penal law also deals with certain occult, or non-public, delicts known only to a few individuals, e.g., solicitation in confession. This is because such acts may significantly harm the community and hence are deemed matters of penal discipline.

Not every sin is an ecclesiastical delict warranting a penalty, yet every delict is a seriously sinful act or omission reflecting significant, if not full, freedom and knowledge. Certain factors notably impairing such freedom (e.g., fear) and knowledge (e.g., ignorance) may diminish or completely preclude imputability, or responsibility, for one's apparently criminal behavior.

Furthermore, not every canonical violation is a delict warranting a penalty. In fact, the violation of relatively few laws in the 1983 code constitutes a delict. Historically there have been different understandings of what patterns of thought or behavior so impair the Church's spiritual integrity as to require an ecclesiastical penalty, i.e., the deprivation of some spiritual or temporal good within the Church's control. The determination of such delicts has reflected at least an implicit hierarchy of values. Both such delicts and their corresponding penalties are historically conditioned.[2] Throughout the ages there has been a continuing effort to clarify the boundaries of ecclesial communion and specify those breaches of ecclesial values which the community cannot tolerate.

A significant historical factor affecting ecclesiastical penal discipline has been a change in Church-State relations. Until relatively recently, the Church occasionally had recourse to the secular arm to enforce its own discipline, and at times church authorities implemented distinctly civil

---

[1] The author is grateful to Rev. Ladislas Örsy, S.J., whose unpublished reflections entitled "Breach of Law and Punishment" were helpful in preparing these observations. See also A. Marzoa, in *Com Ex*, 222–245.

[2] For a brief overview of the evolution of ecclesiastical delicts and penalties, see G. Michiels, *De Delictis et Poenis* (Paris: Desclée, 1961) 1: 30–40.

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

One of the most serious obligations of most clerics (cc. 277, §1; 1037)[279] and all religious (c. 599) is observing perfect and perpetual continence (non-use of the sexual faculty) as well as celibacy, which prevents them from marrying. Canons 1087–1088 invalidate the attempted marriages[280] of clerics as well as members of religious institutes in perpetual (not temporary) vows. Married deacons may not remarry validly after the death of their spouses and continue their official ministry without a Holy See dispensation from canon 1087.[281]

If a cleric illegally attempts marriage, he incurs a *latae sententiae* suspension restricting his exercise of various ministerial functions (c. 1333).[282] One may wonder how realistic is the possibility of his giving up this new relationship, especially if children are involved. However, if after a formal warning the cleric contumaciously and scandalously persists in that relationship, he is liable to increasingly severe *ferendae sententiae* privations (c. 1336, §1, 2) including dismissal from the clerical state (§1).[283] This is one of the few delicts for which such a penalty is warranted.[284] Furthermore, by the law itself the cleric loses any ecclesiastical offices he may hold (c. 194, §1, 3°), yet the enforcement of this provision requires an authoritative declaration.

The non-clerical religious illegally attempting marriage incurs a *latae sententiae* interdict and, like the religious cleric, is also *ipso facto* dismissed from the religious institute given the radical incompatibility between the attempted marriage and one's religious commitment.[285] This dismissal is to be formally declared by the major superior with the council after gathering pertinent proofs of the attempted marriage (c. 694, §1, 2°–§2).

While canon 1394 does not explicitly refer to the partner of the above-mentioned cleric or religious, canon 1329, §2 on knowing and free complicity in a delict punished by a *latae sententiae* penalty is relevant here. Such a partner is a necessary accomplice, without whose cooperation there would be no delict. The partner of the cleric would be subject to a discretionary, *ferendae sententiae* penalty to be determined by the competent penal authority since she cannot incur a suspension. However, the partner of the non-clerical religious is subject to the same *latae sententiae* interdict. In assessing possible penalties, the penal authority needs to take cognizance of the norms on imputability (cc. 1323–1327), e.g., ignorance, grave fear, etc.

One might note briefly another administrative non-penal consequence of such a delict. A layman committing such a delict is irregular for receiving orders while a cleric is irregular for receiving further orders, e.g., a deacon vis-à-vis the priesthood (c. 1041, 3°). Such a cleric is also irregular for exercising the orders he has received (c. 1044, §1, 3°).

*Various Violations of Clerical Continence*[286]

**Canon 1395 — §1. A cleric who lives in concubinage, other than the case mentioned in can. 1394, and a cleric who persists with scandal in another external sin against the sixth commandment of the Decalogue is to be punished by a suspension.**

---

[279] An exception to the general rule of celibacy for Latin clerics is the married deacon (c. 1042, 1°).

[280] The code speaks technically about "attempting" marriage. This means that the cleric or religious may be mature enough to exchange naturally sufficient marriage consent, i.e., prescinding from church regulations. However, that consent is legally ineffective or not recognized by the Church because of the aforementioned marriage impediments.

[281] See June 6, 1997 circular letter of CDWDS in *Origins* 27/11 (August 28, 1997) 169; 171.

[282] See commentary on c. 1352.

[283] Interestingly enough, this is one of two instances where the Eastern code requires the deposition of a cleric (*CCEO* 1453, §2). The other is *CCEO* 1461 on the simoniacal conferral or reception of orders.

[284] The delict is viewed as so serious that the statute of limitations (prescription) for pursuing a criminal action is five years instead of the usual three years (c. 1362, §1, 2°).

[285] A strict interpretation of penal law means that the *latae sententiae* interdict here (c. 1394, §2) does not apply to non-clerical members of secular institutes or societies of apostolic life. However, they are *ipso facto* dismissed from the institute or society (cc. 729; 746).

[286] Cf. *CCEO* 1453, §1 and §3.

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

**If he persists in the delict after a warning, other penalties can gradually be added, including dismissal from the clerical state.**
**§2. A cleric who in another way has committed an offense against the sixth commandment of the Decalogue, if the delict was committed by force or threats or publicly or with a minor below the age of sixteen years, is to be punished with just penalties, not excluding dismissal from the clerical state if the case so warrants.**

A similar concern for an authentic observance of clerical[287] continence for the sake of the Kingdom prompts this canon penalizing other violations of that obligation[288] besides attempted marriage. Paragraph one treats of concubinage, an ongoing non-marital sexual relationship between a cleric and a woman, married or single. It also encompasses other scandalous, habitual, clerical sexual offenses with persons of either sex not entailing the exclusivity of concubinage.

A preceptive (c. 1344), *ferendae sententiae* suspension is envisioned initially, with subsequent increasingly severe penalties depending on the cleric's obstinate refusal to heed official warnings to change his scandalous behavior. The issue is quite serious since dismissal from the clerical state is possible in cases of notable intransigence. Furthermore, the statute of limitations (prescription) for pursuing a criminal action here and in most situations mentioned in the next paragraph is five years instead of the usual three years (c. 1362, §1, 2°).

While the canon does not explicitly refer to the cleric's accomplice in the ongoing sexual relationship, canon 1329, §1 on complicity in a delict punished by a *ferendae sententiae* penalty seems relevant. Such an accomplice is to be punished with a penalty comparable to suspension (e.g., interdict) or a less serious one depending on the level of imputability.

Paragraph two addresses certain occasional, non-habitual clerical sexual delicts,[289] which are especially serious if they are perpetrated publicly (i.e., in a public place), or with force, or with threats, or with a person of either sex under sixteen years of age.[290] These four criteria must be carefully considered in determining whether a delict has been committed. If any one of them is verified in an instance of external, seriously imputable, clerical sexual behavior, there may be a delict. In fact occasionally more than one of these criteria may be exemplified, e.g., the use of force or manipulation in sexual abuse of minors.

The issue of possibly diminished imputability is a critical one here, especially but not exclusively in cases of pedophilia. This means the experiencing of and acting upon recurrent, intense sexual urges and/or fantasies involving a prepubescent child for at least six months.[291] Church authorities

---

[287] Unlike c. 1394, §2, which also dealt with non-clerical religious, the present canon deals solely with clerics, secular and "religious" of all types.

[288] Besides concubinage, the present canon speaks generically of an external sin "against the sixth commandment of the Decalogue." See also cc. 977 and 1378, §1 (absolution of an accomplice) and c. 1387 (solicitation in confession). Regrettably, the exact meaning of this phrase is not entirely clear. It may mean technically adultery or sexual delicts involving clerics and married women. However, it is also used as a circumlocution for other types of sexual misconduct, heterosexual or homosexual, e.g., rape, fornication, or incest. For a thoughtful examination of this complex issue, including the contemporary problems of sexual harassment, exploitation, and abuse, see J. Provost, "Offenses against the Sixth Commandment: Toward a Canonical Analysis of Canon 1395," *J* 55 (1995) 632–663.

[289] Interestingly enough, the Eastern code penalizes only ongoing sexual delicts (c. 1395, §1), not the occasional sexual delict (c. 1395, §2).

[290] The age of "minors" here has been temporarily raised to eighteen years of age in the United States due to a special Holy See modification of the code for five years beginning April 25, 1994. On November 30, 1998 John Paul II extended this provision for ten years until April 25, 2009.

[291] For further discussion of the psychological implications of pedophilia, ephebophilia, and other sexual disorders involving clerics see P. Cimbolic, "The Identification and Treatment of Sexual Disorders and the Priesthood," *J* 52 (1992) 598–614.

Case 04-37154-tmb11    Doc 2445    Filed 11/18/05

should exercise great care in developing policies in this delicate area, and consultation with psychological and other experts is imperative before disciplinary or penal measures are taken.[292]

Such authorities must be sensitive to the diverse situations of clerics accused of sexual misconduct, which require different legal-pastoral approaches. For example, the cleric accused of recent repeated sexual abuse of children or minors seems notably different from the one accused of one or possibly several sexual offenses many years ago who has sought treatment and subsequently exercised the ministry laudably. Furthermore, the cleric engaging in consensual sexual activity with another adult, however morally objectionable, is different from the one forcefully engaging in non-consensual sexual activity with a minor or another vulnerable person such as a counselee. Complicity in the delict is to be assessed in terms of the free, deliberate sexual involvement of an individual with the guilty cleric (c. 1329, §1).

At times the most beneficial approach may be pastoral and therapeutic in character rather than penal, especially if the cleric's imputability is notably diminished. Concerns about his dignity, well-being, and future ministerial options[293] are key legal-pastoral considerations. However, one must also seriously consider the significant damage possibly done to the ecclesial community and certain individuals within it, especially the most vulnerable. Furthermore, there may be legitimate community outrage regarding the serious betrayal of trust involved in clerical sex abuse of minors. This may heighten the imputability of the offending cleric (c. 1326, §1, 2°).[294]

Somewhat surprisingly, the code does not seem to view such delicts as seriously as other violations of clerical continence since, initially at least, the canon envisions only obligatory, indeterminate, *ferendae sententiae* penalties (c. 1344; 1349) rather than the suspension indicated in canons 1394, §1 and 1395, §1.[295] Furthermore, possible civil penalties such as incarceration may possibly preclude the need for canonical penalties if the various purposes of the penal system have been otherwise achieved (c. 1344, 2°). Nevertheless, if such penal and other remedial measures do not repair the ecclesial damage, the seriously imputable cleric may be dismissed from the clerical state, another illustration of the seriousness of this delict.[296]

---

[292] A helpful resource in this area are two volumes entitled *Restoring Trust*, prepared in 1994–1995 by the NCCB Ad Hoc Committee on Sexual Abuse. They review various diocesan sexual abuse policies, report on various treatment/evaluation centers, and provide useful articles on various aspects of the clergy sex abuse issue. See also *From Pain to Hope*, Report from the CCCB Ad Hoc Committee on Child Sexual Abuse (Ottawa: Publications Service CCCB, 1992).

[293] In assessing the possible reintegration of such a cleric in ministry, see, for example, F. Morrisey, "The Pastoral and Juridical Dimensions of Dismissal from the Clerical State and of Other Penalties for Acts of Sexual Misconduct," *CLSAP* (1991) 221–239, esp. 237–239.

[294] See *Canonical Delicts Involving Sexual Misconduct and Dismissal from the Clerical State* (Canonical Delicts) (Washington, D.C.: USCC, 1995). Pages 46–47 contain a helpful bibliography on clerical sexual abuse. See also *J* 52/2 (1992) containing articles by canonists Beal (642–683) and Provost (615–641) and psychologist Cimbolic (598–614) mentioned earlier.

[295] One must remember that the code was drafted and promulgated in the 1970s and early 1980s, somewhat prior to the notable emergence of the scandal of clerical sex abuse of minors in the United States and elsewhere. At that time church authorities and canonists were much less aware than today of the broad and complex implications of this tragic development.

[296] Another example of the seriousness with which this delict is viewed in the United States is a change in the statute of limitations (prescription) for initiating a criminal action based on alleged sexual abuse of minors. The aforementioned special April 1994 Holy See norms (cf. supra, n. 290) modified c. 1362, §1, 2°, which normally provides for a five-year period after the commission of such a delict. For alleged delicts committed with minors *under 18* years of age *between April 25, 1994 and April 24, 1999*, such a criminal action may be initiated until the minor celebrates his/her 28th birthday or one year has elapsed from the denunciation of the delict expedited prior to that 28th birthday. For alleged delicts committed with minors *under 16* years of age (former rule) *before April 25, 1994*, such a criminal action may be initiated until the minor in question celebrates his/her 23rd birthday. See *Canonical Delicts*, 38–39. On

Case 04-37154-tmb11     Doc 2445     Filed 11/18/05