**Below is an Opinion of the Court.**

_Elizabeth L. Perris_
ELIZABETH PERRIS
U.S. Bankruptcy Judge

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

In Re:                              ) Bankruptcy Case
                                    ) No. 04-37154-elp11
ROMAN CATHOLIC ARCHBISHOP OF        )
PORTLAND IN OREGON, AND SUCCESSORS, )
A CORPORATION SOLE, dba the         ) MEMORANDUM OPINION
ARCHDIOCESE OF PORTLAND IN OREGON,  )
                                    )
                        Debtor.     )


    In this chapter 11[1] case filed by the Archbishop of Portland in

Oregon, and Successors, a Corporation Sole, dba the Archdiocese of

Portland in Oregon, the tort claimants have submitted a list of topics

for depositions of four witnesses regarding debtor's patterns, practices,

and policies with regard to allegations of sexual misconduct with a minor

by any priest while working in an Archdiocesan ministry assignment.  The

witnesses designated by the tort claimants, including Archbishop William

J. Levada, object to some of the topics.  This matter came before the

---

    [1]    11 U.S.C. § 1101 <u>et seq</u>.

Page 1 -  MEMORANDUM OPINION

court for resolution of the objections in advance of the depositions.

Debtor and Archbishop Levada have raised numerous objections to the lists of topics for pattern and practice depositions provided by the tort claimants.[2] Some of the objections apply to all witnesses; some apply only to the questions proposed to be put to Archbishop Levada.  I will address the common objections together, and those specific to Archbishop Levada separately.

In federal court, a party is entitled to discovery of

> any matter, not privileged, that is relevant to the claim or defense
> of any party . . . .  For good cause, the court may order discovery
> of any matter relevant to the subject matter involved in the action.
> Relevant information need not be admissible at the trial if the
> discovery appears reasonably calculated to lead to the discovery of
> admissible evidence.

Fed. R. Civ. P. 26(b)(1), made applicable to the adversary proceedings by Fed. R. Bankr. P. 7026.  "The burden is on the party objecting to discovery to show that discovery should not be allowed."  <u>Meller v. Walker</u>, 124 F.R.D. 654, 656 (D. Or. 1989).

These depositions are being taken pursuant to the January 14, 2005 Order Regarding Premediation Discovery by Tort Claimants, in which the court concluded that evidence regarding debtor's "'patterns, practices,

---

        [2]  Archbishop Levada filed a Motion to Modify Subpoena, pursuant to Fed. R. Civ. P. 45(c), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9016.  That rule allows the court that issued a subpoena to quash or modify the subpoena if, among other things, it "requires disclosure of privileged or other protected matter and no exception or waiver applies," Fed. R. Civ. P. 45(c)(3)(A)(iii), or if it "subjects a person to undue burden."  Fed. R. Civ. P. 45(c)(3)(A)(iv).  Debtor filed objections to the list of topics for the three other pattern and practice witnesses.  The procedure chosen is not critical; the point is to present the dispute to the court before the depositions so the parties know what matters are properly the subject of questioning at the depositions.

Page 2 – MEMORANDUM OPINION

and policies' in regards to allegations of sexual misconduct with a minor by any priest while working in an Archdiocesan ministry assignment is relevant for discovery purposes to the negligence claims of various tort claimants." Order Regarding Premediation Discovery by Tort Claimants at p. 1, ¶ 1. That is because the defendant's knowledge of sexual misconduct of priests with minors, and knowledge about whether priests who engage in such behavior may safely be returned to ministry involving children, bears upon whether debtor was negligent in how it handled allegations of abuse, and because the extended statute of limitations for child abuse cases set out in ORS 12.117(1) provides that the statute is extended with regard to "an action based on conduct that constitutes child abuse or conduct knowingly allowing, permitting or encouraging child abuse[.]" The order provided that "Tort claimants may depose up to four witnesses, to be chosen jointly by the tort claimants, for purposes of discovering Debtor's 'patterns, practices, and policies' in regard to the abuse or molestation of minors by priests." Order Regarding Premediation Discovery by Tort Claimants at p. 3, ¶ 2.

COMMON OBJECTIONS

1.  <u>Evidence of clergy sexual misconduct</u>

In a number of the topics included on the tort claimants' list, they seek various types of information about clergy "sexual misconduct." Debtor objects, arguing that questions should be limited to sexual misconduct with minors by a priest working in an Archdiocesan ministry assignment, because the claims at issue involve minors, and the court's order holds that evidence of debtor's patterns and practices with regard to "allegations of sexual misconduct with a minor by any priest while

Page 3 - MEMORANDUM OPINION

working in an Archdiocesan ministry assignment" is relevant to these claims.  The tort claimants respond that they do not intend to ask questions about clergy sexual contact with adults, "unless it is in a context in which there is clear relevance."  Tort Claimants' Reply to Debtor's Responses and Objections to Topic Listing for Pattern and Practice Witnesses (Non-Levada) at 11.  As an example, the tort claimants indicate they might want to question witnesses "about a prison chaplain's sexual contact with inmates, be they adolescent boys at MacLaren or young men at Oregon State Correctional Institution."  Id.

The order allowing these pattern and practice depositions was limited to debtor's patterns and practices with regard to sexual abuse of minors.  The tort claimants may inquire into debtor's practices and policies with regard to priest sexual misconduct with minors, not with adults.  If debtor had patterns, practices, or policies with regard to sexual abuse by priests in general, which applied to abuse of both minors and adults, that information would be discoverable.  Information about patterns, practices, or policies relating to sexual abuse of adults is not discoverable, unless the patterns, practices, or policies applied to minors as well.

Debtor also argues that questions should be limited to debtor's patterns and practices regarding misconduct of clergy working within the Portland Archdiocese.  The claims against debtor are based on alleged misconduct by Archdiocesan clergy or non-Archdiocesan clergy who were working in an Archdiocesan ministry, and debtor's response to that conduct.  Evidence of debtor's response to allegations of sexual misconduct with minors by clergy who were either Archdiocesan clergy or

Page 4 -  MEMORANDUM OPINION

were working in the ministry of the Archdiocese is discoverable.  Inquiry
is not limited to clergy who were directly employed by the Archdiocese.
That means that debtor's patterns and practices with regard to
Archdiocesan clergy and clergy who were part of a non-diocesan order but
who were working in the Archdiocese's ministry are discoverable.
Evidence of debtor's response to allegations of sexual misconduct by
clergy outside the Portland Archdiocese (unless the clergy remained
priests of the Archdiocese of Portland when working outside the
Archdiocese) is not relevant, nor is it likely to lead to relevant
evidence, of patterns and practice with regard to allegations of abuse by
Archdiocesan priests or other priests working with an Archdiocesan
ministry.

2.   Evidence of debtor's patterns, practices, and policies after the
     last alleged date of abuse

     Debtor seeks a time limitation on questions, arguing that debtor's
patterns, practices, and policies after the last date of alleged abuse
are irrelevant to its liability for the alleged abuse.  The tort
claimants respond that evidence of continued concealment after the
alleged abuse shows that the concealment was not an accident.

     The tort claimants rely on Rader v. Gibbons & Reed Co., 261 Or. 354,
359 (1972), which holds that "[e]vidence of prior similar occurrences is
admissible under some circumstances in a negligence action."  The Oregon
Supreme Court held that, although evidence of prior acts of negligence
are generally not admissible to prove a specific act of negligence,
"[s]uch evidence is, however, admissible to prove the existence of . . .
a continuing course of negligent conduct, and that the . . . course of

Page 5 -  MEMORANDUM OPINION

conduct is in fact dangerous, or that the defendant had notice of its dangerous character." Id.

They further argue that conduct that occurs after the alleged misconduct can also be relevant to show state of mind, because concealment of misconduct can indicate knowledge that the conduct was negligent. They cite two Oregon cases that upheld the admission of evidence of the defendant's conduct after the alleged negligent conduct. In Joachim v. Crater Lake Lodge, Inc., 48 Or. App. 379 (1980), the Oregon Court of Appeals concluded that evidence that, after the plaintiff became sick from drinking the water at Crater Lake Lodge, the manager of the lodge removed notices that water at the lodge was contaminated provided some evidence that the manager's conduct in failing to warn the public about the contamination was in deliberate disregard of the rights of others. The Court of Appeals held in Stephens v. Bohlman, 138 Or. App. 381 (1996), that evidence that a tortfeasor participated in covering up the true cause of the injury was circumstantial evidence that he believed he had acted negligently.

I will not limit the time frame for questions about debtor's patterns, practices, and policies with regard to dealing with allegations of clergy sexual misconduct with minors. This is discovery. The test is whether the information obtained would be admissible at trial; it is whether the information sought "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Although the relevant time frame for these claims is the time of the alleged misconduct, evidence of debtor's later policies could possibly lead to evidence that would be relevant to the claims of negligence or to

Page 6 -   MEMORANDUM OPINION

establishing debtor's knowledge for purposes of extending the statute of limitations under ORS 12.117(1). If, for example, evidence shows that debtor continued to reassign known pedophile priests to new parishes even after it knew that child molesters are likely to re-offend, that fact would provide some evidence that debtor's earlier reassignment was not merely a mistake or accident. Further, changes in policies after alleged abuse occurred could shed light on what the policies were at the time of the abuse.

Debtor argues that evidence of subsequent actions is relevant only to the issue of punitive damages, which is not currently at issue. I disagree that the relevance is only to punitive damages. As I explained above, evidence that debtor continued a particular practice in light of information about the harmful effects of sexual abuse on children, or changed its policies may lead to relevant evidence about the practices it followed when the abuse occurred.[3]

---

[3] Debtor points out that, at the August 4, 2005 hearing, I denied Mr. Barton's request to inquire into what had happened between 1986 and 1995, saying that it was relevant to punitive damages, which was not yet at issue. From that, debtor argues that I have already ruled that information about what happened during Archbishop Levada's tenure in Portland is relevant only to punitive damages. That is not what I said at the August 4 hearing. According to the portion of the transcript provided by debtor, Mr. Barton argued only that the information was relevant to his punitive damages claim. I denied his request to depose Levada based on his argument that the information would relate only to the punitive damages claim. I did not rule that it could not be relevant to liability; Mr. Barton did not argue that to the court. Transcript of August 4, 2005 deposition of Archbishop Levada at 18-19 (Exhibit A to Declaration of Thomas Dulcich in Support of Debtor's Responses and Objections to Topic Listing of Pattern and Practice Witnesses (Non-Levada)).

(continued...)

Page 7 - MEMORANDUM OPINION

3.  <u>Mental reservation</u>

At the hearing on the objections to the topics for these depositions, the tort claimants argued that they should not be precluded from asking questions about the role of mental reservation in a witness's answer to questions posed.  In simple terms, a person asserting mental reservation may, for moral or ethical reasons, give less than a true answer to a question.

Counsel for Archbishop Levada argued at the hearing that the tort claimants waived any right to ask about mental reservation by not including that topic in their topic lists.  In my view, the question of mental reservation is more of a follow-up question than a particular topic.  The tort claimants may not explore the concept of mental reservation generally or the circumstances under which it may be used, but they may ask whether a particular witness's answer to a question is affected by the exercise of mental reservation.  This is appropriate in order to determine a witness's compliance with the civil oath to tell the truth.

Counsel for Archbishop Levada argues that the tort claimants need not ask about mental reservation, but may simply ask whether the witness has given truthful answers.  Because it would seem that the answer to that question could itself be affected by the exercise of mental

---

[3](...continued)
I note that the tort claimants have a limited amount of time to question these witnesses.  It seems unlikely that they will spend much time exploring matters relating to debtor's conduct that post-dates the last alleged date of abuse, because of the minimal use that type of evidence might be to them.

Page 8 -  MEMORANDUM OPINION

reservation, I conclude that limiting the tort claimants to that type of general truthfulness question is not sufficient under the circumstances of this case.

4.   Internal church governance

     Debtor argues that I should limit deposition questions "that seek to delve into internal church decision-making." Debtor's Objections to Proposed Topics for the Deposition of Archbishop Levada at 12. It asserts that questions inquiring into matters of church governance are protected by the First Amendment's Establishment and Free Exercise clauses, and so should be avoided. The tort claimants argue that there is no such thing as an internal church governance privilege.

     In state law claims litigated in federal court, the federal court applies state privilege law. Fed. R. Evid. 501. Debtor does not point to any Oregon privilege for internal church governance, and there is none.

     However, state privilege law applies "[e]xcept as otherwise required by the Constitution of the United States . . . ." Fed. R. Evid. 501. Debtor argues that questions about church internal governance are prohibited by the First Amendment.

     The First Amendment Establishment and Free Exercise clauses "[prevent] courts from resolving internal church disputes that would require adjudication of questions of religious doctrine." Malicki v. Doe, 814 So.2d 347, 355 (Fla. 2002). See also Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696 (1976); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952). Justice Rehnquist explained, in a one-judge order granting a temporary stay:

Page 9 -  MEMORANDUM OPINION

There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes. But this Court never has suggested that those constraints similarly apply outside the context of such intraorganization disputes. Thus, <u>Serbian Eastern Orthodox Diocese</u> and the other cases cited . . . are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged.

<u>Gen. Council on Fin. and Admin., United Methodist Church v. California Superior Court</u>, 439 U.S. 1369, 1372-73 (1978)(citations omitted). Thus, while "[t]he church autonomy doctrine might insulate the church from the dictates of a secular court regarding liturgy and leadership, . . . it does not permit a church, as a general matter, to cloak its decisions and actions in secrecy when the law requires compliance with the requirements of civil law." <u>Newport Church of the Nazarene v. Hensley</u>, 335 Or. 1, 15 (2002).

The Oregon District Court explained:

> Courts may not, without justification, force religious bodies to abandon their religious beliefs or doctrines in favor of purely secular rules or rule on the appropriateness or correctness of those beliefs or doctrines. However, the mere consideration of religious authorities in an action involving the church and third parties does not necessarily amount to an infringement of the [churches'] religious freedom. A court may look to such evidence to establish the basic purposes or policies of the religion as merely a guide to determining whether a plaintiff has a viable action against the church.

<u>M.K. v. Archdiocese of Portland in Oregon</u>, 228 F.Supp.2d 1168, 1170-71 (D. Or. 2002)(discussing vicarious liability claims against church for sexual abuse by priest).

Page 10 - MEMORANDUM OPINION

In these tort claims, the dispute is not over church doctrine or beliefs, but over liability for misconduct by those in the church's employ. The court is not called upon to resolve any matters of ecclesiastical or theological doctrine. Instead, evidence of internal church policy may be relevant to the question of what the church did at what time in dealing with allegations of sexual abuse of minors by its priests. Thus, the internal church governance doctrine, even if it gave rise to some sort of discovery privilege under some circumstances, is not implicated in these tort claims.

The cases debtor cites do not demonstrate that the First Amendment protects the witness from questions about internal church governance, to the extent the internal workings of the church are pertinent to debtor's patterns, practices, and policies in addressing sexual misconduct with minors by priests. As the court acknowledged in United Methodist Church v. White, 571 A.2d 790 (D.C. App. 1990), cited by debtor, any immunity from discovery or trial exists only under certain circumstances "in order to avoid subjecting religious institutions to defending their religious beliefs and practices in a court of law." 571 A.2d at 792. That case, which involved a minister suing the church for wrongful discharge, does not suggest that internal governance immunity exists in the context of a tort claim for sexual abuse against a church.

Similarly, the court in Word of Faith World Outreach Center Church, Inc. v. Morales, 787 F. Supp. 689, 699 (W.D. Tex. 1992), rev'd on other grounds, 986 F.2d 962 (5th Cir. 1993), recognized that there are limits to the First Amendment's protection of information about the internal operations of a church. The court said that the state's authority to

Page 11 - MEMORANDUM OPINION

1  inquire into internal church operations is not "without limitation or
2  compelling purpose." <u>Id.</u>  It recognized that "[f]ull and complete
3  documentation of the Church's internal affairs" may be permissible, if
4  narrowly drawn to accomplish the purpose of the investigation, which was
5  to determine if the church was obtaining donations fraudulently.  <u>Id.</u> at
6  700.  The case does not say that tort claimants may not inquire into
7  internal church practices and policies in furtherance of their claims for
8  sexual abuse.

9       To the extent the First Amendment protects internal church
10  governance information, that protection does not apply in these claims
11  for sexual misconduct with minors by priests working in debtor's ministry
12  assignments.  The tort claimants will not be precluded from questioning
13  deponents about internal church organization and practices that could
14  bear on debtor's patterns, practices, and policies with regard to
15  allegations of sexual misconduct with minors by Archdiocesan clergy.

16           **SPECIFIC OBJECTIONS TO NON-LEVADA DEPOSITION TOPICS**

17       The scope of each of the topics for the depositions is limited by my
18  ruling, set out above, regarding the general objections to the topics.
19  The term "sexual misconduct" will mean sexual misconduct with minors.
20  "Clergy" means Archdiocesan clergy, including those working outside the
21  Archdiocese, or non-Archdiocesan clergy in an Archdiocesan ministry.  I
22  will address below only those objections that are specific to the
23  individual topics.

24  1.   The sources, scope, and form of Debtor's policies, practices, and
          procedures regarding the manner of responding to allegations of, or
25        to any information suggesting, that a member of the clergy has or
          may have engaged in sexual misconduct.
26

Page 12 - MEMORANDUM OPINION

Subject to the limitations discussed above in the general objections to the topics, the tort claimants may inquire about this topic.

2. Knowledge of accusations involving sexual misconduct against the clergy listed in the unredacted letter containing the subjects for William J. Levada's deposition, together with knowledge of Debtor's responses to those allegations, knowledge of decisions concerning the assignment or reassignment of the clergy, and knowledge of additions or modifications to their personnel file as a result thereof.

Debtor does not raise additional objections, except that some of the names on the list were not in a ministry assignment of the Archdiocese of Portland.  The tort claimants may inquire; the answer may be that the witness does not know anything about that individual or allegations relating to that individual because the individual did not serve in an Archdiocesan ministry.

3. Knowledge of the storage and disposition of records concerning those referenced in No. 2.

No objection.

4. Whether personal practices of the listed witnesses in responding to reports of sexual misconduct by clergy have been consistent with the stated policy of the Roman Catholic Church, U.S. Conference of Catholic Bishops, and/or the Archdiocese.

Debtor originally objected to the term "personal practices," but has since been satisfied as to the meaning of the term.

Subject to the general limitations set out above, the questions should be limited to personal practices of the witnesses in responding to reports of sexual misconduct by Archdiocesan clergy or clergy serving in an Archdiocesan ministry.  This is not seeking an expert opinion.

Debtor objects to the topic as an inquiry into the religious rules of the Roman Catholic Church or other religious entities.  This is an internal church governance objection, which I have overruled.

Page 13 - MEMORANDUM OPINION

5.  Discussions with other officials in the Archdiocese (other than attorneys representing you or the Archdiocese), the USCCB, other dioceses or archdioceses, concerning the destruction of records concerning allegations of sexual misconduct by members of the clergy.

To the extent the objection is that the topic requires inquiry into internal church governance, it is overruled.  As to debtor's objection to the assumption that records have been destroyed, the tort claimants may inquire as to whether there were discussions about destruction of records of debtor, or involving records of an Archdiocesan priest or other priest in an Archdiocesan ministry and who was the subject of a complaint that the priest had engaged in sexual misconduct with minors, whether or not records were actually destroyed.

6.  Information passed along to the listed witnesses by other clergy or other Archdiocesan officials concerning Archdiocesan clergy accused of sexual misconduct.

Debtor seeks to limit this topic to exclude discussions covered by the attorney-client privilege and information received from in-house or outside counsel.  The tort claimants respond that information is not protected by the attorney-client privilege simply because counsel is the conduit for the information.

State privilege law applies to the tort claims, because they are civil proceedings in which state law provides the rule of decision.  Fed. R. Evid. 501.  Oregon's attorney-client privilege is set out in Oregon Rule of Evidence 503.  It protects "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client[.]"  OEC 503(2).  "Confidential communication" is defined as "a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of

Page 14 - MEMORANDUM OPINION

professional legal services to the client or those reasonably necessary for the transmission of the communication." OEC 503(1)(b). To the extent the tort claimants seek information about reports made by a victim of sexual abuse of minors by Archdiocesan clergy or communications between debtor's representatives and the victims, there is no confidential communication made for the purpose of facilitating the giving of legal advice. If that information was routed through counsel, the fact that counsel received the information does not make it privileged. Thus, the tort claimants are entitled to inquire into that topic area.

To the extent the tort claimants seek information relating to legal advice with regard to reports of such sexual abuse, that information is privileged, unless the tort claimants can make some showing that the crime-fraud exception applies. Until they make such a showing, they may not inquire into inquiries to counsel seeking advice or any advice given by counsel.

7. Discussions of the Clergy Personnel Board, Cabinet, or other official Archdiocesan groups about or concerning clergy accused of misconduct, policies concerning the handling of complaints of sexual misconduct by clergy, and reassignment of clergy accused of sexual misconduct.

The scope of this topic, as for all topics, is subject to the general limitations set out above in my discussion of the general objections. Subject to those limitations, the parties agree that information obtained in answer to questions about this topic will be confidential in accordance with the court's protective order entered January 11, 2005 although the information may, in accordance with that order, be shared among counsel for the tort claimants.

Page 15 - MEMORANDUM OPINION

8. Responsibilities of Archdiocesan personnel to investigate reports of sexual misconduct by clergy.

There are no additional objections to this topic.

9. Communication with, and training of, Archdiocesan clergy concerning responses to reports or observations of sexual misconduct by clergy.

There are no additional objections to this topic.

10. Former general counsel Robert McMenamin's advice concerning #9, supra. (Attorney-client privilege has been waived - see In re McMenamin, 319 Or 609, 615 (1994)(Graber, J., dissenting)).

Debtor objects to this topic, arguing that it seeks information covered by the attorney-client privilege. There is no doubt that questions about advice given to debtor by its former counsel seek information that ordinarily would be covered by the attorney-client privilege. The tort claimants argue that the privilege does not apply when, as in this case, the client brings a disciplinary complaint against the lawyer, and that the privilege was waived by its disclosure in the Supreme Court's opinion on the complaint and the dissemination of the bar disciplinary file to members of the public.

OEC 503(4)(c) provides that the privilege does not apply to "a communication relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer[.]" "This exception should be construed narrowly to avoid disclosing any more of the client's confidences than are necessary for the lawyer to defend against the client's claim or obtain redress for breach of duty by the client." Laird C. Kirkpatrick, OREGON EVIDENCE § 503.12[3] (4th ed. 2002).

There are no Oregon cases addressing whether the exception to the attorney-client privilege for communications that are relevant to the breach of a duty by the lawyer to the client extends to matters other

Page 16 - MEMORANDUM OPINION

than the dispute between the attorney and the client.  The language of OEC 503(4)(c) is quite plain, however, and appears to remove the privilege for those communications within its scope.  There is no rule or principle that would re-impose the privilege for such communications, once they are excepted from the privilege because of a breach of duty claim.

The Oregon rule, which excepts such communications from the privilege, is different from the implied waiver of privilege that the Ninth Circuit has discussed under the federal common law privilege.  In <u>Bittaker v. Woodford</u>, 331 F.3d 715 (9th Cir. 2003), a defendant in a federal habeas corpus case raised the issue of ineffective assistance of counsel.  The district court entered a protective order that precluded use of privileged attorney-client communications for any purpose other than the habeas corpus petition.  The state appealed, asserting that, once the client waived the attorney-client privilege by claiming ineffective assistance of counsel, the privilege was waived for all purposes, including use in a subsequent re-trial of the murder charges. The circuit held that a client's waiver of the privilege by putting the attorney's performance at issue was an implied, not an express, waiver. Although a privilege no longer exists when it is expressly waived, implied waiver is different, and must be limited to its purpose. Therefore, the court held that the district court did not err in imposing the protective order.

Under Oregon law, there is no waiver; the privilege simply does not apply to communications that are "relevant to an issue of breach of duty by the lawyer to the client . . . ." OEC 503(4)(c).  That language is

Page 17 - MEMORANDUM OPINION

1  unambiguous, and says that there is no privilege that applies to the

2  communications that relate to debtor's complaint about McMenamin to the

3  Oregon State Bar.

4      The attorney-client privilege continues to apply to advice McMenamin

5  gave debtor on matters other than those relating to the bar complaint.

6  The topic as the tort claimants set it out adequately limits the subject

7  matters about which they may inquire.

8  11.  Knowledge of communications in any form between representatives of
         the Debtor and the Holy See (including the Congregation of the

9       Doctrine of the Faith and the Congregation for the Clergy), the
         Papal Nuncio, the USCCB and predecessor entities, and other dioceses

10      or archdioceses concerning allegations of sexual misconduct against
         individual clergy, as well as concerning the policies, practices,

11      and procedures regarding the manner of responding to allegations of,
         or to any information suggesting, that a member of the clergy has or

12      may have engaged in sexual misconduct.

13      Debtor raises three objections to this topic.  First, it argues that

14  the topic would violate the privilege for confidential communications to

15  clergy under OEC 506.  OEC 506(2) provides:

16          (2) A member of the clergy may not be examined as to any
             confidential communication made to the member of the clergy in the

17          member's professional character unless consent to the disclosure of
             the confidential communication is given by the person who made the

18          communication.

19  A confidential communication is "a communication made privately and not

20  intended for further disclosure except to other persons present in

21  furtherance of the purpose of the communication." OEC 506(1)(a).  A

22  member of the clergy for purposes of the privilege is "a minister of any

23  church, religious denomination or organization . . . who in the course of

24  the discipline or practice of that church, denomination or organization

25  is authorized or accustomed to hearing confidential communications and,

26  under the discipline or tenets of that church, denomination or

Page 18 - MEMORANDUM OPINION

organization, has a duty to keep such communications secret."  OEC
506(1)(b).

Thus, the privilege extends to communications with clergy, not with
other employees, agents, or officials of the church who are not clergy.

Even with regard to clergy, not all communications, even those made
privately and in confidence, are subject to the privilege; only those
confidential communications that are made to a clergy member "in the
member's professional character" are protected.  The language is
ambiguous; the question is what "in the member's professional character"
means.

OEC 506 was enacted in 1981, and was "intended to restate existing
Oregon law."  Legislative Commentary to Rule 506, reprinted in Laird C.
Kirkpatrick, OREGON EVIDENCE § 506.02 (4th ed. 2002).  "The privilege
allows and encourages individuals to fulfill their religious, emotional
or other needs by protecting confidential disclosures to religious
practitioners."  Id.

Before 1981, the privilege was set out in ORS 44.040(1)(c), and
applied only to confessions made to a clergyman "in his professional
character."  Former ORS 44.040(1)(c), set out in State v. Forsyth, 20 Or.
App. 624, 636 (1975).

In light of the purpose of the privilege, and the fact that it was
originally directed at confession, I conclude that it should be applied
only to communications that are made to a clergy person acting in the
capacity of a spiritual advisor.

This is consistent with cases from other states that have similar
privilege statutes.  Although the language of those privilege statutes

Page 19 - MEMORANDUM OPINION

may vary, on this point they seem to be interpreted relatively consistently. See, e.g., Masquat v. Maquire, 638 P.2d 1105 (Okla. 1981)(communication with Catholic nun in her capacity as hospital administrator not within the privilege); Bonds v. State of Arkansas, 837 S.W.2d 881 (Ark. 1992)(communication with minister who was also defendant's employer not privileged, because the communication was in minister's capacity as employer, not spiritual advisor); State of New Jersey v. Cary, 751 A.2d 620 (N.J. App. 2000)(communication with church deacon who was also police officer not privileged, as the deacon was performing at least partially secular function as law enforcement officer at time of communication). See also State of Washington v. Martin, 975 P.2d 1020, 1026 n.65 (Wash. 1999)(listing cases where communication with clergy was in other than professional capacity as clergy).

In Commonwealth of Pennsylvania v. Stewart, 690 A.2d 195, 198 (Pa. 1997), the court noted that "the mere fact that a communication is made to a member of the clergy, or that documentation is transmitted to a member of the clergy, is not sufficient alone to invoke the privilege." The court pointed out that nearly every jurisdiction in the United States has a clergy-penitent privilege, "which requires the communication to have been motivated by penitential or spiritual considerations." Id. Because the statutes require that the communication be made to clergy members in the course of the discipline enjoined by the clergy's denomination, the privilege has been applied only to clergy when they are "acting in a spiritual capacity." Id. at 198-99. The court said: "Our review of the relevant case law reveals no jurisdiction extending the privilege to communications that are not penitential or spiritual in

Page 20 - MEMORANDUM OPINION

nature." Id. at 200.

Oregon's statute includes the restriction regarding the discipline of the denomination; "member of the clergy" is defined as "a minister of any church . . . who in the course of the discipline or practice of that church . . . is authorized or accustomed to hearing confidential communications and, under the discipline or tenets of that church, . . . has a duty to keep such communications secret." OEC 506(1)(b). Thus, the requirement that the communication relate to the seeking of spiritual advice should apply equally under the Oregon privilege statute.

Thus, communications, even those the person intends to be confidential, are not protected by the privilege unless they are made to the clergy person in the furtherance of obtaining spiritual advice. Under this view, communications to persons, even members of the clergy, who at the time of the communication were acting as employers or administrators or in other, non-spiritual capacities, are not privileged.

The tort claimant should be able to inquire into the witnesses' knowledge of communications between representatives of the debtor and other religious organizations or personnel on the subject matter set out in the topic (as limited by my ruling on the general objections), unless that communication was made to a clergy person in furtherance of spiritual advice.

Debtor also objects on the basis of internal church governance. I have already rejected that objection.

Finally, debtor objects on the basis of attorney-client privilege. Debtor does not explain how answering questions related to this topic would invade the attorney-client privilege. The tort claimants may

Page 21 - MEMORANDUM OPINION

inquire into the topic.

12.   Understanding of what Canons and religious doctrine governed
      Debtor's responses to allegations of sexual misconduct by clergy.

Debtor objects to this topic, arguing that it impermissibly inquires into the reasonableness of religious rules and what is adequate compliance with those rules. I agree with the tort claimants that there is no basis for precluding them from asking questions about the subject. The questions could lead to evidence shedding light on the reasons why debtor responded to allegations of clergy sexual abuse of minors in the way it did. That is clearly relevant to the issues in these claims. Further, simply asking the questions cannot infringe on any First Amendment rights. There is no privilege to keep religious doctrine secret.

13.   The hierarchy of the Archdiocese, including officials and other
      persons responsible for assigning and reassigning clergy,
      disciplining clergy, transferring clergy, and responding to reports
      of sexual misconduct by clergy. Also, those officials and other
      persons responsible for recommending same to the Archbishop.

Debtor does not object to this topic of inquiry, assuming that the tort claimants mean to ask about debtor's internal structure with respect to dealing with complaints of sexual misconduct with minors. By the tort claimants' failure to respond to debtor's assumption, it appears they agree that the questions will relate to debtor's internal structure with respect to dealing with complaints of sexual misconduct with minors.

14.   The Archdiocese's policies and practices regarding reporting child
      abuse to civil authorities.

Debtor has no objections to this topic, other than limiting it to knowledge of the witnesses while within the Archdiocese of Portland. The tort claimants may inquire about any information the witnesses have

Page 22 - MEMORANDUM OPINION

regarding Archdiocesan policies and practices, regardless of the time frame to which that information relates.

15. Knowledge of the 1962 "Instruction About the Manner of Proceeding in Cases of the Crime of Solicitation."

Debtor objects to this topic, arguing that it raises constitutional concerns. I disagree. First, as I have already explained, the tort claimants are not precluded from asking questions about internal church governance or laws. Second, the document about which the tort claimants seek to inquire could lead to discovery of relevant evidence, if it was a document that was transmitted to the Archdiocese or provided some basis for the Archdiocese's practices or policies with regard to the types of sexual abuse claims at issue here.

Debtor also argues that Archbishop Levada testified that he had not seen the document and, therefore, the other witnesses would also not have seen the document. There is no reason to believe that, simply because one witness has not seen a document, other witnesses also have not seen it. The tort claimants can ask about this topic.

16. Assistance provided, and responses in general, to persons who reported sexual misconduct by clergy.

Debtor has no additional objections to this topic.

17. Policies, practices, and procedures regarding the maintenance, control, and purging of priest personnel and *sub secreto* files and whether those policies, practices, and procedures were consistent with those of the Roman Catholic Church and/or the USCCB (or its predecessor entities); and adherence to such policies and procedures.

Debtor objects to this topic to the extent it could relate to policies, practices, and procedures of religious organizations other than the Archdiocese of Portland. I agree that inquiry into organizations

Page 23 - MEMORANDUM OPINION

1  other than the Archdiocese of Portland would not likely lead to
2  discoverable evidence.  The topic should be so limited.

3      Debtor also claims that the topic involves church law or church
4  rules and so is outside the scope of discovery.  I have already rejected
5  that argument.

6      Finally, debtor objects to the "pejorative assumption" arising from
7  the use of the word "purging."  This is discovery; I will not prohibit
8  inquiry into this topic simply because debtor does not like the tone set
9  by the language used in the topic listed.

10 18.  The nature and scope of any oath of secrecy taken in investigating
        or prosecuting accusations of sexual misconduct by clergy, and the
11      role of "mental reservation" in adhering to that oath.

12      Debtor objects to this topic on the basis that it relates to an
13 attempt to impose civil liability for damages measured by a religious
14 organization's compliance with its religious rules.  This is simply
15 another iteration of the internal church governance argument, which I
16 have rejected.

17      The tort claimants may inquire whether the witnesses have taken any
18 oath of secrecy relating to investigating or prosecuting accusations of
19 sexual misconduct by clergy, because that could bear on the quality of
20 the answers they give to questions about what they did or knew at a
21 particular time with regard to sexual abuse allegations.  The tort
22 claimants may also ask about whether answers given in the deposition are
23 affected by the exercise of mental reservation.  As I explained above,
24 however, they may not inquire into mental reservation generally, but only
25 as relates to questions posed in these depositions.

26 19.  Communications, or knowledge of communications, with parish priests

Page 24 - MEMORANDUM OPINION

1    and/or other parish employees or representatives of parishes or
2    schools when returning a priest who had been previously accused of
     sexual misconduct to a parish or school ministry or position.

3        Debtor does not have any additional objections to this topic, so

4    long as it is limited to communications involving priests in an

5    Archdiocesan ministry.  The tort claimants argue that there should be no

6    geographical limitation, because the tort claimants are entitled to know

7    whether the witness responded differently under these circumstances

8    depending on whether the witness was in the Portland Archdiocese or

9    elsewhere.  I fail to see how information about how witnesses responded

10   when they were outside the Portland Archdiocese is likely to lead to

11   relevant information.  The topic will be limited to the witnesses'

12   communications or knowledge of communications while the witness was at

13   the Portland Archdiocese.

14   20.  The witnesses' personal philosophies regarding clergy sexual
          misconduct, i.e. whether it is a spiritual or a criminal problem,
15        and how it is best addressed.

16       Debtor objects to this topic on the basis that this line of inquiry

17   has no relevance to the pending claims.  I agree.  The question in these

18   tort claims is what debtor knew and did with regard to sexual misconduct

19   with minors by priests in an Archdiocesan ministry.  The witnesses'

20   personal beliefs are not relevant, nor are they likely to lead to

21   relevant evidence of what they, as representatives of debtor, knew or

22   did.  The tort claimants may inquire about what the witnesses knew or

23   did.  They may ask why the witnesses did what they did.  They may not,

24   however, inquire generally into the witnesses' personal philosophies

25   about clergy sexual misconduct.  What is relevant is what the witnesses

26   knew or did, not what their personal philosophies are.


Page 25 - MEMORANDUM OPINION

**ARCHBISHOP LEVADA**

Debtor, joined by Archbishop Levada, raises many of the same objections to the proposed topics for deposition of Archbishop Levada as to the proposed topics for the other pattern and practice deposition witnesses.[4]  My ruling on those issues is the same for Archbishop Levada's deposition as it is for the other witnesses.

Archbishop Levada raises several general objections, which I will address before I address each of the topics individually.

1.  <u>Evidence relating to Archbishop Levada's knowledge or practices other than during his tenure as Archbishop of Portland</u>

Archbishop Levada was Archbishop of Portland from 1986 through 1995. Debtor seeks to limit deposition questions to the extent that they seek to inquire into Archbishop Levada's knowledge or activities before or after his tenure as Archbishop of Portland, arguing that information about his knowledge or activities other than when he was Archbishop of Portland is irrelevant to the claims at issue in these adversary proceedings.  For the moment, I will not discuss questions about his work at the Congregation for the Doctrine of the Faith.  My discussion in this section relates only to Archbishop Levada's knowledge or activities other than those that were obtained or occurred at the Congregation for the Doctrine of the Faith.

---

[4]    Debtor recognizes that it has no standing to object to questions directed to Archbishop Levada.  Debtor's Objections to Proposed Topics for the Deposition of Archbishop Levada at 12:5-6.  However, Archbishop Levada has joined in debtor's memoranda filed on July 25, 2005, August 1, 2005, and October 21, 2005 and adopts those arguments as his own.  Archbishop Levada's Joinder in Holy See's Motion to Modify Subpoena and Archdiocese Response, filed October 24, 2005.  Therefore, I will consider the arguments made by debtor as being made by the witness.

Page 26 – MEMORANDUM OPINION

As Archbishop of Portland, Archbishop Levada effectively controlled the corporation that is the defendant in these tort claims. Thus, his knowledge and activities while in Portland are relevant to proof of debtor's knowledge, patterns, practices, and policies with regard to child sexual abuse by clergy.

After Archbishop Levada left Portland, he may have communicated with the new archbishop or other representatives of the Archdiocese of Portland on matters pertaining to what had occurred during his tenure in Portland or what was occurring in Portland after he left. The tort claimants may seek information from Archbishop Levada that relates to the time post-dating his tenure in Portland, provided it is related to the Portland Archdiocese. They may not inquire about his activities or obtain other information that is unrelated to what was happening in Portland after he left.

As for Archbishop Levada's activities that pre-date his tenure in Portland, the question is more difficult. Because Archbishop Levada controlled the debtor once he came to Portland, whether he knew that child sexual abuse was damaging and the practices or policies that he followed or implemented while in Portland are certainly relevant. However, Archbishop Levada engaged in activities before he came to Portland that may have affected his knowledge of the issue of sexual abuse by clergy in general, and his actions with regard to such issues, when he arrived here. Because debtor's knowledge of the existence of claims of sexual abuse among clergy and the reasonableness of its response to such claims is relevant to the extension of the statute of limitations for child abuse claims in Oregon and the negligence claims,

Page 27 - MEMORANDUM OPINION

questioning Archbishop Levada about his knowledge of the subject could lead to admissible evidence in this litigation.

Subject to the limitations imposed in my discussion in the next section, the tort claimants may ask Archbishop Levada what he knew at the time he arrived at his Portland post of the problem of sexual abuse of minors by clergy, and whether he had policies or practices that he planned to or did implement when he got here. The tort claimants are entitled to inquire about how he obtained any such information, and whether his pre-Portland activities influenced his views during his tenure in Portland on how to handle claims of sexual abuse of minors by clergy.[5]

2.  <u>Questions relating to Archbishop Levada's tenure at the Congregation for the Doctrine of the Faith</u>

Archbishop Levada raises numerous objections to any questions that seek to elicit information about his activities and communications while serving at the Congregation for the Doctrine of the Faith at the Holy See. He is currently serving as Prefect of that body. My understanding is that he also served in some capacity with that body in the late 1970s and early 1980s. The tort claimants have stipulated that they will not ask questions about Archbishop Levada's current work, or decisions made during his current tenure at the Congregation for the Doctrine of the Faith. Therefore, it is unnecessary for me to decide whether certain

---

[5] The time frame that is appropriate for questioning Archbishop Levada is broader than it is for the other witnesses, because Archbishop Levada effectively controlled the debtor while he was Archbishop of Portland, so what he knew and did before he came to Portland could bear on what he knew and did when he arrived here.

Page 28 - MEMORANDUM OPINION

immunities would apply to protect him from being compelled to answer such questions.

The tort claimants do seek to ask questions about Archbishop Levada's work and information he obtained during his earlier tenure at the Congregation for the Doctrine of the Faith, which occurred before he became the Archbishop of Portland. They argue that his work there is relevant to these tort claims against the Archdiocese of Portland, because he later became the Archbishop of Portland, whose knowledge and attitudes are relevant.

Archbishop Levada argues that he should be protected from questions about this information for numerous reasons, including application of the Federal Sovereign Immunity Act, comity with the law of the Holy See, and various governmental privileges.

I conclude that he is entitled to protection from questions regarding his internal communications and acts at the Congregation for the Doctrine of the Faith, because it would cause an undue burden on him to compel him to answer such questions.

There does not seem to be any dispute that the Holy See's rules require persons serving at the Congregation for the Doctrine of the Faith to observe confidentiality and not disclose any information about what the person has done during or learned through that service. This includes protecting from disclosure any information about acts and proceedings related to matters treated by the Congregation. The consequence of disclosure in violation of this rule can be excommunication, house arrest for up to five years, and deprivation of any ecclesiastical office.

The Federal Rules of Civil Procedure allow a court to issue a protective order or modify a subpoena if the discovery sought in an action would be an undue burden on the person from whom discovery is sought. Fed. R. Civ. P. 26(c)(4); 45(c)(3)(A)(iv) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7026 and 9016). Whether or not the information sought might be relevant or lead to discovery of admissible evidence, and whether or not it is protected by some immunity or privilege, I will not require Archbishop Levada to answer questions that could potentially cause him to be excommunicated, arrested, or stripped of his authority in the church. That is an undue burden.

Archbishop Levada is not a party to this action. His tenure as Archbishop of Portland began after the last alleged abuse in the pending claims occurred. There is no indication that his internal communications and acts at the Congregation for the Doctrine of the Faith had any direct relationship to the patterns, practices, and policies of the Archdiocese of Portland during the time the alleged abuse was occurring.

The tort claimants will be precluded from asking any questions relating to internal communications and acts at the Congregation for the Doctrine of the Faith during Archbishop Levada's tenure, whenever that tenure occurred. This restriction applies only to what he learned and did at the Congregation for the Doctrine of the Faith. It does not mean that the tort claimants are precluded from asking questions about a particular subject merely because it was discussed while Archbishop Levada was at the Congregation for the Doctrine of the Faith, if the subject later arose in a different context, such as while he was Archbishop of Portland. He also may be asked why he did what he did

Page 30 - MEMORANDUM OPINION

while he was in Portland.  He need not disclose in his answers any reasons based on what he learned at the Congregation for the Doctrine of the Faith.

The tort claimants may ask questions about any actions Archbishop Levada may have taken while he was working at the Congregation for the Doctrine of the Faith with regard to issuance of any general policies or directives from that Congregation to the church in the United States that related to sexual abuse of minors by priests.  There is no indication that the oath of secrecy for work at the Congregation for the Doctrine of the Faith includes work in communicating general directives to the wider church body.  If Archbishop Levada was involved in disseminating general directives that were issued from the Congregation for the Doctrine of the Faith to the Catholic Church in the United States, not related to specific allegations or instances of misconduct, the tort claimants are entitled to learn about it.

Archbishop Levada argues that the tort claimants should also be precluded from asking questions about the pattern and practice of the Roman Catholic Church.  Because the argument is included with the arguments about questions relating to work at the Congregation for the Doctrine of the Faith, it is not clear what precisely the objection is. It apparently relates to topics #4 and 20, which refer to whether the personal practices of Archbishop Levada in responding to reports of sexual misconduct with clergy were consistent with the stated policy of the Roman Catholic Church (Topic #4), and whether the policies, practices, and procedures of debtor with regard to priest personnel and *sub secreto* files were consistent with those of the Roman Catholic Church

Page 31 - MEMORANDUM OPINION

(Topic #20).

I assume that Archbishop Levada's argument against these questions rests in his concern that he will be questioned about policies of the Roman Catholic Church that he learned while working at the Congregation for the Doctrine of the Faith. Except for general policies of the church regarding sexual abuse of minors by priests that were communicated to the wider church body, those questions are precluded under my ruling that such questions would cause undue burden to the witness. I will not preclude the questions to the extent they simply ask about whether his or debtor's practices or policies were consistent with those of the Roman Catholic Church. The questions about consistency of debtor's practices or policies with practices or policies of the Roman Catholic Church are limited to debtor's practices or policies during his tenure as Archbishop of Portland. His opinion about whether debtor's practices or policies were consistent with the policies of the Roman Catholic Church at other times is seeking an expert opinion. He has not been retained as an expert.

3. <u>Privileges</u>

Archbishop Levada also seeks a ruling that he is entitled to raise numerous privilege objections, including objections based on Oregon's clerical privilege, as well as the deliberative process privilege, the confidential report privilege, the judicial privilege, the self-critical analysis privilege, and the attorney-client privilege and work product doctrine.

A. <u>Clergy privilege</u>

As I explained above in ruling on the objections to the topics for

Page 32 - MEMORANDUM OPINION

the other witnesses, Oregon privilege law applies in this matter.  <u>See</u>

Fed. R. Evid. 501.[6]  I have rejected the argument that Oregon's privilege

for communications with clergy, set forth in OEC 506(2), applies to all

confidential communications with clergy.  The rule requires that the

communications with clergy be "in the [clergy] member's professional

character," which I interpret to mean in his role as spiritual advisor.

Therefore, the tort claimants will not be precluded from seeking

information set out in Topic # 11 (which is the topic to which I assume

this objection relates) about communications Archbishop Levada had on the

subject, so long as those communications were not made for the purpose of

obtaining or providing spiritual advice, including confession.

    B.   <u>Deliberative process privilege, confidential report privilege,</u>
           <u>judicial privilege</u>

    I understand these objections to relate solely to Archbishop

Levada's work at the Holy See and the Congregation for the Doctrine of

the Faith.[7]  They relate to the exercise of governmental functions, and

do not exist under Oregon law.  Because the tort claimants will be

precluded from asking questions about Archbishop Levada's communications

_____

    [6]    Archbishop Levada argues that other privilege law applies with
regard to questions about his work at the Congregation for the Doctrine
of the Faith.  Because he will not be asked any questions about that
work, I need not consider whether other privilege law might protect
against such inquiries.

    [7]    The topic heading in Archbishop Levada's memorandum is
"Questions Regarding the Inner Workings of the Holy See are Barred by the
Deliberative Process Privilege and the Confidential Report Privilege."
The Holy See's Memorandum of Points and Authorities in Support of Motion
to Modify Subpoena at 30.  He argues that the judicial privilege applies
because the Congregation for the Doctrine of the Faith "has a judicial
function."  <u>Id.</u> at 34.

Page 33 – MEMORANDUM OPINION

1  and activities at the Congregation for the Doctrine of the Faith, there
2  will be no basis for him to assert these privileges.

3      C.  Self-critical analysis privilege

4      Archbishop Levada argues that, "[t]o the extent that Tort Claimants'
5  questions attempt to elicit [information covered by the self-critical
6  analysis privilege], Archbishop Levada is entitled to invoke the
7  privilege."  The Holy See's Memorandum of Points and Authorities in
8  Support of Motion to Modify Subpoena at 36.  However, he does not point
9  to any Oregon privilege for questions about self-critical analysis.  Nor
10 does he point to any topics that would raise the self-critical analysis
11 issue.  The tort claimants are limited to asking questions relating to
12 the topics that they have submitted and any reasonable follow-up
13 questions.  Because Archbishop Levada does not point to any questions
14 that would seek to elicit information covered by the privilege, and
15 because he has not shown that the privilege exists in Oregon, he is not
16 entitled to object based on the self-critical analysis privilege.

17     D.  Attorney-client privilege and work product doctrine

18     I have discussed the attorney-client privilege issue above in
19 relation to the other pattern and practice witnesses.  The same analysis
20 and ruling applies to questions posed to Archbishop Levada.  The only
21 topic that would cover questions relating to matters that might be
22 privileged is Topic # 10, which involves advice given to Archbishop
23 Levada by Robert McMenamin concerning communication with and training of
24 Archdiocesan clergy concerning responses to reports or observations of
25 sexual misconduct by clergy.

26     As for work product, Archbishop Levada does not point to any topic

Page 34 - MEMORANDUM OPINION

1   that arguably raises the work product issue.  Because the tort claimants

2   are limited to the topics included in the list and any reasonable follow-

3   up questions, there should be no work product issue.

4                **SPECIFIC OBJECTIONS TO TOPICS FOR ARCHBISHOP LEVADA**

5           As with the topics for the other pattern and practice witnesses, the

6   scope of the topics for Archbishop Levada is limited by my ruling, set

7   out above, that any reference to "sexual misconduct" shall mean sexual

8   misconduct with minors.  References to "clergy" means Archdiocesan

9   clergy, including those working outside the Archdiocese, or other clergy

10  working in a ministry of the Archdiocese of Portland, and not to conduct

11  or practices in other dioceses or geographic locations.  The time and

12  geographic limits are as set out above in my discussion of the general

13  objections to topics for Archbishop Levada's deposition.

14          These rulings address most of the specific objections raised to the

15  particular topics.  I will discuss below only those additional objections

16  to particular topics.

17  1.  The sources, scope, and form of Debtor's policies, practices, and
        procedures regarding the manner of responding to allegations of, or
18      to any information suggesting, that a member of the clergy has or
        may have engaged in sexual misconduct.
19
        No additional objections.
20
21  2.  Knowledge of accusations involving sexual misconduct against [a
        redacted list of] clergy working in the Archdiocese, together with
22      knowledge of Debtor's responses to these allegations, knowledge of
        decisions concerning the assignment or reassignment of the clergy,
23      and knowledge of additions or modifications to their personnel file
        as a result thereof.

24          Debtor objects to questions about names on the list that he says

25  were not part of an Archdiocesan ministry.  If the witness is not

26  familiar with the name on the list, he may so testify.  The fact that he

Page 35 - MEMORANDUM OPINION

may not know who the person is does not preclude the tort claimants from asking the question.

3. Knowledge of the storage and disposition of records concerning those listed in No. 2.

No additional objections.

4. Whether personal practices in responding to reports of sexual misconduct by clergy have been consistent with the stated policy of the Roman Catholic Church, U.S. Conference of Catholic Bishops, and/or the assigned dioceses or Archdioceses.

Debtor is apparently satisfied with the tort claimant's explanation of what is meant by "personal practices."

The tort claimants may ask whether Archbishop Levada's personal practices in responding to reports of sexual misconduct by clergy, whether before or during his tenure as Archbishop of Portland, was consistent with the policies stated in the topic. They may not ask about Archbishop Levada's personal practices after he left the Archdiocese of Portland.

5. Discussions with other officials in the Archdiocese (other than attorneys representing you or the Archdiocese), the USCCB, other dioceses or archdioceses, the Congregation of the Doctrine of Faith, and/or the Congregation for the Clergy concerning the destruction of records concerning allegations of sexual misconduct by members of the clergy.

The tort claimants are precluded from asking Archbishop Levada about internal discussions he had while serving at the Congregation for the Doctrine of the Faith. They are not precluded from asking Archbishop Levada about discussions he may have had with representatives of the Congregation for the Doctrine of the Faith before or after his tenure with that Congregation that relate to the subject matter set out in the topic, as limited by my ruling on the general objections.

Page 36 - MEMORANDUM OPINION

6. Information passed along to you by Archbishop Power or other officials of the Archdiocese upon your appointment as Archbishop of Portland concerning clergy accused of sexual misconduct.

Archbishop Levada objects to this topic of inquiry, arguing that the question was already asked and answered at his earlier deposition. That a question has been asked and answered in a separate deposition is not a basis for limiting the scope of this deposition.

7. Discussions of the Clergy Personnel Board, Cabinet, and other official Archdiocesan groups about or concerning clergy accused of misconduct, policies concerning the handling of complaints of sexual misconduct by clergy, and reassignment of clergy accused of sexual misconduct.

No additional objections.

8. Responsibilities of Archdiocesan personnel to investigate reports of sexual misconduct by clergy.

No additional objections.

9. Communication with, and training of, Archdiocesan clergy concerning responses to reports or observations of sexual misconduct by clergy.

No additional objections.

10. Former general counsel Robert McMenamin's advice concerning #9, *supra*. (Attorney-client privilege has been waived -- *see* <u>In re McMenamin</u>, 319 Or 609, 615 (1994)(Graber, J., dissenting)).

This topic was discussed above with regard to the topics for the other witnesses. The tort claimants may inquire about McMenamin's legal advice with regard to communication with, and training of, Archdiocesan clergy concerning responses to reports or observations of sexual misconduct by clergy, because there is no privilege for matters pertinent to the bar complaint.

11. Knowledge of communications in any form between representatives of the Debtor and the Holy See (including the Congregation of the Doctrine of the Faith and the Congregation for the Clergy), the Papal Nuncio, the USCCB and predecessor entities, and other dioceses or archdioceses concerning allegations of sexual misconduct against

1    individual clergy, as well as concerning the policies, practices,
2    and procedures regarding the manner of responding to allegations of,
     or to any information suggesting, that a member of the clergy has or
3    may have engaged in sexual misconduct.

4    This topic is not limited by the clergy privilege in Oregon.  It is,

5    however, limited to knowledge obtained or communications made during

6    times other than when Archbishop Levada was at the Congregation for the

     Doctrine of the Faith, unless those communications related to general
7
     policies communicated to the wider church body, or relate to subjects
8
     that came up in contexts outside the Congregation for the Doctrine of the
9
     Faith.
10
11   12.  Understanding of what Canons and religious doctrine governed
          Debtor's response to allegations of sexual misconduct by clergy.

12       Archbishop Levada argues that this topic seeks his expert opinion

13   about canon law and religious doctrine.  I agree, to the extent the topic

14   relates to any time period other than when Archbishop Levada was

15   Archbishop of Portland.  His understanding of what canons and religious

16   doctrine governed debtor's response when he was not the Archbishop of

17   Portland would require him to give an expert opinion.  He has not been

18   retained as an expert, and need not answer questions seeking his expert

19   opinion.

20       Questions about what canons and doctrine governed debtor's response

21   to allegations of sexual misconduct by clergy while Archbishop Levada was

22   Archbishop of Portland do not seek expert opinion.  They are not seeking

23   to determine what canon law or religious doctrine is, other than as it

24   formed a basis for debtor's responses.  The tort claimants may inquire

25   into this topic, but limited to Archbishop Levada's tenure in Portland.

26   13.  The hierarchy of the Archdiocese, including officials and other

Page 38 - MEMORANDUM OPINION

persons responsible for assigning and reassigning clergy, disciplining clergy, transferring clergy, and responding to reports of sexual misconduct by clergy. Also, those officials and other persons responsible for recommending same to the Archbishop.

No additional objections.

14. Role in the presentation of the 1985 report prepared by Fr. Thomas Doyle, Fr. Michael Peterson, and attorney Ray Mouton to the Conference of Catholic Bishops, and the responses received by officials of that organization.

15. The discussions, preparations, and approval that went into the "Restoring Trust" publication of 1994 and the canonical procedures set forth therein.

16. The discussions, preparations, and approval that went into the "Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons" in 2002 and the canonical procedures set forth therein.

Archbishop Levada objects to Topics # 14, 15, and 16 on the grounds that they raise constitutional questions. I have rejected that argument in my discussion above.

He also objects because the topics are unrelated to the claims at issue in this case, which occurred at the latest in 1985. I have also rejected that argument, because information about debtor's policies and actions after the last alleged abuse could lead to discoverable evidence of what debtor's policies and knowledge were during the time the abuse was alleged to have occurred.

However, the topics do not simply relate to the existence of the referenced documents; they seek information about Archbishop Levada's involvement in creating or approving them. Because Archbishop Levada's pre-Portland conduct is relevant, I will allow the tort claimants to ask about the 1985 report. Because the 1994 "Restoring Trust" publication appears to have been produced while Archbishop Levada was in Portland,

Page 39 - MEMORANDUM OPINION

they may also ask about that topic.

For the 2002 document, however, I have already said that Archbishop Levada's activities that post-dated his Portland tenure are not discoverable, unless they relate specifically to practices or policies that were communicated to or from the Archdiocese of Portland. The process that went into the approval of the 2002 document is unlikely to lead to admissible evidence on these tort claims. The tort claimants may not ask about the 2002 document, other than to ask if Archbishop Levada had any communications with the Portland Archdiocese about it and, if so, what that communication was.

17. The Archdiocese's policies and practices regarding reporting child abuse to civil authorities.

No additional objections.

18. The 1962 "Instruction About the Manner of Proceeding in Cases of the Crime of Solicitation," marked as Exhibit 2 (Latin) and Exhibit 3 (English translation) during the April 7, 2004 deposition.

Archbishop Levada objects to this topic, because he testified at his earlier deposition that he had never seen the document. That is not the basis for precluding the topic. If he has not seen the document and has no information about or knowledge of it, he can so testify.

He also objects because the document has no connection to these claims or to Archbishop Levada's tenure in Portland. I have already held that Archbishop Levada may be asked about information or knowledge that pre-dated his tenure in Portland. According to debtor, the claims at issue in this litigation are based on conduct that occurred in the 1950s through the 1980s. Thus, a 1962 document relates to the time frame of the claims at issue here.

Page 40 - MEMORANDUM OPINION

19.   Assistance provided, and responses in general, to persons who
      reported sexual misconduct by clergy during your tenure as
      Archbishop of Portland.

      No additional objections.

20.   Policies, practices, and procedures regarding the maintenance,
      control, and purging of priest personnel and *sub secreto* files;
      whether those policies, practices, and procedures were consistent
      with those of the Roman Catholic Church, the USCCB (or its
      predecessor entities), and/or other dioceses and archdioceses; and
      adherence to such policies and procedures.

This topic is limited to information about Archbishop Levada's

policies, practices, and procedures other than when he was at the

Congregation for the Doctrine of the Faith.  The tort claimants may ask

whether the policies, practices, and procedures of debtor during the time

Archbishop Levada was Archbishop of Portland were consistent with those

of the Roman Catholic Church.  They may not inquire about consistency for

periods when he was not in Portland, as that would constitute an expert

opinion.

21.   The nature and scope of the oath of secrecy you took while working
      at the Congregation of the Doctrine of the Faith, and the role of
      "mental reservation" in adhering to that oath.

Because I have concluded that the tort claimants may not question

Archbishop Levada about his activities at the Congregation for the

Doctrine of the Faith, the nature and scope of any oath of secrecy he

took for his work at the Congregation for the Doctrine of the Faith is

not relevant to this litigation, and is not likely to lead to

discoverable evidence.

As I held with regard to the other deposition witnesses, this does

not preclude the tort claimants from asking whether answers to particular

questions are influenced by Archbishop Levada's exercise of mental

Page 41 - MEMORANDUM OPINION

1    reservation.

2    22.   Your communication, or communication at your direction, with parish
           priests and/or other parish employees or representatives of parishes
3          or schools when returning a priest who had been previously accused
           of sexual misconduct to a parish or school ministry or position.
4
           No additional objections.
5
6    23.   Your personal philosophy regarding clergy sexual misconduct, i.e.
           whether it is a spiritual or a criminal problem, and how it is best
7          addressed.

8          Archbishop Levada argues that inquiry into his personal philosophy

9    has no relevance to the pending claims.  I agree.  As I explained in

     ruling on the topics for the other witnesses, the question in these tort
10
     claims is what debtor knew and did with regard to sexual misconduct with
11
     minors by priests in an Archdiocesan ministry.  Archbishop Levada's
12
     personal beliefs are not relevant, nor are they likely to lead to
13
     relevant evidence of what he, when he controlled debtor, knew or did.
14
     The tort claimants may ask what he did and why; they may not ask about
15
     his personal philosophy generally.
16
                                   CONCLUSION
17
           These depositions are for discovery purposes.  The scope of
18
     discovery is much broader than the admissibility of evidence; a party is
19
     entitled to seek any information that might lead to admissible evidence.
20
     These particular depositions are for a limited purpose, however, which is
21
     to determine liability for the claims of sexual abuse of minors by
22
     Archdiocesan priests or other priests in the ministry of the Archdiocese
23
     of Portland.  They are not for the purpose of gathering evidence for
24
     possible punitive damages for these claims, or for the purpose of
25
     gathering information unrelated to these claims that might be useful in
26


Page 42 - MEMORANDUM OPINION

1 later claims against other church entities.  The tort claimants have only

2 a limited amount of time in which to question these pattern and practices

3 witnesses.  They should focus on the questions that would be most likely

4 to lead to admissible evidence on the liability of the Archdiocese of

5 Portland for these claims.  The witnesses should provide answers to those

6 questions, so long as the questions are limited as set out in this

7 ruling.

8                                    ###

9

10 cc:  Erin Olson
         Kelly Clark
11     Jeffrey Lena
       Tom Dulcich
12     Jim Westwood

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 43 - MEMORANDUM OPINION