1   David A. Foraker, OSB # 81228
    Sanford R. Landress, OSB #81483
2   Greene & Markley, P.C.
    1515 SW Fifth Avenue, Suite 600
3   Portland, OR 97201
    Telephone: (503) 295-2668
4   Facsimile: (503) 224-8434
    E-mail: david.foraker@greenemarkley.com
5   E-mail: sanford.landress@greenemarkley.com

6       Attorneys for Future Claimants Representative

CLERK US BANKRUPTCY COURT
DISTRICT OF OREGON

'06 MAY 23 A9 :15

LODGED_____REC'D____
PAID._____DOCKETED._____

7

8               UNITED STATES BANKRUPTCY COURT

9                     DISTRICT OF OREGON

10

| | |
|---|---|
| In re | ) Case No. 04-37154-elp11 |
| | ) |
| Roman Catholic Archbishop of Portland in Oregon, and successors, a corporation sole, | ) Chapter 11 |
| | ) |
| | ) REPORT OF HAMILTON, |
| Debtor. | ) RABINOVITZ & ALSCHULER, INC. |
| | ) ON ESTIMATED NUMBER AND |
| | ) AMOUNTS OF FUTURE CLAIMS |
| | ) |
| | ) |

16      Attached hereto is the report of Hamilton, Rabinovitz & Alschuler, Inc., dated

17   March 10, 2006, and revised May 22, 2006, and entitled "Estimating the Number and

18   Value of Future Child Sex Abuse Claims Filed Against the Archdiocese of Portland in

19   Oregon."

20      Dated: May 22, 2006.

21                          Greene & Markley, P.C.

22                          By: _____

23                              David A. Foraker, OSB # 81228
                                Attorneys for Future Claimants Representative

24

25

26

Page 1 of 1 -   REPORT OF HAMILTON, RABINOVITZ & ALSCHULER, INC. ON ESTIMATED NUMBER
                AND AMOUNTS OF FUTURE CLAIMS                    \5753\p Report of HR&A.wpd
                                                            GREENE & MARKLEY, P.C.
                                                               Attorneys at Law
                                                         1515 S.W. Fifth Avenue, Suite 600
                                                              Portland, Oregon 97201
                                                           Telephone (503) 295-2668

Case 04-37154-tmb11   Doc 3673   Filed 05/23/06

# Estimating the Number and Value of
# Future Child Sex Abuse Claims Filed Against
# The Archdiocese of Portland in Oregon

March 10, 2006
(revised May 22, 2006)

**Hamilton, Rabinovitz & Alschuler, Inc.**

**Los Angeles • Northern California • Portland • New York**

## Introduction

Hamilton, Rabinovitz & Alschuler, Inc (HR&A) was appointed by United States Bankruptcy Judge Elizabeth Perris, on March 9, 2005 In re Roman Catholic Archbishop of Portland in Oregon, and successors, a corporation sole, Debtor. One of the purposes of the appointment was to develop, "…in consultation with the Applicants, a data base and analytical models for use in estimating and valuing the 'future' claims of the future claimants." This report documents the development of the claims database and analytical models, HR&A's range of future claim estimates and values, and a discussion of requests comments made by the Applicants since the draft of this report was issued on March 10, 2006.

## Summary and Conclusions

As discussed in more detail below, there is considerable uncertainty surrounding the number of future sex abuse claims that may be filed against the Archdiocese of Portland in Oregon (Archdiocese) and the indemnity values that may be paid to future claims. The range of future claims and liability total value is reported in Table 1, and ranges from 89 to 168 claims, and from $16.7 million to $41.7, million, net present value. The details of the forecasts are shown in Appendix Tables 1 and 2. This forecast includes any claims that have been filed since the April 29, 2005 bar date.

**Table 1**
**Summary of Future Claim Filings and Liabilities Using Alternative Assumptions**

| | Total Number of Future Claims | Nominal Liabilities Assuming Average Indemnity Value of: | | NPV Liabilities Assuming Net 3% Discount Rate & Average Indemnity Value of: | |
|---|---|---|---|---|---|
| **Assuming John Jay Lag From Incident to Claim** | | | | | |
| **Claims Estimate** | | $225,000 | $307,500 | $225,000 | $307,500 |
| Lower Bound | 89.2 | $20.1 mill | $27.4 mill | $16.7 mill | $22.9 mill |
| Upper Bound | 167.7 | $37.7 mill | $51.6 mill | $30.5 mill | $41.7 mill |

The estimates reported above are based on Archdiocese's abuse claims made or closed from 2000 through June 2004 (the calibration period). This period captures the claim environment following the Fearing and Lourim decisions made in 1999 and claims filed before the Archdiocese filed for bankruptcy on July 6, 2004. Pre-Fearing claims were excluded from the calibration period since extant liability standards made the successful prosecution of sex abuse claims considerably more difficult than after the Fearing decision. Bankruptcy claims were excluded from the calibration period since the

1

characteristics of many appear to differ from pre-bankruptcy claims and since almost two-thirds of these claims remain pending as of January 2006.[1]

The estimated range of future liabilities accounts for uncertainty in the number of future claims and in the average indemnity values paid using two definitions of what constitutes a historically filed claim that is likely to recur in the future. The upper-bound claims estimate (20.6 claims per year) is defined by all abuse claims filed in the 2000-2004 calibration period, after adjusting the number of claims filed in 2002 downward to account for the likely effects of intense publicity during that period and after excluding the Grammond claims. The upper-bound average indemnity value ($307,500) is calculated from the same subset of claims if they had been resolved during the calibration period.

The lower-bound claims estimate (13.3 claims per year) is defined by all abuse claims filed in the 2000-2004 calibration period, after adjusting the number of claims filed in 2002 downward to account for the likely effects of intense publicity during that period, and after excluding the Grammond and Laughlin claims, multiple claims filed against religious order Priests that were resolved for $0, Priests that were employed by the State of Oregon at the time of the alleged abuse incidents and single claims against Priests that were resolved for $0. The lower-bound average indemnity value ($225,000) is calculated from the same subset of claims if they had been resolved during the calibration period.

The upper- and lower-bound forecasts are also adjusted to account for the time lag from the time an alleged abuse incident occurred to the time a report of claim was made. The reporting lag, which ranges from less than ten to over fifty years, is a generally recognized characteristic of child sex abuse claims that is reported in professional journals concerned with abuse, the John Jay study prepared for the United States Conference of Catholic Bishops) and in claims that have made against the Archdiocese (see Charts 1 and 2 below). In the case of the Archdiocese, the adjustment accounting for filing lag reduces the size of the future claims forecast, as explained in more detail below.

As discussed below, the Applicants raised a number of issues about the forecast of future liabilities reported in Table 10. The issues raised suggest that the range of liability forecasts in Table 10 could be increased to account for possibilities that might lower the forecast of claims and liabilities and for possibilities that might increase the forecast of claims and liabilities. Given the many uncertainties documented in this report, the Applicant's perspectives are not surprising. Recently, a process has been recently been initiated by the Debtor to gather additional information about the facts and circumstance of closed and pending claims, and two claims have been scheduled for trial. Under these circumstances, HR&A has concluded that revising the estimates of future claims and liabilities is not warranted at this time.

---

[1] For example, approximately 34 percent of the bankruptcy claims are *pro se*,c ompared to six percent in the calibration period.

2

## Uncertainties in the Estimation of Future Abuse

It must be emphasized that there are many complex relationships between key variables in the dataset which create uncertainty in the forecast including:

1. Long lag between when abuse incidents occur and when claims are made (ranges from less than ten to over 50 years),

2. Patterns of abuse by priests that are not homogeneous (number of claims and annual patterns of abuse vary considerably and a small number of accused priests account for a large number of the claims),

3. Abrupt change in liability standards following Fearing and Lourim decisions, which compress most filings into a five year period that includes the bankruptcy filing,

4. Substantial variation in national and local publicity regarding abuse generally (church and non-church), specific to claims made against the Archdiocese, and following bankruptcy declaration.

As a consequence, the existing claims data (368 claims and 133 accused) are not sufficient to support causal statistical models of abuse and claim filing behavior.

Future uncertainties that also complicate making a future claims forecast:

1. The resolution of the large number of unresolved claims in the bankruptcy proceeding by settlement or trial may increase or decrease average indemnity values estimated from existing data.

2. Structure and provisions of Claims Resolution Facility (or other entity) created to compensate future plaintiffs including:

   a. Magnitude of assets available to compensate claimants may influence future claiming behavior (increasing the asset pool may increase the likelihood of future claim filings, holding everything else equal),

   b. Allowance of punitive damages may increase the likelihood of future claim filings, holding everything else equal.[2]

---

[2] David Foraker, Future Claimants Representative notes that the effect of punitive damage awards is likely to be limited since they are awarded to deter future behavior. The abuse claims in the bankruptcy are all based on allegations in the past, and arguably a single or even several punitive damage awards could be deemed a sufficient deterrent.

3

# Estimation Methods and Issues

## Estimation Issues:  Reconciling Quantitative Claims Data and Relationships with Qualitative Knowledge

Table 2 summarizes the number of claims for each of the key claims filing periods for the Archdiocese:  1) pre-Fearing tort system; 2) post-Fearing tort system (2000 to bankruptcy); and 3) post-bankruptcy.  As discussed previously, HR&A relies on the post-Fearing tort system experience, with some adjustments, as the basis for estimating future claims.

**Table 2**
**Sex Abuse Claims Filed**
**Against the Archdiocese**

```
------------------------
Claim Filing|
Categories  |  Claims
------------+-----------
Pre-Fearing |      27 → from 1982 through 1999
       2000 |      28
       2001 |      27
       2002 |      93 → likely effect of Boston AD publicity
       2003 |      33
       2004 |      23 → one-half year of filings though July 5, 2004
 Bankruptcy |     137 → from July 6, 2004 through April 29, 2005
            |
      Total |     368
------------------------
```

Having processed the Archdiocese's claims data and defined an internally consistent calibration period for purposes of estimating future claims, HR&A prepared some preliminary future forecasts for discussions with the Applicants.  Discussions with the Debtor indicated that there was considerable disagreement about whether future claiming behavior would follow the pattern in the calibration period shown in Table 2.  While the Archdiocese believes that "very few" if any claims will be filed in the future, the empirical record shows that claims were made and paid during the calibration period.  The pattern of post-Fearing claim filings against the Archdiocese shown in Table 2 does not support the conclusion that the number of claims was falling or that future abuse filings against the Archdiocese would be highly unlikely.  In addition to the filing record shown in Table 2, a detailed examination of claim characteristics does not suggest that there is any reason to expect a sudden reduction in claim filings.

The factors supporting the Archdiocese's argument that very few future claims will be filed include:  a) the intense publicity surrounding child sex abuse in the Catholic Church, nationally (e.g., Boston Archdiocese) and locally (e.g., the Grammond and Laughlin cases); b) the publicity surrounding the bankruptcy filing by the Archdiocese including the notice campaign and bar date; c) increased difficulty in meeting Oregon's statute of limitations for child abuse cases as a result of the intense publicity, notice campaign and bar date;  and d)  with the exception of  the six "DW siblings" who are associated by

4

family with a current claim in the bankruptcy, only two other future claims have been filed since the bar date.[3]

The effect of intense national and local publicity is expected to motivate any potential claimants to file claims if they wished to do so, recognizing that some potential claimants will choose not to file. Further, those potential claimants that remain and later chose to file a future claim will be susceptible to Oregon statute of limitations arguments that they failed to, "…exercise reasonable care," and that they, "…should have discovered the injury or the causal connection between the child abuse and the injury."[4] Finally, the fact that no more than nine future claims have been filed from the bar date to the date of this report, must be considered in light of the number of pre-bankruptcy filings.[5]

HR&A also engaged in discussions with members of the Tort Claimants' Committee and one of their experts, Randall Green, Ph.D. These discussions broadly confirmed the observations of the Debtor: a) that the intense publicity had motivated many claimants to file with and without the assistance of counsel; b) that overcoming statute of limitations arguments would be more difficult than it had been in the pre-bankruptcy environment; and c) that their "phones were not ringing," with new abuse claims that could be filed against the Archdiocese. Ultimately, these discussions suggested that the number of future claims would fall well below the number of claims filed in the past, but that there was no reason to believe that some claims would not continue to arise in the future.

Although these qualitative assessments indicate that historical claim filings are likely to overstate future claim levels, they offer little guidance as to how to account for these factors in a quantitative model of future claims. In light of the discussions with the Applicants, HR&A's initial upper- and lower bound estimates of annual average claims were revised to explicitly account for the considerable publicity effects on 2002 filings, as well as the likelihood that claims arising from a number of different types of priests would not recur in the future. An explicit adjustment was not made with respect to the relatively low number of post-bar date claims given the potential that publicity surrounding the bankruptcy may have accelerated the filing of some claims into the bankruptcy and the limited claim experience since the bar date. As a result of these adjustments and considerations, the average annual number of claims for the upper-bound forecast was reduced from 45 claims to 21 claims. The adjustments to the lower-bound forecast assumptions reduced the average annual number of claims from 28 to 13.

---

[3] Two non-DW sibling claims were recently filed, but the essential point of the argument remains.
[4] ORS, 12.117.
[5] In addition to the six DW siblings, there are two known future claim filings and an unconfirmed report of one additional future claim.

5

**Revised Estimation Method**

Based on earlier work with the Archdiocese's historical claims data and discussions with the Applicants, HR&A developed the following approach to incorporate their qualitative assessments into a future claims quantitative model:

1. Define lower- and upper-bound ranges of historical annual average claim filings that account for the effects of publicity on filings in 2002 and the likelihood that certain types of claims are non-recurring. As noted above, the effect of these adjustments reduced the filings during the calibration period from an unadjusted annual average of 45 claims, to an upper-bound average of 21 claims, and a lower-bound average of 13 claims.

2. Disaggregate the upper- and lower-bound average annual claim filings into six year-of-first-abuse "incident cohorts" (e.g., pre-1950, 1950-1959, 1960-1969) so that the time available for a potential claimant to file a claim can be statistically controlled (i.e. a person alleging abuse in 1955 has had more time, approximately 49 years, to file a claim by 2004 than a person alleging abuse in 1985).

3. Derive the percentage distribution of the lag from alleged incident to report or filing from the Archdiocese historical claims data and from the John Jay report. As shown in Charts 1 and 2 below, the lag distributions describe, on a year-by-year basis from the alleged incident, the percentage of all abuse incidents reported or claimed.

   For example, in the John Jay report, approximately 12 percent of the incidents were reported or claimed in the year the abuse took place, and approximately 3 percent were reported twenty years after the alleged incident. Approximately 50 percent of all abuse allegations in the John Jay report were reported or claimed within 20 years from the abuse incident, with the remainder being reported or claimed twenty-one or more years after the incident.

4. For each abuse cohort period (e.g., pre-1950, 1950-1959, 1960-1969) create an index that links the estimated average annual claims to the corresponding point on the lag to filing distribution. For example, the time from the mid-point of the 1950-1959 cohort to the mid-point of the calibration period is 48 years (i.e., 2003 – 1955, or 48 years) which links the average annual cohort claims to the last three years of the John Jay College lag from incident to filing distribution (i.e., 49, 50, 51).

5. Estimate average indemnity values for closed claims that were consistent with the definitions used to define lower- and upper-bound historical claim filings. These average values are $225,000 and $307,500, respectively. There are a number of factors that may increase or decrease future indemnity values

6

including jury verdicts and punitive damages for claims taken to trial, a different abuse severity/credibility mix than seen during the calibration period, and the effects of the statute of limitations on the likelihood a successful claim could be brought.

The future liability estimates are made by multiplying the number of claims projected to be made in each year of the forecast (as adjusted by the filing lag) by the average indemnity paid per claim.

The future forecasts were discounted to present value using a net three percent discount rate. This net discount rate is based on HR&A's review of the Congressional Budget Office forecast which reports a 2.2% future inflation rate and a 5.2% rate of return on U.S. government securities with a ten year term.[6]

---

[6] See, http://www.cbo.gov/Spreadsheet/7027_TableE-1.xls.

# Primary Claims Data & Other Reliance Materials

## Primary Claims Data

With the assistance of the Archdiocese staff and outside counsel, and legal representatives for current and future claimants, HR&A developed a list of data specifications that could be of assistance in estimating future claims. The list of data requested falls into two basic categories: 1) general information about child sex abuse claims filed against the Archdiocese; and 2) specific information about each minor alleging abuse and each Diocesan priest or "other responsible party" who was accused.[7] The specifications also contain three definitions to simplify communication among the interested parties in the Bankruptcy:

1. A **Priest** is defined as an ordained person with an Archdiocesan ministry assignment in the Archdiocese including Archdiocesan priests, Religious Order Priests and Non-incardinated Priests on assignment from other dioceses.

2. An **abuse claim** is defined as an incident of alleged child abuse by a Priest where a demand for financial compensation has been made.

3. An **abuse report** is defined as written or oral communication with the Archdiocese that alleges an incident of child abuse by a Priest where a demand for financial compensation has not been made.

Since the Archdiocese declared bankruptcy on July 6, 2004, some abuse reports have been filed as claims. These abuse reports have been dropped from the dataset and replaced with available claim information. Claimed (368) and reported (46) instances of abuse are both counted as separate variables in the accused dataset. The claims dataset does not contain any information on reports of abuse, presumably since reports of abuse often lack specificity.

The liability estimates contained in this report are based on claims data only.

General information regarding the number of priests, proxies for the number of children at risk, and the "environmental conditions" surrounding the abuse claims were produced to HR&A in late August 2004.

The individual level data describing claimants and the accused were collected by Archdiocese staff during the summer and fall of 2005. A provisional Access dataset of claims made through December 31, 2004 was produced by the Archdiocese on August 26, 2005. A final version of these data was produced on October 11, 2005 and the dataset of claims filed from January 1, 2005 to the April 29, 2005 bar date was produced on November 16, 2005. Two additional data fields, year closed and a crosswalk from

---

[7] Other responsible parties included Sisters, Brothers, teachers and scout masters who were accused of abuse in a Diocesan capacity. These persons were included in the data collection effort in order to account for all abuse allegations made against the Archdiocese.

Case 04-37154-tmb11   Doc 3673   Filed 05/23/06

claimant identifier to proof of claim (POC) number were produced on December 7, 2005. A final supplement including the most recent settlement activity (status and indemnity values) was produced by the Archdiocese on January 26, 2006.

Archdiocese staff extracted abuse claim data specified by HR&A from settlement and litigation files maintained for each claimant. Data describing reports of abuse were collected from whatever materials were available to document such reports such as telephone logs and letters. Data describing Priests and others accused of abuse was extracted from personnel files maintained by the Archdiocese and from claimant settlement and litigation files also maintained by the Archdiocese.

As the data collection process was drawing to a close, HR&A drew a sample of ten claims of abuse to test the data extraction process for the claimant and for Priest data. HR&A tested each of the data fields contained in the Access databases against the claim settlement and litigation files and Priest personnel records maintained by the Archdiocese at the Pastoral Center on East Burnside Street during November and December. Outside defense counsel for the Archdiocese, Schwabe, Williamson, & Wyatt maintain a parallel but not identical set of files, so a review of the Access data fields and those records was also conducted by HR&A. The review of the claims databases and source records did not identify any material discrepancies. As further data review took place during the creation of the analytic datasets for claimants and Priests minor discrepancies were identified and resolved.

## Other Reliance Materials

In addition to the claims data described above, the Archdiocese produced a number of descriptive materials including statistics regarding the population of Priests assigned to the Archdiocese, characteristics of the membership, child sex abuse policies and related materials and copies of press clippings and television newscasts covering sex abuse incidents. A complete list of these materials will be produced as Exhibit 1 of this report.

The John Jay study on child sex abuse in the Catholic Church was used as a general reference in the estimation of future claims and liabilities.[8] The percentage distribution of the lag from first abuse incident to the reporting of abuse was used as a key parameter in the estimation of future claims.[9]

A number of books, articles published in professional journals and abstracts of articles were reviewed. If requested, a complete list of these materials can be produced.

As described above, HR&A engaged in telephone and in-person discussions with experts and representative for the Applicants. If requested, a complete list of these contacts can be produced.

---

[8] *The Nature and Scope of the Problem of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States*, John Jay College of Criminal Justice, February, 2004.
[9] Ibid. p. 79.

## Key Estimation Parameters

The future forecast of claims and liabilities is based on three key parameters: 1) the average annual number of claims, disaggregated by year of first abuse incident categories; 2) the percentage distribution of the time from first abuse incident to the time the abuse is reported or claimed; and 3) the average indemnity value paid to resolved claims.

The derivation of each estimation parameter is discussed below.

### Claims Made Against Archdiocese

Table 3 shows the total number of abuse claims in the Archdiocese data, by the year the claim was filed and by the year of the first abuse incident. Filing year has been categorized into pre-Fearing claims, post-Fearing claims (2000 to July 2004) and bankruptcy to the bar date on April 29, 2005. As shown in the bottom row of the table, the number of claims filed has ranged from 27 during the pre-Fearing period (1983 through 1999) to 127 claims during the period from bankruptcy declaration to the bar date. Including the pre-Fearing period, annual claims averaged 15 over the entire 24 year period, and 64 claims for the 5 year post-Fearing period. The large upsurge in claims made in 2002 is likely to be related to the intense publicity regarding abuse in the Boston Archdiocese as a similar peak is found in the John Jay study.[10]

The year of first abuse incident categories were generally designed as ten year cohorts with the exception of the 1970-1983 category which was designed to distinguish between the potential affects of changes in Archdiocese abuse policies before and after the first Laughlin claims came to light. The classification by year of first incident suggests that the abuse policies put into place after the first Laughlin claims substantially reduced the likelihood of abuse. For example, there is a gross reduction in claims: 112 claim filings from the 1970-1983 cohort down to six claims from the 1984-1989 cohort. However, the lag from first abuse incident to claiming obscures the exact effect of the post-Laughlin policies since claims in the post-Laughlin period are less likely to have been filed.

---

[10] John Jay study, p. 77.

Case 04-37154-tmb11    Doc 3673    Filed 05/23/06

**Table 3**
**Child Sex Abuse Claims Filed Against the Archdiocese: By Year Filed & Year of First Incident**

### All Claims Filed

| Year of 1st Incident Category | Year Filed Categories | | | | | | | | Average Annual Claims | |
| | Pre-Fearing | 2000 | 2001 | 2002 | 2003 | 2004: 1/2 Year | Bankruptcy: To April 2005 Bar Date | Total | Inc. Fearing | Exc. Fearing |
|---|---|---|---|---|---|---|---|---|---|---|
| 1937-1949 | 0 | 0 | 3 | 3 | 0 | 2 | 14 | 22 | 0.9 | 4.1 |
| 1950-1959 | 3 | 9 | 8 | 29 | 7 | 4 | 28 | 88 | 3.7 | 15.9 |
| 1960-1969 | 4 | 16 | 10 | 33 | 8 | 7 | 41 | 119 | 5.0 | 21.6 |
| 1970-1983 | 14 | 3 | 6 | 26 | 17 | 9 | 37 | 112 | 4.7 | 18.4 |
| 1984-1989 | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 6 | 0.3 | 0.4 |
| 1990-1999 | 2 | 0 | 0 | 0 | 0 | 1 | 3 | 6 | 0.3 | 0.8 |
| Unknown | 0 | 0 | 0 | 2 | 0 | 0 | 13 | 15 | 0.6 | 2.8 |
| Total | 27 | 28 | 27 | 93 | 33 | 23 | 137 | 368 | 15.3 | 64.0 |

Table 4 shows the relationship between claim filings and year of first abuse incident for the post-Fearing period excluding filings made during the bankruptcy. The average annual number of claims filed during this period is 45, with the bulk of the claims made from the pre-Laughlin cohorts, especially between 1950 and 1983.

**Table 4**
**Child Sex Abuse Claims Filed Against the Archdiocese: By Year Filed & Year of First Incident**

### Claims Filed After Fearing & Before Bankruptcy

| Year of 1st Incident Category | Year Filed Categories | | | | | | Average Annual Claims |
| | 2000 | 2001 | 2002 | 2003 | 2004: 1/2 Year | Total | |
|---|---|---|---|---|---|---|---|
| 1937-1949 | 0 | 3 | 3 | 0 | 2 | 8 | 1.8 |
| 1950-1959 | 9 | 8 | 29 | 7 | 4 | 57 | 12.7 |
| 1960-1969 | 16 | 10 | 33 | 8 | 7 | 74 | 16.4 |
| 1970-1983 | 3 | 6 | 26 | 17 | 9 | 61 | 13.6 |
| 1984-1989 | 0 | 0 | 0 | 0 | 1 | 1 | 0.2 |
| 1990-1999 | 0 | 0 | 0 | 1 | 0 | 1 | 0.2 |
| Total | 28 | 27 | 91 | 33 | 23 | 202 | 44.9 |

11

Table 5 shows that the effect of smoothing the publicity peak by substituting the average number of claims filed in 2001 and in 2003 is to reduce the average annual number of claims from 45 to slightly less than 32 claims.

## Table 5
## Child Sex Abuse Claims Filed Against the Archdiocese: By Year Filed & Year of First Incident
**Claims Filed After Fearing & Before Bankruptcy; Smoothed Publicity Spike in 2002**

Year Filed Categories

| Year of 1st Incident Category | 2000 | 2001 | 2002 | 2003 | 2004: 1/2 Year | Total | Average Annual Claims |
|---|---|---|---|---|---|---|---|
| 1937-1949 | 0 | 3 | 2 | 0 | 2 | 7 | 1.6 |
| 1950-1959 | 9 | 8 | 8 | 7 | 4 | 36 | 8.0 |
| 1960-1969 | 16 | 10 | 9 | 8 | 7 | 50 | 11.1 |
| 1970-1983 | 3 | 6 | 12 | 17 | 9 | 47 | 10.4 |
| 1984-1989 | 0 | 0 | 0 | 0 | 1 | 1 | 0.2 |
| 1990-1999 | 0 | 0 | 0 | 1 | 0 | 1 | 0.2 |
| Total | 28 | 27 | 31 | 33 | 23 | 142 | 31.6 |

## Table 6
## Child Sex Abuse Claims Filed Against the Archdiocese: By Year Filed & Year of First Incident
**Claims Filed After Fearing & Before Bankruptcy; Smoothed Publicity Spike in 2002**
**Exclude Multiple Claims Filed Against Religious Order Priest Settled for $0**
**and Claims Filed Against Grammond**

Year Filed Categories

| Year of 1st Incident Category | 2000 | 2001 | 2002 | 2003 | 2004: 1/2 Year | Total | Average Annual Claims |
|---|---|---|---|---|---|---|---|
| 1937-1949 | 0 | 3 | 2 | 0 | 1 | 6 | 1.3 |
| 1950-1959 | 2 | 2 | 5 | 7 | 4 | 20 | 4.4 |
| 1960-1969 | 2 | 3 | 6 | 8 | 7 | 26 | 5.8 |
| 1970-1983 | 1 | 4 | 10 | 15 | 9 | 39 | 8.7 |
| 1984-1989 | 0 | 0 | 0 | 0 | 1 | 1 | 0.2 |
| 1990-1999 | 0 | 0 | 0 | 1 | 0 | 1 | 0.2 |
| Total | 5 | 12 | 23 | 31 | 22 | 93 | 20.7 |

Table 6 shows that excluding multiple claims filed against religious order Priests that were all settled for $0 and the approximately fifty-six Grammond claims reduces the average annual number of claims to 21, less than one-half of the unadjusted average of 45

claims. This is the annual average used in the upper-bound claim estimate (before adjusting for the time to file lag)

The lower-bound claim annual average estimate of 13 is derived by further excluding the claims filed against Laughlin, claims filed against Priests who were employed by the state of Oregon at the time of the abuse and Priests with single claims that were resolved for $0.

**Table 7**
**Child Sex Abuse Claims Filed Against the Archdiocese: By Year Filed & Year of First Incident**
Claims Filed After Fearing & Before Bankruptcy; Smoothed Publicity Spike in 2002
  Exclude Multiple Claims Filed Against Religious Order Priest Settled for $0,
  Claims Filed Against Grammond, Laughlin, State Employees at Time of Alleged Abuse,
  and Claims Against Single Priests Settled for $0

|                                        |      |      | Year Filed Categories |      |                      |       |                             |
| -------------------------------------- | ---- | ---- | --------------------- | ---- | -------------------- | ----- | --------------------------- |
| Year of 1st<br>Incident<br>Category    | 2000 | 2001 | 2002                  | 2003 | 2004:<br>1/2<br>Year | Total | Average<br>Annual<br>Claims |
| 1937-1949                              | 0    | 3    | 2                     | 0    | 1                    | 6     | 1.3                         |
| 1950-1959                              | 2    | 2    | 3                     | 4    | 4                    | 15    | 3.3                         |
| 1960-1969                              | 2    | 2    | 5                     | 8    | 4                    | 21    | 4.7                         |
| 1970-1983                              | 1    | 1    | 3                     | 4    | 8                    | 17    | 3.8                         |
| 1984-1989                              | 0    | 0    | 0                     | 0    | 1                    | 1     | 0.2                         |
| 1990-1999                              | 0    | 0    | 0                     | 0    | 0                    | 0     | 0.0                         |
| Total                                  | 5    | 8    | 13                    | 16   | 18                   | 60    | 13.3                        |

## Resolved Claim Indemnity Values

The estimation of average indemnity values parallels the approach taken to calculate the upper- and lower-bound average annual claims. This approach ensures that the estimates of the average claim and indemnity parameters are consistent in terms of the claims used to make the calculations.

Table 8 shows average claim values (including disallowed, withdrawn and dismissed claims) for all 237 claims that have been resolved, including claims tentatively resolved in the bankruptcy. The table shows by year settled, the number of claims closed, total indemnity payments, average indemnity payments, the maximum indemnity paid and the percentage of claims resolved for $0. Table 8 shows there is considerable variation across all of these variables. In particular, the average indemnity for all claims is $266,300, with a range from a low of $22,500 in 1999 (a single claim) to a high of $724,038 in 2000 (all but one were Grammond claims). Table 8 also shows that over one-half of the claims resolved during the bankruptcy proceedings were tentatively disallowed with no indemnity payment.

13

**Table 8**
**All Closed Claims**

| YrSettled | Claims | Total Indem. | Average Indem. | Max. Indem | Percent Closed for $0 |
|---|---|---|---|---|---|
| 1984 | 4 | $490,000 | $122,500 | $200,000 | 0% |
| 1986 | 1 | 550,000 | 550,000 | 550,000 | 0% |
| 1989 | 2 | 519,000 | 259,500 | 469,000 | 0% |
| 1990 | 2 | 465,000 | 232,500 | 400,000 | 0% |
| 1993 | 5 | 596,950 | 119,390 | 250,000 | 0% |
| 1999 | 1 | 22,500 | 22,500 | 22,500 | 0% |
| Unknown | 25 | 0 | 0 | 0 | 0% |
| 2000 | 26 | 18,825,000 | 724,038 | 2,100,000 | 0% |
| 2001 | 6 | 2,252,500 | 375,416 | 550,000 | 0% |
| 2002 | 6 | 238,000 | 39,666 | 125,000 | 0% |
| 2003 | 75 | 29,414,334 | 392,191 | 1,700,000 | 3% |
| 2004 ½ Yr | 10 | 2,617,265 | 261,726 | 1,500,000 | 30% |
| Bankruptcy | 74 | 7,119,000 | 96,202 | 1,000,000 | 53% |
| Total | 237 | 63,109,549 | 266,285 | 2,100,000 | 29% |

Table 9 shows the same statistics after excluding claims resolved in the pre-Fearing period and during the bankruptcy. The average value increased to $360,500, but the variability in average values is still considerable, from $39,700 for claims closed in 2002 to $724,000 for claims closed in 2000.

**Table 9**
**All Claims Settled After Fearing & Before Bankruptcy**

| YrSettled | Claims | Total Indem. | Average Indem. | Max. Indem | Percent Closed for $0 |
|---|---|---|---|---|---|
| Unknown | 25 | $0 | $0 | $0 | 100% |
| 2000 | 26 | 18,825,000 | 724,038 | 2,100,000 | 0% |
| 2001 | 6 | 2,252,500 | 375,417 | 550,000 | 0% |
| 2002 | 6 | 238,000 | 39,667 | 125,000 | 0% |
| 2003 | 75 | 29,414,334 | 392,191 | 1,700,000 | 3% |
| 2004 | 10 | 2,617,265 | 261,727 | 1,500,000 | 30% |
| Total | 148 | 53,347,099 | 360,453 | 2,100,000 | 20% |

Table 10 shows the upper-bound average indemnity value which further excludes multiple claims filed against Religious Order Priests for $0 and claims closed against Grammond. The average indemnity is reduced to $307,500, but there is still a wide range of average values on a year-by-year basis, from $40,100 in 2002 to $379,600 in 2003.

14

**Table 10**
**Claims Closed After Fearing & Before Bankruptcy; Exclude Multiple Claims Closed**
**Against Religious Order Priest Closed for $0 and Claims Closed Against Grammond**

| YrSettled | Claims | Total Indem. | Average Indem. | Max. Indem | Percent Closed for $0 |
|---|---|---|---|---|---|
| Unknown | 4 | $0 | $0 | $0 | 100% |
| 2000 | 1 | 75,000 | 75,000 | 75,000 | 0% |
| 2001 | 6 | 2,252,500 | 375,417 | 550,000 | 0% |
| 2002 | 5 | 200,500 | 40,100 | 125,000 | 0% |
| 2003 | 56 | 21,259,834 | 379,640 | 1,700,000 | 4% |
| 2004 | 9 | 1,117,265 | 124,141 | 590,000 | 33% |
| Total | 81 | 24,905,099 | 307,470 | 1,700,000 | 11% |

Table 11 shows the lower-bound average indemnity value which further excludes claims filed against Laughlin, Priests that were Oregon state employees at the time of the allegation and single claims closed against Priests for $0. The average indemnity is reduced to $225,005, but there is still a wide range of average values on a year-by-year basis, from $40,100 in 2002 to $375,400 in 2003.

**Table 11**
**Claims Settled After Fearing & Before Bankruptcy; Exclude Multiple Claims Closed**
**Against Religious Order Priest Settled for $0; Exclude Claims Closed Against Grammond,**
**Laughlin, State Employees at Time of Alleged Abuse, and Single Claims Against Priests**
**Settled for $0**

| YrSettled | Claims | Total Indem. | Average Indem. | Max. Indem | Percent Closed for $0 |
|---|---|---|---|---|---|
| Unknown | 3 | $0 | $0 | $0 | 100% |
| 2000 | 1 | 75,000 | 75,000 | 75,000 | 0% |
| 2001 | 6 | 2,252,500 | 375,417 | 550,000 | 0% |
| 2002 | 5 | 200,500 | 40,100 | 125,000 | 0% |
| 2003 | 43 | 11,274,834 | 262,205 | 975,000 | 2% |
| 2004 | 8 | 1,047,500 | 130,938 | 590,000 | 38% |
| Total | 66 | 14,850,334 | 225,005 | 975,000 | 11% |

Table 12 shows the number of closed claims and average indemnity values for all years filed (columns) and all years settled (rows) using the exclusions listed above for the lower-bound estimate. The relationship between average indemnity values as they are classified by claim filing dates and claim closing dates is complex, but typically the highest average indemnity value for post-Fearing claims in a given filing year cohort (e.g., 2002) is found once or two years into the settlement process. As a consequence of these complex relationships, it is difficult to conclude that there is clear trend in average indemnity values by filing year. Thus far into the bankruptcy settlement process, it does appear that claims filed and closed in the bankruptcy command lower average indemnity values.

15

## Table 12

All Settled Claims by Year Filed and Year Settled; Exclude Multiple Claims Closed Against Religious Order Priest Settled for $0; Exclude Claims Closed Against Grammond, Laughlin, State Employees at Time of Alleged Abuse, and Single Claims Against Priests Settled for $0

| YrFiledSubCats | 1998 | UnkPostHearing | 2000 | 2001 | 2002 | 2003 | 2004 | Bankruptcy | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Hearing | 9 / 176,833 | | 1 / 75,000 | 2 / 531,250 | 1 / 37,500 | 1 / 11,380 | | 1 / 10,000 | 15 / 185,859 | <- Claims / <- Avg. $ Indemnity |
| 2000 | | | | 4 / 297,500 | 1 / 25,000 | | | | 5 / 243,000 | |
| 2001 | | | | | 2 / 67,500 | 5 / 154,000 | | | 7 / 129,286 | |
| 2002 | | 3 / 0 | | | 1 / 3,000 | 34 / 302,381 | 6 / 124,583 | 6 / 65,833 | 50 / 228,529 | |
| 2003 | | | | | | 3 / 70,833 | 1 / 300,000 | 2 / 450,000 | 6 / 235,417 | |
| 2004 | | | | | | | 1 / 0 | 7 / 303,214 | 8 / 265,313 | |
| Bankruptcy | | | | | | | | 17 / 69,029 | 17 / 69,029 | |
| Total | 9 / 176,833 | 3 / 0 | 1 / 75,000 | 6 / 375,417 | 5 / 40,100 | 43 / 262,205 | 8 / 130,938 | 33 / 139,424 | 108 / 194,841 | |

16

**Lag (in years) From Alleged Abuse Incident to Report/Claim**

The long lag from the date of the abuse incident to the reporting or claiming of the
incident is a generally recognized characteristic of child abuse. For the purpose of
estimating future claims and liabilities the lag is used to determine how much longer the
average annual number of claims for a particular claimant cohort (year from first abuse)
is likely to continue and whether or not the trend in future claims is likely to be upward or
downward.

The distribution of claims made against the Archdiocese and reports collected in the John
Jay study are shown in Charts 1 and 2. In both cases, the distributions are bell-shaped in
nature, which indicates that the reporting of abuse starts slowly, builds gradually to a
peak, and then slowly declines. This relationship can be used to link estimates of
average annual claims for cohorts of persons to the lag distribution and then adjust the
future annual average claims to account for the cohort's place on the curve.



For example, using the cohort of claims based on incidents in the earliest year of first
abuse cohort (1937-1949), the lag from the mid-point of the cohort to 2004 is 61 years
(2004 – 1943). Using the Archdiocese's distribution shown in Chart 1, we find that there
is no information regarding claims made with a lag of more than 61 years, while the John
Jay distribution shows the longest lag is no more than 51 years. Thus both distributions
suggest that additional claims from the 1937-1949 cohort are unlikely, especially
considering the fact that all of the claims from this cohort were made in the post-Fearing

17

period with its attendant publicity, and over one-half of the claims were made during the bankruptcy.

This method was applied to the remaining cohorts by linking the average annual claim estimate for each cohort to their place on the lag to file distribution and indexing the distribution so the average annual number of claims increased or decreased according to their place in the distribution. For older cohorts, the trend was downward since they were linked to the right hand side of the curve. Average annual claims for more recent cohorts (post-Laughlin) increased and then decreased, but since so few claims have been filed the resulting number of claims ranged from 5 to 20. See Appendix Tables 1 and 2 for details.

For claims from later cohorts, the choice of the distribution is important since the lag to filing in the Archdiocese data is considerably longer than the lag found in the John Jay study. There are many reasons for the difference including what is being counted (i.e., claims of abuse and reports of abuse), the amount of data being collected and unknown factors specific to the Archdiocese.



The Archdiocese data reported here counted 202 claims (i.e. demands for compensation) since the available data reports of abuse are incomplete. The Archdiocese lag distribution was also affected by the Fearing decision and by the bankruptcy filing so the data used was restricted to post-Fearing pre-bankruptcy claims. Since the Archdiocese data is based on a relatively small population, the shape of the lag to claim distribution is lumpy and highly variable on a year-to-year basis.

18

The John Jay study counted both claims and reports of abuse that totaled more than 10,000 instances of alleged abuse. The distribution is affected by differences in liability rules and other factors on a state-by-state basis that is unknown.

Ultimately, the John Jay distribution was used to make the future forecast given the high variability found in the Archdiocese data and the extreme data manipulation measures required to make the Archdiocese distribution usable for estimation purposes.

Case 04-37154-tmb11    Doc 3673    Filed 05/23/06

# Responses to Applicant's Comments Regarding Draft Report

After the draft report was issued on March 10, 2006, the Applicants made comments and requested HR&A to make additional calculations. These comments, requests and calculations are described below.

## Future Claimants Representative Comments

David Foraker, Future Claimants Representative, in telephone discussions with Robert Sims requested that HR&A make four additional calculations related to future abuse claims liabilities:

1) **Estimate Poisson confidence intervals for the lower- and upper-bound annual claim counts used to make to the future liability forecast.**

   a) The 95% confidence interval for the lower-bound estimate (13.3 claims in forecast year 1) is ± 50 percent, or from 6.65 claims to 19.95 claims.

   b) The 95% confidence interval for the upper-bound estimate (20.6 claims in forecast year 1) is ± 56 percent, or from 9.1 claims to 32.1 claims.

The estimated rage of claims and indemnity values using the 95% confidence intervals is shown in Table 13 using the average lower and upper bound indemnity values. In nominal terms, the 95% confidence intervals for the estimated future liabilities range from a low of approximately $10 million to a high of $81 million. In NPV terms the 95% confidence intervals range from approximately $8 million to $65 million.

Case 04-37154-tmb11    Doc 3673    Filed 05/23/06

**Table 13**
**Summary of Future Claim Filings and Liabilities Using Alternative Assumptions**

**Assuming John Jay Lag From Incident to Claim**

| Claims Estimate | Total Number of Future Claims | Nominal Liabilities Assuming Average Indemnity Value of: | | NPV Liabilities Assuming Net 3% Discount Rate & Average Indemnity Value of: | |
|---|---|---|---|---|---|
| | | $225,000 | $307,500 | $225,000 | $307,500 |
| Lower Bound | 89.2 ± 44.6 | $20.1m ± $10m | $27.4m ± $13.7m | $16.7m ± $8.4m | $22.9m ± $11.5m |
| Upper Bound | 167.7 ± 93.9 | $37.7m ± $21.1m | $51.6 ± $28.9m | $30.5m ± $17.1m | $41.7m ± $23.4m |

2) **Assess the potential effect of claims taken to verdict on average indemnity values paid by the Archdiocese.**

As of the date of this report, no abuse claims filed against the Archdiocese have gone to trial and verdict. It is HR&A's understanding that two claims are set for trial in Federal Court in the fall of 2006. Most of the specific facts and circumstances of these cases that may determine their potential verdict values are not contained in the sex abuse claims database prepared by the Archdiocese, nor are most of the facts and circumstances that determined the values paid to closed claims filed against the Archdiocese.

The absence of any Archdiocese specific verdicts[11] as well as most substantive information about the two claims going to trial and most substantive information about the resolved claims makes it extremely difficult to quantitatively assess the effects that the two verdicts may have on indemnity values paid to future claims. HR&A considered several statistical tools to assess the effect of verdicts including bootstrapping and Monte Carlo simulation methods. Ultimately, it was concluded that the lack of specific information about the claims set for trial and closed claims made the results of limited use at this time in the bankruptcy proceedings.

It is HR&A's understanding that the Archdiocese is developing a process to collect and organize the facts and circumstances of closed and open abuse claims in order to develop

---

[11] Verdicts for some child sex abuse cases involving priests has been collected and reported by the Debtor.[11] These verdicts range from $0 to over $3.5 million and have been rendered in Minnesota, California and Texas jurisdictions. Since the liability rules in these jurisdictions are likely to differ from those in Oregon, and the specific facts of the cases are mostly unknown, the applicability of these verdicts and others that may be available is limited without additional review and research.

Case 04-37154-tmb11    Doc 3673    Filed 05/23/06

a payment schedule. That information, in conjunction with the outcome of the two scheduled trials should offer sufficient data to assess, on a limited basis, the effects of verdicts on indemnity values for future claimants.

## 3) Estimate future liabilities including indemnity values paid to Grammond claimants.

The average indemnity values used for the lower- and upper-bound estimates of future liabilities excluded indemnity values paid to Grammond claims. Grammond claims were assumed to be non-recurring given the intense publicity surrounding the allegations against Grammond. As shown in Table 14, including the Grammond claims increases the average indemnity to $420,056:

  a) The lower-bound average indemnity is increased by 87%, from $225,005 to $420,056

  b) The upper-bound average indemnity is increased by 37%, $307,470 to $420,056.

The increases in average indemnity value raise the nominal value of the lower-bound estimate from $27.4 million to $37.5 million. The upper-bound estimate is increased from $51.6 million to $70.4 million. The details of these calculations are summarized in Appendix Tables 3 and 4.

**Table 14**
**Claims Settled After Fearing & Before Bankruptcy; Exclude Multiple Claims Closed Against Religious Order Priest Settled for $0; Exclude State Employees at Time of Alleged Abuse, and Single Claims Against Priests Settled for $0; Include Claims Closed Against Grammond and Laughlin**

| YrSettled | Claims | Total Indem. | Average Indem. | Max. Indem | Percent Closed for $0 |
|-----------|--------|--------------|----------------|------------|------------------------|
| Unknown | 4 | $0 | $0 | $0 | 100.0% |
| 2000 | 26 | 18,825,000 | 724,038 | 2,100,000 | 0.0% |
| 2001 | 6 | 2,252,500 | 375,417 | 550,000 | 0.0% |
| 2002 | 6 | 238,000 | 39,667 | 125,000 | 0.0% |
| 2003 | 75 | 29,414,334 | 392,191 | 1,700,000 | 3.0% |
| 2004 | 10 | 2,617,265 | 261,727 | 1,500,000 | 30.0% |
| Total | 127 | 53,347,099 | 420,056 | 2,100,000 | 7.0% |

## 4) Estimate future liabilities using the lag structure of alleged abuse to claim filing distribution found in the Archdiocese abuse claims data.

The future liability estimates summarized in Table 1 of this report relied upon to the lag from abuse to claim filing found in the 2004 John Jay study. The John Jay lag structure was chosen since the claims describing the lag structure were much more numerous (over

10,000 abuse instances compare to 202 complete Archdiocese filings) which created a smoother less variable lag structure. The John Jay data suggest that the lag from abuse incident to filing is shorter than that foud in the Archdiocese data. These differences can be seen by reviewing Charts 1 and 2.

Review of the deposition of former Archdiocese Personnel Director, Father Charles Lienert since the preparation of the draft report suggests that incomplete record keeping of early abuse reports may explain why the Archdiocese lag to filing structure is much longer than for the John Jay data. Thus, early reports of abuse may not be adequately represented in the Archdiocese data, which would tend to lengthen the filing lag compared to the John Jay data.

The Archdiocese lag to filing data was smoothed as shown in Chart 3 to better approximate the likely shape of the distribution if more claims data were available. Applying this distribution to the lower- and upper-bound forecast parameters increased the lower-bound claims forecast from 89 claims to 208 claims and the upper-bound forecast from 168 claims to 397 claims. Nominal value liabilities range from $51.2 to $70.0 million under the lower-bound assumptions and from $98.6 to $134.7 million under the upper-bound assumptions. These results are shown in Appendix tables 5 and 6.



Case 04-37154-tmb11    Doc 3673    Filed 05/23/06

**Debtor's Comments**

Susan Ford, writing for the Debtor, raised three issues regarding HR&A's draft estimates of the number and value of future child abuse claims filed against the Archdiocese:[12]

- There is a fixed pool of potential future claimants and that, "spikes" in the number of claims made in 2002 and post-petition, deplete the size of the future claims' pool on a claim-by-claim basis;

- HR&A excluded post-petition claims from the estimated indemnity values used to forecast future liabilities and that the decrease in the quality of claims post-petition, will reduce either the number of valid claims or average indemnity values;

- That using a risk-free rate of return to discount the value of future claims to present value does not seem appropriate for the Archdiocese.

## 1) Effect of Filing Spikes Assuming a Fixed Pool of Future Claims

The non-recurring claims identified by HR&A in the 2002 filing year were defined as such because one-time conditions (e.g., intense adverse publicity) leading to those filings were thought not likely to occur again in the future (i.e., after April 29, 2005). If non-recurring conditions should occur in the future, then HR&A's claim forecast is biased downward by the effects of these unexpected events on claiming behavior. Including the claims assumed to be nonrecurring with the exception the poet-petition claims increases the claim filing forecast to 321 claims, a substantial, increase from the 89 to 168 claims forecast in the draft report.

The debtor appears to be arguing that the 2002 claims spike identified by HR&A actually consisted of claims that would have been filed in the future (i.e., after April 29, 2005), but-for the adverse publicity in 2002. It is unclear how it is known that these claims would have been after April 29, 2005 as future claims, as opposed to some time in 2003, 2004 or 2005.

The possibility that some claims filed in the post-petition bankruptcy period may have been accelerated from the future into the bankruptcy seems likely, although estimating the number and characteristics of these claims is likely to yield ambiguous results given the large number of what appear to be non-recurring claims. Since all post-petition claims have been excluded from the claim filing and indemnity value calculations, any claims that may have been accelerated do not increase the future forecast. In light of the magnitude of the downward adjustments for non-recurring claims outside the post-petition period, it is HR&A's opinion that any further adjustments are not warranted given available information. As further information about the facts and circumstance of

---

[12] This letter is attached as Exhibit 2 to this report.

Case 04-37154-tmb11   Doc 3673   Filed 05/23/06

the post-petition claims is developed, it may be possible to refine what constitutes a non-recurring claim in the post-petition claim period.

The debtor also states that there is a fixed pool of "potential claimants" and that if a claim is made, the pool of potential claims has been reduced by one claimant and the additional claim made must be subtracted from the future forecast. The notion of subtracting claims made from a fixed pool of potential claimants assumes that all potential claims will eventually be made, and that it is only a matter of when a claim will be made.

HR&A's use of the lag from abuse to claim filing adjusted for non-recurring events implicitly assumes that the pool of potential claimants is not fixed and that external events such as adverse publicity, the bankruptcy filing and bar date increase claim filings above levels that would otherwise be suggested by the lag from abuse to filing structure. This model of abuse claims filings is supported by clear differences in known claimant characteristics during nonrecurring events such as the bankruptcy filing and bar date establishment.

For example, approximately 34 percent of the bankruptcy claims have no legal representation, as opposed to six percent in the 2000 to 2004 calibration period. Similarly, 9.5 percent of the claims filed after bankruptcy have not stated the year when abuse allegedly took place as opposed to less than one percent pre-bankruptcy. Finally, plaintiff's counsels report that credible potential claimants have chosen to not file claims, which indicates that some potential claims are not made. Such heterogeneity does not support the concept of a fixed potential claimant pool. The heterogeneity in post-bankruptcy claims forms the basis for excluding all of these claims from the calibration period used to estimate a future forecast. Additional information about post-petition claims may support revisions to this assumption.

## 2) Accounting for the Decrease in the Quality of Post-Petition Claims

HR&A excluded post-petition claims from the forecast of future claims because many of the claims appeared to be non-recurring, and if included in the calibration period, would overstate the magnitude of the future claims forecast. Post-petition claims were excluded from the valuation of future claims because 87 of the 137 (over 60 percent) post-petition claims remain open with little or no information available about their potential indemnity values.[13] The use of incomplete claim resolution data from the post-petition period seems unlikely to improve on the current forecast, and creates the possibility of biasing the liability estimates upward or downward in unknown directions, as compared to the true values once most, if not all of the post-petition claims are resolved.

---

[13] There are also 33 pending claims filed in 2003 and 2004, including two claims that were influenced the Archdiocese's decision to file for bankruptcy, that may have a material effect on the estimated indemnity value for future claims.

Case 04-37154-tmb11    Doc 3673    Filed 05/23/06

If the claims closed in the post-petition period are included in calculation of average indemnity values using the lower-bound assumptions, the effect is to reduce the average indemnity value from $225,005 to $196,478 as shown in Table 15 on the next page. The reduction in average indemnity is relatively modest for two main reasons. First, indemnity payments in the post-petition period total $4.6 million, or approximately 25% of the $19.5 million paid. Thus the low average values paid post-petition, $139,424 are offset by the higher average values paid in previous years, especially the average of $262,205 paid in 2003. Second, Table 15 and its comparable Table 11 (excludes post-petition) both exclude single claims against priests that were settled for $0 since they were assumed to be non-recurring.

**Table 15**
**Claims Settled After Fearing; Exclude Multiple Claims Closed Against Religious Order Priest Settled for $0; Exclude Claims Closed Against Grammond and Laughlin; Exclude State Employees at Time of Alleged Abuse, and Single Claims Against Priests Settled for $0; Include Claims Resolved in Bankruptcy**

| YrSettled | Claims | Total Indem. | Average Indem. | Max. Indem | Percent Closed for $0 |
|---|---|---|---|---|---|
| Unknown | 3 | $ - | $ - | $ - | 100% |
| 2000 | 1 | 75,000 | 75,000 | 75,000 | 0% |
| 2001 | 6 | 2,252,500 | 375,417 | 550,000 | 0% |
| 2002 | 5 | 200,500 | 40,100 | 125,000 | 0% |
| 2003 | 43 | 11,274,834 | 262,205 | 975,000 | 2% |
| 2004 | 8 | 1,047,500 | 130,938 | 590,000 | 38% |
| Bankruptcy | 33 | 4,601,000 | 139,424 | 1,000,000 | 18% |
| Total | 99 | 19,451,334 | 196,478 | 1,000,000 | 13% |

As shown in Table 16, including the 30 single priest claims settled for $0 lowers the average indemnity value from $196,478 to $148,483, and the post-petition average to $73,032. The reduction in indemnity values is offset by an increase in the number of claims included in the calibration period, which now includes the relatively large number of claims filed through the bar date as shown in Table 17 on the next page (Table 7 is the comparable excluding the post-petition claims and single priest claims settled for $0). The net effect of these adjustments is a $3.9 million dollar increase in the future liability forecast, from $20.1 million as shown in Appendix Table 1 to $24.0 million in Appendix Table 7. So while the average value is reduced by the inclusion of closed post-petition claims and single priest claims settled for $0, the total number of claims considered to recur in the future increases and total liabilities increase slightly.

Case 04-37154-tmb11   Doc 3673   Filed 05/23/06

**Table 16**
Claims Settled After Fearing; Exclude Multiple Claims Closed Against Religious Order
Priest Settled for $0; Exclude Claims Closed Against Grammond and Laughlin; Exclude
State Employees at Time of Alleged Abuse; Includ e Claims Resolved in Bankruptcy &
Single Claims Against Priests Settled for $0

| YrSettled | Claims | Total Indem. | Average Indem. | Max. Indem | Percent Closed for $0 |
|---|---|---|---|---|---|
| Unknown | 4 | $ - | $ - | $ - | 100% |
| 2000 | 1 | 75,000 | 75,000 | 75,000 | 0% |
| 2001 | 6 | 2,252,500 | 375,417 | 550,000 | 0% |
| 2002 | 5 | 200,500 | 40,100 | 125,000 | 0% |
| 2003 | 44 | 11,274,834 | 256,246 | 975,000 | 5% |
| 2004 | 8 | 1,047,500 | 130,938 | 590,000 | 38% |
| Bankruptcy | 63 | 4,601,000 | 73,032 | 1,000,000 | 57% |
| Total | 131 | 19,451,334 | 148,483 | 1,000,000 | 34% |

**Table 17**
**Child Sex Abuse Claims Filed Against the Archdiocese:  By Year Filed & Year of
First Incident**
Claims Filed After Fearing; Smoothed Publicity Spike in 2002,
  Exclude Multiple Claims Filed Against Religious Order Priest Settled for $0,
  Claims Filed Against Grammond, Laughlin, State Employees at Time of Alleged Abuse;
  Include Bankruptcy Claims and Claims Against Single Priests Settled for $0

| Year of 1st Incident Category | Year Filed Categories | | | | | | | Average Annual Claims |
|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004: 1/2 Year | Bankruptcy | Total | |
| 1937-1949 | | 3 | 2 | | 1 | 13 | 19 | 3.5 |
| 1950-1959 | 2 | 2 | 5 | 7 | 4 | 22 | 42 | 7.6 |
| 1960-1969 | 2 | 2 | 5 | 8 | 4 | 30 | 51 | 9.3 |
| 1970-1983 | 1 | 1 | 3 | 4 | 8 | 20 | 37 | 6.7 |
| 1984-1989 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 0.4 |
| 1990-1999 | 0 | 0 | 0 | 1 | 0 | 2 | 3 | 0.5 |
| Total | 5 | 8 | 15 | 20 | 18 | 88 | 154 | 28.0 |

As additional data is collected for the post-petition claims and pending pre-petition
claims, HR&A plans to incorporate the additional information that will inform all parties
in the bankruptcy.  At this time in the bankruptcy process, HR&A does not believe that

Case 04-37154-tmb11   Doc 3673   Filed 05/23/06

sufficient information about claims from the post-petition period is available to use these claims for estimation purposes.

### 3) Use of a Risk-Free Discount Rate Does Not Seem Appropriate

The net present value (NPV) of the forecasted future liability stream was calculated to answer the question that was expected from one or more of the Applicants in this case. The relevance and use of the NPV calculation is likely to vary according to the interests and objectives of each Applicant, and the use of alternative discount rates may be appropriate. The choice of a risk-free yield on U.S. government securities was made as a point of departure, to be revised if warranted by the specifics of future funding proposals. As noted by the debtor, the use of a discount rate may not be relevant.

The NPV calculation is intended to yield a lump sum amount that, if invested in the present at the assumed discount rate, could generate the forecasted future liability stream. While the appropriate discount rate used to calculate net present value may or may not be risk-free, the interest rate charged to the Archdiocese for pre-bankruptcy borrowing is not likely to generate forecast stream of future liabilities since it is a borrowing rate, not an investment rate. Instead, some measure of the rate of return on the Archdiocese's pension fund or investment portfolio would seem to be a better measure of the rate of return used to discount future liability forecasts to present value.

28

**Appendices**

**Appendix Table 1**

**Year-by-Year Future Forecast of Sex Abuse Claims Made Against the Archdiocese of Portland in Oregon**

**Lower Bound Estimate Assuming John Jay Report Lag From Incident to Filing**

| | Claims by Incident Cohort & Filing Year | | | | | | | Avg. Indemnity | |
|---|---|---|---|---|---|---|---|---|---|
| Years At Risk to File (from mid-points) | 1937 - 1949 | 1950 - 1959 | 1960 - 1969 | 1970 - 1983 | 1984 - 1999 | 1990 - 1999 | Total Claims | $225,000 | $307,500 |
| | 61 | 49 | 39 | 29 | 19 | 9 | | | |
| | | | | | | 0 | | | |
| Average Claims Per Year | 1.3 | 3.3 | 4.7 | 3.8 | 0.2 | 0 | 13.3 | Annual Payments | |
| Future Claims From April 29, 2005 | 0 | | | | | 0 | 0 | | |
| 2006 | | 2.64 | 3.58 | 2.94 | 0.19 | | 9.35 | $2,103,353 | $2,874,583 |
| 2007 | | 2.64 | 5.37 | 3.80 | 0.24 | | 12.06 | $2,712,449 | $3,707,014 |
| 2008 | | 3.96 | 5.37 | 4.18 | 0.31 | | 13.82 | $3,110,315 | $4,250,764 |
| 2009 | | | 4.03 | 2.66 | 0.27 | | 6.96 | $1,565,294 | $2,139,236 |
| 2010 | | | 2.69 | 2.96 | 0.28 | | 5.93 | $1,334,844 | $1,824,287 |
| 2011 | | | 2.24 | 2.66 | 0.27 | | 5.17 | $1,163,535 | $1,590,164 |
| 2012 | | | 2.46 | 2.43 | 0.28 | | 5.17 | $1,162,592 | $1,588,876 |
| 2013 | | | 2.69 | 2.81 | 0.27 | | 5.78 | $1,300,644 | $1,777,547 |
| 2014 | | | 1.34 | 1.90 | 0.21 | | 3.46 | $777,936 | $1,063,179 |
| 2015 | | | 1.12 | 1.60 | 0.24 | | 2.96 | $665,764 | $909,877 |
| 2016 | | | 1.34 | 1.82 | 0.28 | | 3.45 | $776,201 | $1,060,809 |
| 2017 | | | 0.90 | 1.82 | 0.24 | | 2.96 | $666,707 | $911,166 |
| 2018 | | | 1.34 | 1.82 | 0.27 | | 3.44 | $772,909 | $1,056,309 |
| 2019 | | | 0.00 | 1.37 | 0.17 | | 1.54 | $346,215 | $473,160 |
| 2020 | | | | 0.91 | 0.19 | | 1.10 | $248,005 | $338,940 |
| 2021 | | | | 0.76 | 0.17 | | 0.93 | $209,415 | $286,200 |
| 2022 | | | | 0.84 | 0.16 | | 0.99 | $223,222 | $305,070 |
| 2023 | | | | 0.91 | 0.18 | | 1.09 | $245,810 | $335,940 |
| 2024 | | | | 0.46 | 0.12 | | 0.58 | $130,039 | $177,720 |
| 2025 | | | | 0.38 | 0.10 | | 0.48 | $108,549 | $148,350 |
| 2026 | | | | 0.46 | 0.12 | | 0.57 | $128,941 | $176,220 |
| 2027 | | | | 0.30 | 0.12 | | 0.42 | $94,741 | $129,480 |
| 2028 | | | | 0.46 | 0.12 | | 0.57 | $128,941 | $176,220 |
| 2029 | | | | 0.00 | 0.09 | | 0.09 | $19,756 | $27,000 |
| 2030 | | | | | 0.06 | | 0.06 | $13,171 | $18,000 |
| 2031 | | | | | 0.05 | | 0.05 | $10,976 | $15,000 |
| 2032 | | | | | 0.05 | | 0.05 | $12,073 | $16,500 |
| 2033 | | | | | 0.06 | | 0.06 | $13,171 | $18,000 |
| 2034 | | | | | 0.03 | | 0.03 | $6,585 | $9,000 |
| 2035 | | | | | 0.02 | | 0.02 | $5,488 | $7,500 |
| 2036 | | | | | 0.03 | | 0.03 | $6,585 | $9,000 |
| 2037 | | | | | 0.02 | | 0.02 | $4,390 | $6,000 |
| 2038 | | | | | 0.03 | | 0.03 | $6,585 | $9,000 |
| | | | | | 0.00 | | 0.00 | $0 | $0 |
| Total | 0.00 | 9.24 | 34.47 | 40.25 | 5.26 | 0.00 | 89.22 | $20,075,202 | $27,436,110 |
| | | | | | | NPV @ net 3% discount --> | | $16,740,701 | $22,878,957 |

## Appendix Table 2
### Year-by-Year Future Forecast of Sex Abuse Claims Made Against the Archdiocese of Portland in Oregon
### Upper Bound Estimate Assuming John Jay Report Lag From Incident to Filing

| | Claims by Incident Cohort & Filing Year | | | | | | | Avg. Indemnity | |
| | 1937 - 1949 | 1950 - 1959 | 1960 - 1969 | 1970 - 1983 | 1984 - 1999 | 1990 - 1999 | Total Claims | $225,000 | $307,500 |
|---|---|---|---|---|---|---|---|---|---|
| Years At Risk to File (from mid-points) | 61 | 49 | 39 | 29 | 19 | 9 | | | |
| Average Claims Per Year | 1.3 | 4.4 | 5.8 | 8.7 | 0.2 | 0.2 | 20.6 | | Annual Payments |
| **Future Claims From April 29, 2005** | | | | | | | | | |
| 2006 | 0 | 3.52 | 4.42 | 6.73 | 0.19 | 0.22 | 15.08 | $3,392,525 | $4,636,450 |
| 2007 | | 3.52 | 6.63 | 8.70 | 0.24 | 0.28 | 19.37 | $4,358,307 | $5,956,352 |
| 2008 | | 5.28 | 6.63 | 9.57 | 0.31 | 0.40 | 22.19 | $4,992,922 | $6,823,661 |
| 2009 | | | 4.97 | 6.09 | 0.27 | 0.41 | 11.74 | $2,641,687 | $3,610,306 |
| 2010 | | | 3.31 | 6.79 | 0.28 | 0.44 | 10.83 | $2,436,223 | $3,329,505 |
| 2011 | | | 2.76 | 6.09 | 0.27 | 0.47 | 9.59 | $2,158,142 | $2,949,461 |
| 2012 | | | 3.04 | 5.57 | 0.28 | 0.44 | 9.32 | $2,097,835 | $2,867,041 |
| 2013 | | | 3.31 | 6.44 | 0.21 | 0.46 | 10.49 | $2,360,423 | $3,225,911 |
| 2014 | | | 1.66 | 4.35 | 0.24 | 0.46 | 6.68 | $1,502,400 | $2,053,280 |
| 2015 | | | 1.38 | 3.65 | 0.24 | 0.64 | 5.73 | $1,290,242 | $1,763,331 |
| 2016 | | | 1.66 | 4.18 | 0.27 | 0.56 | 6.76 | $1,521,116 | $2,078,858 |
| 2017 | | | 1.10 | 4.18 | 0.17 | 0.71 | 6.08 | $1,368,049 | $1,869,668 |
| 2018 | | | 1.66 | 4.18 | 0.19 | 0.61 | 6.81 | $1,532,823 | $2,094,858 |
| 2019 | | | 0.00 | 3.13 | 0.17 | 0.64 | 3.91 | $880,615 | $1,203,507 |
| 2020 | | | | 2.09 | 0.16 | 0.62 | 2.92 | $657,605 | $898,727 |
| 2021 | | | | 1.74 | 0.18 | 0.62 | 2.53 | $569,915 | $778,883 |
| 2022 | | | | 1.91 | 0.12 | 0.64 | 2.69 | $605,772 | $827,888 |
| 2023 | | | | 2.09 | 0.10 | 0.49 | 2.91 | $655,410 | $895,727 |
| 2024 | | | | 1.04 | 0.12 | 0.56 | 1.65 | $372,339 | $508,863 |
| 2025 | | | | 0.87 | 0.12 | 0.64 | 1.53 | $343,799 | $469,858 |
| 2026 | | | | 1.04 | 0.12 | 0.56 | 1.81 | $406,241 | $555,197 |
| 2027 | | | | 0.70 | 0.09 | 0.61 | 1.37 | $307,941 | $420,853 |
| 2028 | | | | 1.04 | 0.06 | 0.39 | 1.77 | $398,741 | $544,947 |
| 2029 | | | | 0.00 | 0.05 | 0.43 | 0.48 | $107,256 | $146,583 |
| 2030 | | | | | 0.05 | 0.39 | 0.49 | $110,671 | $151,250 |
| 2031 | | | | | 0.06 | 0.36 | 0.44 | $98,476 | $134,583 |
| 2032 | | | | | 0.03 | 0.41 | 0.41 | $92,073 | $125,833 |
| 2033 | | | | | 0.02 | 0.28 | 0.47 | $105,671 | $144,417 |
| 2034 | | | | | 0.03 | 0.23 | 0.31 | $69,085 | $94,417 |
| 2035 | | | | | 0.02 | 0.27 | 0.26 | $57,988 | $79,250 |
| 2036 | | | | | 0.03 | 0.27 | 0.30 | $66,585 | $91,000 |
| 2037 | | | | | 0.00 | 0.27 | 0.29 | $64,390 | $88,000 |
| 2038 | | | | | | 0.20 | 0.20 | $45,000 | $61,500 |
| **Total** | 0.00 | 12.32 | 42.53 | 92.16 | 5.26 | 15.43 | 167.71 | $37,734,852 | $51,570,965 |
| | | | | | | NPV @ net 3% discount --> | | $30,489,951 | $41,669,600 |

## Appendix Table 3
### Year-by-Year Future Forecast of Sex Abuse Claims Made Against the Archdiocese of Portland in Oregon
### Lower Bound Estimate Assuming John Jay Report Lag From Incident to Filing
### Including Laughlin & Grammond Claims

| | Claims by Incident Cohort & Filing Year | | | | | | | Avg. Indemnity | |
| | 1937 - 1949 | 1950 - 1959 | 1960 - 1969 | 1970 - 1983 | 1984 - 1999 | 1990 - 1999 | Total Claims | $225,000 | $420,056 |
|---|---|---|---|---|---|---|---|---|---|
| Years At Risk to File (from mid-points) | 61 | 49 | 39 | 29 | 19 | 9 | | | |
| Average Claims Per Year | 1.3 | 3.3 | 4.7 | 3.8 | 0.2 | 0 | 13.3 | Annual Payments | |
| **Future Claims From April 29, 2005** | | | | | | | | | |
| 2006 | 0 | 2.64 | 3.58 | 2.94 | 0.19 | 0 | 9.35 | $2,103,353 | $3,926,783 |
| 2007 | | 2.64 | 5.37 | 3.80 | 0.24 | | 12.06 | $2,712,449 | $5,063,914 |
| 2008 | | 3.96 | 5.37 | 4.18 | 0.31 | | 13.82 | $3,110,315 | $5,806,696 |
| 2009 | | | 4.03 | 2.66 | 0.27 | | 6.96 | $1,565,294 | $2,922,273 |
| 2010 | | | 2.69 | 2.96 | 0.28 | | 5.93 | $1,334,844 | $2,492,041 |
| 2011 | | | 2.24 | 2.66 | 0.27 | | 5.17 | $1,163,535 | $2,172,221 |
| 2012 | | | 2.46 | 2.43 | 0.28 | | 5.17 | $1,162,592 | $2,170,461 |
| 2013 | | | 2.69 | 2.81 | 0.28 | | 5.78 | $1,300,644 | $2,428,193 |
| 2014 | | | 1.34 | 1.90 | 0.21 | | 3.46 | $777,936 | $1,452,340 |
| 2015 | | | 1.12 | 1.60 | 0.24 | | 2.96 | $665,764 | $1,242,925 |
| 2016 | | | 1.34 | 1.82 | 0.28 | | 3.45 | $776,201 | $1,449,102 |
| 2017 | | | 0.90 | 1.82 | 0.24 | | 2.96 | $666,707 | $1,244,685 |
| 2018 | | | 1.34 | 1.82 | 0.27 | | 3.44 | $772,909 | $1,442,955 |
| 2019 | | | 0.00 | 1.37 | 0.17 | | 1.54 | $346,215 | $646,353 |
| 2020 | | | | 0.91 | 0.17 | | 1.10 | $248,005 | $463,004 |
| 2021 | | | | 0.84 | 0.16 | | 0.93 | $209,415 | $390,959 |
| 2022 | | | | 0.91 | 0.18 | | 0.99 | $223,222 | $416,737 |
| 2023 | | | | 0.46 | 0.12 | | 1.09 | $245,810 | $458,906 |
| 2024 | | | | 0.38 | 0.10 | | 0.58 | $130,039 | $242,772 |
| 2025 | | | | 0.46 | 0.12 | | 0.48 | $108,549 | $202,651 |
| 2026 | | | | 0.30 | 0.12 | | 0.57 | $128,941 | $240,723 |
| 2027 | | | | 0.46 | 0.12 | | 0.42 | $94,741 | $176,874 |
| 2028 | | | | 0.00 | 0.09 | | 0.57 | $128,941 | $240,723 |
| 2029 | | | | | 0.06 | | 0.09 | $19,756 | $36,883 |
| 2030 | | | | | 0.05 | | 0.06 | $13,171 | $24,589 |
| 2031 | | | | | 0.05 | | 0.05 | $10,976 | $20,491 |
| 2032 | | | | | 0.06 | | 0.05 | $12,073 | $22,540 |
| 2033 | | | | | 0.03 | | 0.06 | $13,171 | $24,589 |
| 2034 | | | | | 0.02 | | 0.03 | $6,585 | $12,294 |
| 2035 | | | | | 0.03 | | 0.02 | $5,488 | $10,245 |
| 2036 | | | | | 0.02 | | 0.03 | $6,585 | $12,294 |
| 2037 | | | | | 0.03 | | 0.02 | $4,390 | $8,196 |
| 2038 | | | | | 0.00 | | 0.03 | $6,585 | $12,294 |
| | | | | | | | 0.00 | $0 | $0 |
| **Total** | 0.00 | 9.24 | 34.47 | 40.25 | 5.26 | 0.00 | 89.22 | $20,075,202 | $37,478,708 |
| | | | | | | | NPV @ net 3% discount --> | $16,740,701 | $31,253,474 |

## Appendix Table 4
### Year-by-Year Future Forecast of Sex Abuse Claims Made Against the Archdiocese of Portland in Oregon
### Upper Bound Estimate Assuming John Jay Report Lag From Incident to Filing
### Including Laughlin & Grammond Claims

| | Claims by Incident Cohort & Filing Year | | | | | | | Annual Payments | |
| | | | | | | | | Avg. Indemnnity | |
| | | | | | | | | $225,000 | $420,056 |
| | 1937 - 1949 | 1950 - 1959 | 1960 - 1969 | 1970 - 1983 | 1984 - 1999 | 1990 - 1999 | Total Claims | | |
| Years At Risk to File (from mid-points) | 61 | 49 | 39 | 29 | 19 | 9 | | | |
| Average Claims Per Year | 1.3 | 4.4 | 5.8 | 8.7 | 0.2 | 0.2 | 20.6 | | |
| Future Claims From April 29, 2005 | | | | | | | | | |
| 2006 | 0 | 3.52 | 4.42 | 6.73 | 0.19 | 0.22 | 15.08 | $3,392,525 | $6,333,557 |
| 2007 | | 3.52 | 6.63 | 8.70 | 0.24 | 0.28 | 19.37 | $4,358,307 | $8,136,590 |
| 2008 | | 5.28 | 6.63 | 9.57 | 0.31 | 0.40 | 22.19 | $4,992,922 | $9,321,365 |
| 2009 | | | 4.97 | 6.09 | 0.27 | 0.41 | 11.74 | $2,641,687 | $4,931,807 |
| 2010 | | | 3.31 | 6.79 | 0.28 | 0.44 | 10.83 | $2,436,223 | $4,548,222 |
| 2011 | | | 2.76 | 6.09 | 0.27 | 0.44 | 9.59 | $2,158,142 | $4,029,069 |
| 2012 | | | 3.04 | 5.57 | 0.27 | 0.44 | 9.32 | $2,097,835 | $3,916,481 |
| 2013 | | | 3.31 | 6.44 | 0.28 | 0.46 | 10.49 | $2,360,423 | $4,406,710 |
| 2014 | | | 1.66 | 4.35 | 0.21 | 0.46 | 6.68 | $1,502,400 | $2,804,854 |
| 2015 | | | 1.38 | 3.65 | 0.24 | 0.46 | 5.73 | $1,290,242 | $2,408,773 |
| 2016 | | | 1.66 | 4.18 | 0.28 | 0.64 | 6.76 | $1,521,116 | $2,839,795 |
| 2017 | | | 1.10 | 4.18 | 0.24 | 0.56 | 6.08 | $1,368,049 | $2,554,033 |
| 2018 | | | 1.66 | 4.18 | 0.27 | 0.71 | 6.81 | $1,532,823 | $2,861,651 |
| 2019 | | | 0.00 | 3.13 | 0.17 | 0.61 | 3.91 | $880,615 | $1,644,033 |
| 2020 | | | | 2.09 | 0.19 | 0.64 | 2.92 | $657,605 | $1,227,693 |
| 2021 | | | | 1.74 | 0.17 | 0.62 | 2.53 | $569,915 | $1,063,982 |
| 2022 | | | | 1.91 | 0.16 | 0.62 | 2.69 | $605,772 | $1,130,925 |
| 2023 | | | | 2.09 | 0.18 | 0.64 | 2.91 | $655,410 | $1,223,595 |
| 2024 | | | | 1.04 | 0.12 | 0.49 | 1.65 | $372,339 | $695,126 |
| 2025 | | | | 0.87 | 0.10 | 0.56 | 1.53 | $343,799 | $641,843 |
| 2026 | | | | 1.04 | 0.12 | 0.64 | 1.81 | $406,241 | $758,419 |
| 2027 | | | | 0.70 | 0.12 | 0.56 | 1.37 | $307,941 | $574,901 |
| 2028 | | | | 1.04 | 0.12 | 0.61 | 1.77 | $398,741 | $744,417 |
| 2029 | | | | 0.00 | 0.09 | 0.39 | 0.48 | $107,256 | $200,238 |
| 2030 | | | | | 0.06 | 0.43 | 0.49 | $110,671 | $206,613 |
| 2031 | | | | | 0.05 | 0.39 | 0.44 | $98,476 | $183,846 |
| 2032 | | | | | 0.05 | 0.36 | 0.41 | $92,073 | $171,893 |
| 2033 | | | | | 0.06 | 0.41 | 0.47 | $105,671 | $197,278 |
| 2034 | | | | | 0.03 | 0.28 | 0.31 | $69,085 | $128,977 |
| 2035 | | | | | 0.02 | 0.23 | 0.26 | $57,988 | $108,258 |
| 2036 | | | | | 0.03 | 0.27 | 0.30 | $66,585 | $124,309 |
| 2037 | | | | | 0.02 | 0.27 | 0.29 | $64,390 | $120,211 |
| 2038 | | | | | 0.03 | 0.27 | 0.30 | $66,585 | $124,309 |
| | | | | | 0.00 | 0.20 | 0.20 | $45,000 | $84,011 |
| Total | 0.00 | 12.32 | 42.53 | 92.16 | 5.26 | 15.43 | 167.71 | $37,734,852 | $70,447,783 |
| | | | | | | NPV @ net 3% discount --> | | $30,489,951 | $56,922,164 |

**Appendix Table 5**

**Year-by-Year Future Forecast of Sex Abuse Claims Made Against the Archdiocese of Portland in Oregon**

**Lower Bound Estimate Assuming Archdiocese Lag From Incident to Filing**

| | | | Claims by Incident Cohort & Filing Year | | | | | Avg. Indemnity | |
|---|---|---|---|---|---|---|---|---|---|
| | 1937 - 1949 | 1950 - 1959 | 1960 - 1969 | 1970 - 1983 | 1984 - 1989 | 1990 - 1999 | | $225,000 | $307,500 |
| Years At Risk to File (from mid-points) | 61 | 49 | 39 | 29 | 19 | 9 | Total | | |
| Average Claims Per Year | 1.3 | 3.3 | 4.7 | 3.8 | 0.2 | 0 | 13.3 | Annual Payments | |
| Future Claims From April 29, 2005 | 0 | | | | | 0.00 | | | |
| 2006 | | 2.08 | 2.86 | 2.80 | 0.27 | | 8.00 | $1,800,414 | $2,460,565 |
| 2007 | | 2.80 | 3.80 | 4.61 | 0.20 | | 11.41 | $2,567,670 | $3,509,149 |
| 2008 | | 2.18 | 3.73 | 5.17 | 0.20 | | 11.29 | $2,539,365 | $3,470,465 |
| 2009 | | 2.05 | 4.08 | 5.66 | 0.20 | | 11.99 | $2,698,252 | $3,687,612 |
| 2010 | | 1.68 | 4.08 | 5.90 | 0.40 | | 12.06 | $2,713,770 | $3,708,819 |
| 2011 | | 1.12 | 4.42 | 5.98 | 0.64 | | 12.17 | $2,738,634 | $3,742,800 |
| 2012 | | 1.12 | 4.15 | 5.98 | 0.67 | | 11.92 | $2,681,428 | $3,664,619 |
| 2013 | | 0.56 | 4.01 | 5.90 | 0.71 | | 11.18 | $2,516,049 | $3,438,600 |
| 2014 | | 0.56 | 3.73 | 5.66 | 0.89 | | 10.84 | $2,439,269 | $3,333,667 |
| 2015 | | 0.56 | 3.66 | 5.50 | 1.04 | | 10.21 | $2,296,249 | $3,138,207 |
| 2016 | | 0.00 | 3.46 | 5.01 | 1.16 | | 9.62 | $2,165,446 | $2,959,443 |
| 2017 | | | 3.11 | 4.45 | 1.27 | | 8.82 | $1,985,348 | $2,713,309 |
| 2018 | | | 2.42 | 4.37 | 1.42 | | 8.21 | $1,846,642 | $2,523,744 |
| 2019 | | | 2.28 | 4.77 | 1.56 | | 8.61 | $1,936,496 | $2,646,545 |
| 2020 | | | 1.87 | 4.77 | 1.62 | | 8.26 | $1,858,188 | $2,539,523 |
| 2021 | | | 1.24 | 5.17 | 1.64 | | 8.06 | $1,814,182 | $2,479,382 |
| 2022 | | | 1.24 | 4.85 | 1.64 | | 7.74 | $1,741,416 | $2,379,935 |
| 2023 | | | 0.62 | 4.69 | 1.62 | | 6.93 | $1,560,070 | $2,132,095 |
| 2024 | | | 0.62 | 4.37 | 1.56 | | 6.54 | $1,472,304 | $2,012,148 |
| 2025 | | | 0.00 | 4.29 | 1.51 | | 5.80 | $1,304,149 | $1,782,337 |
| 2026 | | | | 4.04 | 1.38 | | 5.42 | $1,219,574 | $1,666,752 |
| 2027 | | | | 3.64 | 1.22 | | 4.86 | $1,093,617 | $1,494,610 |
| 2028 | | | | 2.83 | 1.20 | | 4.03 | $906,702 | $1,239,160 |
| 2029 | | | | 2.67 | 1.31 | | 3.98 | $895,319 | $1,223,603 |
| 2030 | | | | 2.18 | 1.31 | | 3.49 | $786,170 | $1,074,433 |
| 2031 | | | | 1.46 | 1.42 | | 2.88 | $647,447 | $884,844 |
| 2032 | | | | 1.46 | 1.33 | | 2.79 | $627,447 | $857,511 |
| 2033 | | | | 0.73 | 1.29 | | 2.02 | $453,723 | $620,089 |
| 2034 | | | | 0.73 | 1.20 | | 1.93 | $433,723 | $592,755 |
| 2035 | | | | 0.00 | 1.18 | | 1.18 | $265,000 | $362,167 |
| 2036 | | | | 0.00 | 1.11 | | 1.11 | $250,000 | $341,667 |
| 2037 | | | | 0.00 | 1.00 | | 1.00 | $225,000 | $307,500 |
| 2038 | | | | | 0.78 | | 0.78 | $175,000 | $239,167 |
| 2039 | | | | | 0.73 | | 0.73 | $165,000 | $225,000 |
| 2040 | | | | | 0.60 | | 0.60 | $135,000 | $184,500 |
| 2041 | | | | | 0.40 | | 0.40 | $90,000 | $123,000 |
| 2042 | | | | | 0.40 | | 0.40 | $90,000 | $123,000 |
| 2043 | | | | | 0.20 | | 0.20 | $45,000 | $61,500 |
| 2044 | | | | | 0.20 | | 0.20 | $45,000 | $61,500 |
| 2045 | | | | | 0.00 | | 0.00 | $0 | $0 |
| Total | 0 | 14.15 | 55.39 | 113.08 | 25.33 | 0.00 | 207.96 | $51,224,064 | $70,006,220 |
| | | | | | | | NPV @ net 3% interest --> | $36,645,682 | $50,082,432 |

## Appendix Table 6
## Year-by-Year Future Forecast of Sex Abuse Claims Made Against the Archdiocese of Portland in Oregon
## Upper Bound Estimate Assuming Archdiocese Lag From Incident to Filing

| | Claims by Incident Cohort & Filing Year | | | | | | Total | Avg. Indemnity $225,000 | $307,500 |
|---|---|---|---|---|---|---|---|---|---|
| | 1937 - 1949 | 1950 - 1959 | 1960 - 1969 | 1970 - 1983 | 1984 - 1999 | 1990 - 1999 | | | |
| Years At Risk to File (from mid-points) | 61 | 49 | 39 | 29 | 19 | 9 | 20.6 | | |
| Average Claims Per Year | 1.3 | 4.4 | 5.8 | 8.7 | 0.2 | 0.2 | | Annual Payments | |
| Future Claims From April 29, 2005 | | | | | | | | | |
| 2006 | 0 | 2.77 | 3.53 | 6.42 | 0.27 | 0.27 | 13.24 | $2,979,707 | $4,072,266 |
| 2007 | | 3.74 | 4.69 | 10.55 | 0.20 | 0.20 | 19.38 | $4,360,070 | $5,958,762 |
| 2008 | | 2.91 | 4.61 | 11.85 | 0.20 | 0.20 | 19.76 | $4,445,629 | $6,075,693 |
| 2009 | | 2.74 | 5.03 | 12.96 | 0.20 | 0.20 | 21.13 | $4,754,120 | $6,497,297 |
| 2010 | | 2.24 | 5.03 | 13.51 | 0.40 | 0.40 | 21.59 | $4,856,991 | $6,637,888 |
| 2011 | | 1.49 | 5.46 | 13.70 | 0.64 | 0.64 | 21.94 | $4,936,483 | $6,746,527 |
| 2012 | | 1.49 | 5.12 | 13.70 | 0.67 | 0.67 | 21.64 | $4,869,718 | $6,655,282 |
| 2013 | | 0.75 | 4.95 | 13.51 | 0.71 | 0.71 | 20.63 | $4,641,574 | $6,343,484 |
| 2014 | | 0.75 | 4.61 | 12.96 | 0.89 | 0.89 | 20.09 | $4,519,862 | $6,177,145 |
| 2015 | | 0.00 | 4.52 | 12.59 | 1.04 | 1.04 | 19.20 | $4,319,260 | $5,902,989 |
| 2016 | | | 4.26 | 11.48 | 1.16 | 1.16 | 18.05 | $4,061,793 | $5,551,117 |
| 2017 | | | 3.84 | 10.18 | 1.27 | 1.27 | 16.55 | $3,724,294 | $5,089,869 |
| 2018 | | | 2.99 | 10.00 | 1.42 | 1.42 | 15.83 | $3,560,734 | $4,866,336 |
| 2019 | | | 2.81 | 10.92 | 1.56 | 1.56 | 16.85 | $3,790,596 | $5,180,481 |
| 2020 | | | 2.30 | 10.92 | 1.62 | 1.62 | 16.47 | $3,705,449 | $5,064,114 |
| 2021 | | | 1.54 | 11.85 | 1.64 | 1.64 | 16.67 | $3,750,973 | $5,126,330 |
| 2022 | | | 1.54 | 11.11 | 1.64 | 1.64 | 15.93 | $3,584,377 | $4,898,649 |
| 2023 | | | 0.77 | 10.74 | 1.62 | 1.62 | 14.75 | $3,318,359 | $4,535,090 |
| 2024 | | | 0.77 | 10.00 | 1.56 | 1.56 | 13.87 | $3,121,763 | $4,266,410 |
| 2025 | | | 0.00 | 9.81 | 1.51 | 1.51 | 12.83 | $2,887,394 | $3,946,105 |
| 2026 | | | | 9.26 | 1.38 | 1.38 | 12.01 | $2,702,447 | $3,693,344 |
| 2027 | | | | 8.33 | 1.22 | 1.22 | 10.77 | $2,424,202 | $3,313,076 |
| 2028 | | | | 6.48 | 1.20 | 1.20 | 8.88 | $1,997,713 | $2,730,207 |
| 2029 | | | | 6.11 | 1.31 | 1.31 | 8.73 | $1,964,415 | $2,684,700 |
| 2030 | | | | 5.00 | 1.31 | 1.31 | 7.62 | $1,714,521 | $2,343,179 |
| 2031 | | | | 3.33 | 1.42 | 1.42 | 6.18 | $1,389,681 | $1,899,230 |
| 2032 | | | | 3.33 | 1.33 | 1.33 | 6.00 | $1,349,681 | $1,844,564 |
| 2033 | | | | 1.67 | 1.29 | 1.29 | 4.24 | $954,840 | $1,304,949 |
| 2034 | | | | 1.67 | 1.20 | 1.20 | 4.07 | $914,840 | $1,250,282 |
| 2035 | | | | 0.00 | 1.18 | 1.18 | 2.36 | $530,000 | $724,333 |
| 2036 | | | | 0.00 | 1.11 | 1.11 | 2.22 | $500,000 | $683,333 |
| 2037 | | | | | 1.00 | 1.00 | 2.00 | $450,000 | $615,000 |
| 2038 | | | | | 0.78 | 0.78 | 1.56 | $350,000 | $478,333 |
| 2039 | | | | | 0.73 | 0.73 | 1.47 | $330,000 | $451,000 |
| 2040 | | | | | 0.60 | 0.60 | 1.20 | $270,000 | $369,000 |
| 2041 | | | | | 0.40 | 0.40 | 0.80 | $180,000 | $246,000 |
| 2042 | | | | | 0.40 | 0.40 | 0.80 | $180,000 | $246,000 |
| 2043 | | | | | 0.20 | 0.20 | 0.40 | $90,000 | $123,000 |
| 2044 | | | | | 0.20 | 0.20 | 0.40 | $90,000 | $123,000 |
| 2045 | | | | | 0.00 | 0.00 | 0.00 | $0 | $0 |
| Total | 0 | 18.87 | 68.35 | 258.90 | 25.33 | 25.33 | 396.79 | $89,571,487 | $134,714,366 |
| NPV @ net 3% interest --> | | | | | | | | $69,305,223 | $94,717,138 |

**Appendix Table 7**

**Year-by-Year Future Forecast of Sex Abuse Claims Made Against the Archdiocese of Portland in Oregon**

**Lower Bound Estimate Assuming John Jay Report Lag From Incident to Filing**

| | Claims by Incident Cohort & Filing Year | | | | | | | Avg. Indemnity $148,484 |
| | 1937 - 1949 | 1950 - 1959 | 1960 - 1969 | 1970 - 1983 | 1984 - 1999 | 1990 - 1999 | Total Claims | Annual Payments |
|---|---|---|---|---|---|---|---|---|
| Years At Risk to File (from mid-points) | 61 | 49 | 39 | 29 | 19 | 9 | | |
| Average Claims Per Year | 3.5 | 7.6 | 9.3 | 6.7 | 0.04 | 0.05 | 27.19 | |
| **Future Claims From April 29, 2005** | | | | | | | | |
| 2006 | | 6.08 | 7.09 | 5.18 | 0.04 | 0 | 18.38 | $2,729,844 |
| 2007 | | 6.08 | 10.63 | 6.70 | 0.05 | | 23.46 | $3,483,041 |
| 2008 | | 9.12 | 10.63 | 7.37 | 0.06 | | 27.18 | $4,035,945 |
| 2009 | | | 7.97 | 4.69 | 0.05 | | 12.72 | $1,887,987 |
| 2010 | | | 5.31 | 5.23 | 0.06 | | 10.60 | $1,573,466 |
| 2011 | | | 4.43 | 4.69 | 0.05 | | 9.17 | $1,362,074 |
| 2012 | | | 4.87 | 4.29 | 0.05 | | 9.21 | $1,368,141 |
| 2013 | | | 5.31 | 4.96 | 0.06 | | 10.33 | $1,533,672 |
| 2014 | | | 2.66 | 3.35 | 0.04 | | 6.05 | $898,339 |
| 2015 | | | 2.21 | 2.81 | 0.05 | | 5.08 | $753,863 |
| 2016 | | | 2.66 | 3.22 | 0.06 | | 5.93 | $880,470 |
| 2017 | | | 1.77 | 3.22 | 0.05 | | 5.04 | $747,796 |
| 2018 | | | 2.66 | 3.22 | 0.05 | | 5.93 | $880,035 |
| 2019 | | | 0.00 | 2.41 | 0.03 | | 2.45 | $363,214 |
| 2020 | | | | 1.61 | 0.04 | | 1.65 | $244,412 |
| 2021 | | | | 1.34 | 0.03 | | 1.37 | $204,039 |
| 2022 | | | | 1.47 | 0.04 | | 1.51 | $223,501 |
| 2023 | | | | 1.61 | 0.03 | | 1.64 | $244,122 |
| 2024 | | | | 0.80 | 0.02 | | 0.83 | $123,003 |
| 2025 | | | | 0.67 | 0.02 | | 0.69 | $102,526 |
| 2026 | | | | 0.80 | 0.02 | | 0.83 | $122,858 |
| 2027 | | | | 0.54 | 0.02 | | 0.56 | $83,064 |
| 2028 | | | | 0.80 | 0.02 | | 0.83 | $122,858 |
| 2029 | | | | 0.00 | 0.02 | | 0.02 | $2,608 |
| 2030 | | | | | 0.01 | | 0.01 | $1,738 |
| 2031 | | | | | 0.01 | | 0.01 | $1,449 |
| 2032 | | | | | 0.01 | | 0.01 | $1,593 |
| 2033 | | | | | 0.01 | | 0.01 | $1,738 |
| 2034 | | | | | 0.01 | | 0.01 | $1,738 |
| 2035 | | | | | 0.00 | | 0.00 | $869 |
| 2036 | | | | | 0.01 | | 0.01 | $724 |
| 2037 | | | | | 0.00 | | 0.00 | $869 |
| 2038 | | | | | 0.00 | | 0.00 | $579 |
| | | | | | | | | $869 |
| | | | | | | | | $0 |
| **Total** | 0.00 | 21.28 | 68.20 | 70.98 | 1.05 | 0.00 | 161.51 | $23,981,308 |

NPV @ net 3% discount --> $20,241,896

**Exhibits**

# SUSSMAN SHANK LLP

### ATTORNEYS AT LAW

**Susan S. Ford**
Attorney • Admitted in Oregon & Washington

*direct line:* 503.243.1657
susanf@sussmanshank.com

1000 SW Broadway • Suite 1400
Portland, Oregon 97205-3089

503.227.1111 or 800.352.7078
*fax:* 503.248.0130
www.sussmanshank.com

April 28, 2006

Robert Sims
Hamilton, Rabinovitz & Alschuler, Inc.
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2021

> Re: *In re Roman Catholic Archbishop of Portland in Oregon, and successors, a corporation sole, dba the Archdiocese of Portland In Oregon ("Debtor")*
> U.S. Bankruptcy Court for the District of Oregon (Portland)
> Case No. 04-37154-elp11
> Our File No. 14961-004

Dear Rob:

Set forth below are some of the factors the Debtor believes you should evaluate and take into account prior to finalizing your report. In considering your draft report dated March 10, 2006 ("Draft Report"), we discussed the issues with our client and National Economic Research Associates, Inc. ("NERA"). If it would be more helpful to you to discuss our input with a fellow economist, please contact Mr. Timothy McKenna at NERA (Tel. No. (212) 345-5503).

The input we would like you to consider is as follows:

1.    <u>The Draft Report does not appear to take into account the fact that the 2002 and post-petition spikes in claims depleted the pool of "Future Claims."</u>

Although we do not know the precise number of persons that were abused, we know that we are dealing with a fixed pool of potential claimants. Thus, any spike, past or present, draws down, claim-by-claim, the number in the pool of potential future claimants. While we understand you adjusted downward for the 2002 spike to arrive at your yearly claim averages, it does not appear that you considered the effect that the 93 claims filed in 2002 or the 137 claims filed after the petition date would have on depleting the pool of potential claims.

# SUSSMAN SHANK LLP

2.    The risk-free rate to compute the discount rate does not seem appropriate for the Archdiocese.

A better measure for the present value of future claims, assuming this is relevant to the analysis, might be obtained by looking at interest rates charged to institutions with credit ratings similar to the Archdiocese pre-bankruptcy. While we do not have that information at present, it seems it would not be a risk-free rate.

3.    The Draft Report does not account for the decrease in the quality of claims post-petition which will reduce either the number of valid claims or the average indemnity values.

It appears you eliminated the zero-pay claims from consideration in your report, and valued the remainder at the average pre-petition indemnity. We do not believe this is accurate considering the overall quality of claims that have been filed since the petition date. Your Table 9 shows that twenty percent (20%) of the post-*Fearing* and pre-bankruptcy claims were no-pay claims. We believe the percentage of no-pay claims filed during the post-petition period is greater than twenty percent, considering both settlements and the number of claims disallowed to date. Shouldn't this information serve to reduce the number of valid claims or reduce the overall indemnity value of such claims?

Please note our review has not taken a position on the validity of your basic methodology. Rather, we have assumed your methodology for purposes of providing input, and reserve all rights at this time pending evaluation of your final report.

Thank you very much for your consideration of these matters.

Very truly yours,

SUSSMAN SHANK LLP

Susan S. Ford

SSF:lrs
c:  client
    Thomas Dulcich
F:\CLIENTS\14961\004\L-SSF SIMS 042806.DOC

1     David A. Foraker, OSB # 81228
      Sanford R. Landress, OSB # 81438
2     Greene & Markley, P.C.
      1515 SW Fifth Avenue, Suite 600
3     Portland, OR  97201
      Telephone:  (503) 295-2668
4     Facsimile:   (503) 224-8434
      E-mail:  david.foraker@greenemarkley.com
5     E-mail:  sanford.landress@greenemarkley.com

6          Attorneys for Future Claimants Representative

7

8

9
                 UNITED STATES BANKRUPTCY COURT
10
                       DISTRICT OF OREGON
11
      In re                          )  Case No. 04-37154-elp11
12                                   )
      Roman Catholic Archbishop of Portland in  )  Chapter 11
13    Oregon, and successors, a corporation sole,  )
                                     )  CERTIFICATE OF SERVICE:
14              Debtor.              )  REPORT OF HAMILTON,
                                     )  RABINOVITZ & ALSCHULER, INC.
15                                   )  ON ESTIMATED NUMBER AND
                                     )  AMOUNTS OF FUTURE CLAIMS
16                                   )
                                     )
17
             I hereby certify that I served a copy of the REPORT OF HAMILTON,
18    RABINOVITZ & ALSCHULER, INC. ON ESTIMATED NUMBER AND AMOUNTS
19    OF FUTURE CLAIMS on the following parties:

20    Pamela J. Griffith
      US Trustee's Office
21    Email: pamela.griffith@usdoj.gov

22
      Thomas W. Stilley, Esq.
23    Sussman Shank LLP
24    Email: tom@sussmanshank.com

25    Albert N. Kennedy, Esq.
      Tonkon Torp LLP
26    Email: al@tonkon.com

**Page 1 of 2 -** CERTIFICATE OF SERVICE

GREENE & MARKLEY, P.C.
Attorneys at Law
1515 S.W. Fifth Avenue, Suite 600
Portland, Oregon 97201
Telephone (503) 295-2668

1

2 by causing a full, true and correct copy thereof to be **emailed** to the parties at the email
addresses listed above on the date set forth below.

3

Dated: May 22, 2006.

4

5

6 David A. Foraker, OSB #81228

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 2 of 2** - CERTIFICATE OF SERVICE

GREENE & MARKLEY, P.C.
Attorneys at Law
1515 S.W. Fifth Avenue, Suite 600
Portland, Oregon 97201
Telephone (503) 295-2668