Thomas W. Stilley, OSB No. 88316
Susan S. Ford, OSB No. 84220
SUSSMAN SHANK LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205-3089
Telephone: (503) 227-1111
Facsimile: (503) 248-0130
E-Mail:     tom@sussmanshank.com
            susanf@sussmanshank.com

Attorneys for Debtor and Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>**ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON, AND SUCCESSORS, A CORPORATION SOLE, dba the ARCHDIOCESE OF PORTLAND IN OREGON,**<br><br>Debtor. | Case No. 04-37154-elp11<br><br>DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD MODIFIED PLAN OF REORGANIZATION |

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE §1125. IF YOU HAVE REQUESTED AND RECEIVED A COPY OF THE DISCLOSURE STATEMENT IN CONNECTION WITH THE COURT'S HEARING TO CONSIDER APPROVAL OF THE DISCLOSURE STATEMENT, NOTHING CONTAINED HEREIN IS OR WILL BE DEEMED A SOLICITATION OF ACCEPTANCE OF THE DEBTOR'S THIRD MODIFIED PLAN OF REORGANIZATION FILED BY THE DEBTOR.**

**TABLE OF CONTENTS**

I.      INTRODUCTION AND STATEMENTS REGARDING REPRESENTATIONS ......1
        A.      Introduction ...............................................................................1
        B.      Definitions and Plan Supremacy ................................................1
        C.      Limited Representations ............................................................2
        D.      Voting Procedures.....................................................................3
II.     BACKGROUND. ....................................................................................6
III.    SIGNIFICANT EVENTS IN CHAPTER 11. ..............................................8
IV.     OVERVIEW OF THE PLAN ...................................................................13
        A.      General Structure Of The Plan..................................................13
        B.      Estimated Distributions To Creditors .........................................14
V.      DEBTOR'S RECOMMENDATIONS.........................................................17
VI.     THE ARCHDIOCESE OF PORTLAND IN OREGON..................................20
        A.      The History and Mission of the Archdiocese ............................20
        B.      Organizational Structure Of The Archdiocese ...........................21
        C.      The Debtor's Assets And Liabilities............................................23
                1.      Assets..............................................................................23
                2.      Liabilities..........................................................................28
VII.    DESCRIPTION OF THE PLAN ...............................................................34
        A.      Classification And Treatment Of Claims Under The Plan.........................34
                1.      Claim Amounts .................................................................34
                2.      Effective Date of the Plan .................................................35
                3.      Classification Generally ....................................................35
                4.      Unclassified Claims ..........................................................35
                5.      Unimpaired Claims ...........................................................36
                6.      Impaired Claims................................................................37
        B.      Punitive Damages Will Be Subordinated to Payment of Compensatory
                Damages.................................................................................41
        C.      All Unresolved Tort Claims to be Resolved and Paid by Claims Resolution
                Facility ...................................................................................42
        D.      Tort Claims to be Estimated if Not Resolved Prior to Confirmation ..........43
        E.      Reorganized Debtor's Obligations to Claims Resolution Facility to be
                Funded by Line of Credit and Secured by Letters of Credit ....................47
        F.      Claims Resolution Facility to Receive Insurance Recoveries Paid by
                Insurance Companies ...............................................................48
        G.      Executory Contracts to be Assumed if not Rejected ...............................51
        H.      Objections to Claims................................................................51
        I.      Administrative Claims Bar Date..................................................52
        J.      Discharge................................................................................52
        K.      Vesting of Property...................................................................53
        L.      Reservation of Rights...............................................................53
VIII.   POST-CONFIRMATION MANAGEMENT OF REORGANIZED DEBTOR..........53
IX.     FEDERAL TAX CONSEQUENCES ........................................................54
X.      ACCEPTANCE AND CONFIRMATION ....................................................56

| | | | |
|---|---|---|---|
| A. | | Voting Procedures................................................................56 | |
| | 1. | Generally...................................................................56 | |
| | 2. | Incomplete Ballots......................................................57 | |
| | 3. | Withdrawal Of Ballots; Revocation..............................57 | |
| | 4. | Submission Of Ballots................................................57 | |
| | 5. | Feasibility..................................................................58 | |
| B. | | Best Interests Of Creditors And Liquidation Analysis............59 | |
| C. | | Confirmation Over Dissenting Class.....................................60 | |
| | 1. | No Unfair Discrimination.............................................60 | |
| | 2. | Fair and Equitable Test...............................................60 | |
| XI. | ALTERNATIVES TO THE PLAN...........................................................61 | | |

PDXDOCS:1503546.2

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1       The Roman Catholic Archbishop of Portland in Oregon, and successors, a

2 corporation sole, *dba* the Archdiocese of Portland in Oregon, and the debtor and debtor

3 in possession in the above captioned Chapter 11 reorganization case (the "Debtor"),

4 has prepared this Disclosure Statement in connection with the solicitation of

5 acceptances of the "Debtor's Third Modified Plan of Reorganization" (the "Plan"). A

6 copy of the Plan accompanies this Disclosure Statement.

7 I.     **INTRODUCTION AND STATEMENTS REGARDING REPRESENTATIONS.**

8     A.     **Introduction.**

9       On July 6, 2004 (the "Petition Date"), the Debtor commenced this Chapter 11

10 reorganization case ("Case") by filing a voluntary petition under Chapter 11 of the

11 United States Bankruptcy Code ("Bankruptcy Code"). Since the Petition Date the

12 Debtor has remained a debtor-in-possession pursuant to Sections 1107 and 1108 of the

13 Code. The Debtor filed this Chapter 11 Bankruptcy Case to reorganize its financial

14 affairs pursuant to a plan of reorganization that will, among other things, fairly, justly,

15 and equitably compensate valid Claims of Claimants alleging child sexual abuse by

16 persons associated with the Debtor, while allowing the Debtor to continue its religious

17 ministries, serve the spiritual needs of the faithful, and pursue its non-profit, charitable

18 mission of service to those in need.

19     B.     **Definitions and Plan Supremacy.**

20       Unless this Disclosure Statement expressly states that a term defined in the Plan

21 will have a different meaning herein, all terms defined in the Plan will have the same

22 meanings when used in this Disclosure Statement. In addition, unless otherwise stated,

23 terms used in this Disclosure Statement will have the same meanings as in the

24 Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of

25 the Court. Terms defined in this Disclosure Statement which are also defined in the

26 Plan or the other sources described above are solely for convenience and the Debtor

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1   does not intend to change the definitions of those terms from the Plan or from the

2   otherwise applicable sources.  Furthermore, in the event of any inconsistency between

3   the Plan and this Disclosure Statement, the Plan will control.  The Exhibits attached to

4   this Disclosure Statement are incorporated into and are a part of this Disclosure

5   Statement.

6       **C.      Limited Representations**.

7       This Disclosure Statement is submitted in accordance with Bankruptcy Code

8   §1125 for the purpose of soliciting acceptances of the Plan from holders of certain

9   Claims.  The Court has approved this Disclosure Statement as containing information of

10  a kind, and in sufficient detail, which is adequate to enable you to make an informed

11  judgment whether to vote to accept or to reject the Plan.

12      In determining whether the Plan should be confirmed, the Court will consider

13  whether the Plan satisfies the requirements of the Bankruptcy Code, including whether

14  sufficient classes of creditors have voted to accept it, whether it is feasible from an

15  economic standpoint, and whether it is in the best interests of Creditors and other

16  parties in interest.  The Court also will receive and consider a ballot summary prepared

17  by the Debtor concerning the votes cast for acceptance or rejection of the Plan by

18  parties entitled to vote. Only holders of Allowed Claims that are impaired under the Plan

19  (or that have been temporarily allowed for voting purposes) will be allowed to vote to

20  accept or reject the Plan.  "Impaired" means that a Claimant's legal, equitable, or

21  contractual rights have been altered by the Plan, or the Claimant will not receive

22  payment in full of his or her Claim on or about the Effective Date for those Claims that

23  have been Allowed and are then due.

24      THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  THIS
        DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH
25      ACCOMPANIES THIS DISCLOSURE STATEMENT SHOULD BE READ
        COMPLETELY.  FOR THE CONVENIENCE OF CREDITORS, THE PLAN
26      IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL
        SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1      ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH
     IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.
2

3      The Court will hold a hearing on confirmation of the Plan commencing at

4 _____ a.m. on _____, 2006. The confirmation hearing may be

5 adjourned from time to time without further written notice.

6      Certain materials contained in this Disclosure Statement are taken directly from

7 other, readily accessible documents or are summaries prepared from other documents.

8 While every effort has been made to retain the meaning of such documents, you are

9 urged to rely upon the contents of such materials only after a thorough review of the

10 documents themselves.

11      NO REPRESENTATIONS OR ASSURANCES CONCERNING THE
     DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS OPERATIONS, THE
12      VALUE OF ITS ASSETS, OR THE FUTURE OPERATIONS OF THE
     REORGANIZED DEBTOR ARE AUTHORIZED BY THE DEBTOR
13      OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

14      THIS IS A SOLICITATION BY THE DEBTOR ONLY AND IT IS NOT A
     SOLICITATION BY THE DEBTOR'S ATTORNEYS OR ANY OTHER
15      PROFESSIONALS EMPLOYED BY THE DEBTOR. THE
     REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTOR
16      AND NOT OF THE DEBTOR'S ATTORNEYS OR ANY OTHER
     PROFESSIONAL.
17

18      REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY
     PREPARE ALL FINANCIAL INFORMATION WHICH MAY BE
     CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE
19      INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER, AS TO ALL
     SUCH FINANCIAL INFORMATION, THE DEBTOR IS UNABLE TO
20      WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED
     THEREIN IS WITHOUT ERROR.
21

22      D.    **Voting Procedures**.

23      If you are the holder of a Claim that is "impaired" under the Plan, it is important

24 that you vote. In that regard, acceptances of the Plan are sought only from those

25 holders of Claims whose Claims are "impaired" by the Plan and who are not deemed to

26 have accepted or rejected the Plan. Holders of Claims that are not impaired under the

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1    Plan are deemed to have accepted the Plan.  See Bankruptcy Code §1126(f).

2    Conversely, acceptances need not be solicited from the holders of Claims who will

3    receive nothing under the Plan because they are deemed to have rejected the Plan.

4    See Bankruptcy Code §1126(g).

5          In order for a class of Claims to vote to accept the Plan, votes representing at

6    least two-thirds in amount and more than one-half in number in that class must be cast

7    in favor of acceptance of the Plan.  As more fully described below, the Debtor is seeking

8    acceptances from holders of Allowed Claims in the following classes (reserving the right

9    to supplement as to any other impaired class(es) of Claims, if any):

10

11   | Class | Description | Status |
     | --- | --- | --- |
     | Class 3 | Umpqua Bank | Impaired – Entitled to Vote |
     | Class 4 | Perpetual Endowment Fund | Impaired – Entitled to Vote |
     | Class 5 | Key Bank | Impaired – Entitled to Vote |
     | Class 6 | General Unsecured Claims | Impaired – Entitled to Vote |
     | Class 7 | Present Tort Claims | Impaired – Entitled to Vote |
     | Class 8 | Future Claims | Impaired – Entitled to Vote |
     | Class 13 | Oregon Insurance Guaranty Association | Impaired – Entitled to Vote |

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26

**Page 4 of 62** - DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

The following classes of Claims are not impaired under the Plan or are otherwise prohibited by the Bankruptcy Code from voting on the Plan for the reason indicated:

| Class | Description | Status |
|-------|-------------|--------|
| Class 1 | Non-Tax Priority Claims | Unimpaired – Deemed to Accept |
| Class 2 | Administrative Convenience Claims | Unimpaired – Deemed to Accept |
| Class 9 | Supplemental Present Tort Claims | Impaired - Included in Class 8 – Duplicative and not Entitled to Vote – Will not be Counted for Voting or Confirmation Purposes |
| Class 10 | Retiree Benefit Claims | Unimpaired – Deemed to Accept |
| Class 11 | Donor Claims | Unimpaired – Deemed to Accept |
| Class 12 | Beneficiary Claims | Unimpaired – Deemed to Accept |

The specific treatment of each class under the Plan is set forth in the Plan and is summarized in Articles V and VIII of this Disclosure Statement. Bankruptcy Code §1129(b) provides that, if the Plan is rejected by one or more impaired classes of Claims, the Plan nevertheless may be confirmed by the Court, if: (i) the Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class(es) of Claims that are impaired under the Plan; and (ii) at least one class of impaired Claims has voted to accept the Plan. These requirements are described in further detail in Section X.C. of this Disclosure Statement.

A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS IMPORTANT. THE DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.

Unless otherwise expressly stated, portions of this Disclosure Statement describing the Debtor have not been subjected to an independent audit, but have been

**Page 5 of 62** - DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD MODIFIED PLAN OF REORGANIZATION

1    prepared from information compiled by the Debtor from records maintained in the

2    ordinary course of its operations. Every effort has been made to be as accurate as

3    possible in the preparation of this Disclosure Statement.

4    **II.**    **BACKGROUND.**

5        In 1999, the Oregon Supreme Court decided *Fearing v. Bucher*, 328 Or. 367, 977

6    P.2d 1163 (1999) and *Lourim v. Swensen and the Boy Scouts of America*, 328 Or. 380,

7    977 P.2d 1157 (1999), which established for the first time that an employer/principal

8    (including the Debtor) could be held liable under a *respondeat superior* theory of

9    vicarious liability for the intentional acts of sexual misconduct by its personnel (the same

10    ruling against the Boy Scouts applied to Scoutmaster volunteers). *Fearing v. Bucher*

11    also decided that the extended statute of limitations for civil claims involving child abuse

12    under ORS 12.117 applied to the principal/employer as well as the agent/employee who

13    actually was accused of the misconduct.

14        As a result of these cases, it became legally viable and financially lucrative, for

15    personal injury lawyers and their clients to pursue such claims against the Debtor. Prior

16    to *Fearing v. Bucher,* an employer could not be held vicariously liable for the sexual

17    misconduct of its employee, because that type of activity could not in any way be

18    viewed as serving the interest of the employer and was, therefore, as a matter of law,

19    outside the course and scope of employment of the alleged abuser. *G.L. v. Kaiser*

20    *Foundation Hospitals*, 306 Or. 54, 757 P.2d 1347 (1988)

21        Beginning in late 1999, several lawsuits with twenty-five plaintiffs were filed

22    against the Debtor alleging misconduct of Maurice Grammond, who had been the pastor

23    at Our Lady of Victory Church in Seaside, Oregon from 1966-1985. At the request of

24    the Debtor, and with the participation of its insurance carriers, a mediation was held in

25    mid-2000 that resulted in settlement of all twenty-five (25) cases ("Grammond I"). The

26    settlement of those claims was announced in October 2000, with extensive media

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1 publicity. Also, a very public apology by Archbishop Vlazny was disseminated widely, in
2 the media and otherwise.

3 Cases continued to be filed in 2001 and many new claims were filed in 2002 after
4 intense media reporting of claims against priests of the Archdiocese of Boston and
5 criticism of Cardinal Bernard Law, then the Archbishop of Boston. Again, Archbishop
6 Vlazny sought and announced publicly his desire to resolve the claims and to
7 compensate valid claimants. Another large-scale mediation took place for
8 approximately six weeks in 2003, resulting in settlement of most of the cases mediated.
9 However, the Debtor lost the full support of some of its insurers. As of early 2004,
10 $53,000,000 had been paid to settle claims of alleged sexual misconduct, $27,000,000
11 of which was paid from the Debtor's own funds.

12 Almost all of the Tort Claims against the Debtor allege sexual misconduct with
13 minors happening before the early 1980s. Most of the Tort Claims arise out of the
14 1960s and 1970s, some out of the 1950s and 1940s, and very few in the 1980s. The
15 lack of more recent claims may be the result of policies and programs initiated after the
16 very public arrest, conviction and sentencing of the former Rev. Thomas B. Laughlin,
17 who was pastor of All Saints Parish, Portland when arrested by the police in 1983 on a
18 charge of child sex abuse. In response, the Debtor conducted clergy seminars on child
19 abuse and reporting, clergy screening procedures were updated, and other practices
20 were implemented to prevent these problems from re-occurring. As a result of these
21 efforts, almost all of the Tort Claims against the Debtor alleging sexual misconduct with
22 minors are at least 20 years old, and many are decades older.

23 Despite the refusal of some of its major insurers to defend and pay Claims, the
24 Debtor continued to settle claims into 2004. However, in mid-2004 the Debtor faced two
25 claims asking for more than $155,000,000 between them. Claimant C.B. sought
26 $10,000,000 in compensatory damages and $125,000,000 in punitive damages.

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1   Claimant James Devereaux sought $5,000,000 in compensatory damages and

2   $20,000,000 in punitive damages. The actual alleged misconduct in those cases was

3   less serious than what was alleged in many of the previously settled cases. Plaintiffs'

4   counsel refused the Debtor's efforts to resolve these cases on what the Debtor deemed

5   to be a reasonable basis.

6          With approximately 65 other claims pending, the Debtor was concerned that

7   paying the demands of the two plaintiffs would put the Debtor at great financial risk and

8   cripple its ability to compensate valid claimants.   On July 6, 2004, Archbishop Vlazny

9   announced that the Debtor would file for Chapter 11 reorganization in bankruptcy court,

10  as a just and prudent course of action and as the best choice if he were to be a prudent

11  steward of the resources of parishes and schools, as well as those of the Archdiocese.

12  In a widely publicized Open Letter to the Church of Western Oregon, Archbishop

13  Vlazny stated that: "[f]iling for bankruptcy offers the best possibility for the Archdiocese

14  to resolve fairly *all* pending claims, to manage a difficult financial situation and to

15  preserve the ability of the Archdiocese to fulfill its mission."

16  III.   **SIGNIFICANT EVENTS IN CHAPTER 11.**

17         Since the filing of the petition on July 6, 2004 the following events of significance

18  have occurred:

19         •   The Court established a Claims Bar Date of April 29, 2005 and attendant

20  notice procedures pursuant to which notice of the April 29, 2005 deadline for filing

21  Claims was given to known and potential creditors both by direct mail and by publication

22  in local, regional, and national newspapers and other sources;

23         •   A Tort Claimants Committee (the "TCC") was appointed to represent the

24  collective interest of all Present Tort Claimants;

25         •   A Future Claimants Representative (the "FCR") was appointed to

26  represent the interests of those Child Abuse Tort Claimants who as of the Claims Bar

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1   Date (1) were under the age of 18; (2) were suffering from "repressed memory" and

2   could not remember the Child Abuse; or (3) had not discovered the injury or the causal

3   connection between the injury and the Child Abuse, nor in the exercise of reasonable

4   care should have discovered the injury or the causal connection between the injury and

5   the Child Abuse (collectively the "Future Claimants");

6       • The Court approved an Accelerated Claims Resolution Procedure

7   pursuant to which approximately 60 early filed Tort Claims alleging Child Abuse were

8   mediated in an effort to settle such Claims.  These mediations commenced in August

9   2005 and were concluded in September 2005.  In these mediations, and subsequent

10  thereto, approximately  34 Claimants -- many of whom participated in the mediations --

11  agreed to the amounts necessary to settle their Claims. The Debtor has filed a motion to

12  obtain Court approval of the amount of these Claims.

13      • The TCC instituted litigation to determine whether Parish and school

14  property, and other property which the Debtor asserts is held in trust or is otherwise

15  restricted from being used to pay Claims against the Debtor, is available to pay Claims.

16  On December 30, 2005, the Court issued its decision on the TCC's Second and Third

17  Motions for Partial Summary Judgment in that litigation.  In the Second Motion, the TCC

18  asked the Court to rule that the Parishes had no separate legal existence from the

19  Debtor and the Parishes had no power to sue or be sued.  The Court ruled in favor of

20  the TCC on that motion, finding that the Parishes were merely part of the Debtor and did

21  not have the power to sue or be sued, or to be the beneficiaries of a trust.  In the Third

22  Motion, the TCC asked the Court to avoid any interest asserted by the Parishes, the

23  parishioners, and any donors or other parties in the real property of nine Parishes and

24  Regis High School.  The Court ruled partially in favor of the TCC on that motion finding

25  that such interests were avoidable under §544(a)(3) of the Bankruptcy Code, but also

26  finding that a trial would be necessary to determine whether the Religious Freedom

**Page 9 of 62 -** DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  Restoration Act placed some constraint on whether those properties, or possibly others

2  in place of those properties, could be liquidated to pay Claims against the Debtor. The

3  Debtor and other defendants have appealed the Court's rulings on the TCC's Second

4  and Third Motions for Partial Summary Judgment to the District Court, with briefing

5  scheduled to be completed in October 2006. It is unknown when the District Court will

6  rule on the appeal; however, the Court has stated that it does not intend to hold a trial in

7  the property litigation until the District Court issues its appellate decision. The TCC has

8  also filed a Fourth Motion for Partial Summary Judgment asking the Court to find that

9  the Perpetual Endowment Fund (further described herein), which contains

10  approximately $36 million in cash and liquid investments, is property of the Debtor's

11  estate and is available to pay claims. The Fourth Motion has been briefed and argued

12  to the Court, with the Court expected to issue its decision on that motion by the middle

13  of June 2006.

14  • The Court appointed Hamilton Rabinovitz & Alschuler ("HR&A"), a firm

15  with extensive experience in estimating future tort claims in mass tort cases such as

16  those involving asbestos exposure to assist in determining the estimated amount of

17  Claims which can be expected to be asserted by the Future Claimants. HR&A has

18  provided the Debtor, the TCC, and the FCR with a preliminary report of its findings,

19  however, the Debtor is unable to make that information public until HR&A issues its final

20  report.

21  • The Debtor instituted litigation against its insurers to recover amounts

22  previously paid in settling claims for which the insurers denied coverage, to require the

23  insurance companies to fulfill their obligations to provide coverage for the Tort Claims,

24  and for other causes of action relating to the Insurance Policies. The insurance litigation

25  is ongoing and is not expected to be concluded until after confirmation of the Plan.

26

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1      • As of the Claims Bar Date a total of 197 child sex abuse Claims had been

2  filed against the Debtor (3 additional Claims were filed based on prepetition settlements

3  for which the settlement amounts had not been fully paid). As of May 19, 2006,

4  approximately 87 of these Claims had been disallowed, settled, tentatively settled, or

5  withdrawn, leaving approximately 110 Claims to be resolved (not including any Future

6  Claims, i.e., child abuse Claims which are asserted after the Claims Bar Date). Claims

7  are continuously in the process of being disallowed, withdrawn, or settled. The Debtor

8  has filed a motion asking the Court to estimate the remaining known child sex abuse

9  Claims and other Tort Claims where no settlement has been reached for the purposes

10  of voting on and determining whether to confirm the Plan.

11      • On January 11, 2006, the Court ruled that over 100 of the remaining

12  Unresolved Tort Claims would be permitted to proceed to trial in either federal or state

13  court, depending on whether the claimant elects to waive any claim for punitive

14  damages against the Debtor. Approximately one-third of these Claimants have elected

15  to waive their rights to seek punitive damages and will proceed in state court. The

16  remaining Claimants have elected to proceed in federal District Court. The two cases

17  which were scheduled to go to trial on the date the Debtor filed Chapter 11 - C.B.'s

18  Claims for $10 million in compensatory damages and $125 million in punitive damages,

19  and James Devereaux's Claims for $5 million in compensatory damages and $20 million

20  in punitive damages - will be the first cases allowed to proceed to trial in federal District

21  Court. At this time it appears that those trials, unless the Claims are settled, will likely

22  take place in the Fall 2006.

23      • On February 13, 2006, the Tort Claimants Committee filed its own plan,

24  which it amended on May 22, 2006. In its plan, the TCC proposes to treat all Claims

25  against the Debtor, except for punitive damage claims, as unimpaired. If such a plan

26  could be confirmed, which is far from certain at this time, Claimants would be entitled to

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  pursue their Claims against the Debtor, and once a Claim was settled or a judgment
2  entered, attempt to collect the amount of their settlement or judgment from the Debtor
3  (or from a trust to be established under the TCC's plan with the Debtor's assets).
4  According to the TCC, the trust would initially be funded with $35 million in cash and
5  investments, with subsequent amounts to be paid by the Debtor into the trust as claims
6  are resolved and the trust funds are depleted by payment of prior claims. If the Debtor
7  failed to make these payments, the trust would be entitled to sell as much parish and
8  school real property, including as many parish churches and schools, as necessary to
9  fund the Claims until all the Claims have been paid in full. The promises contained in
10  such a plan are illusory because it would require many favorable court rulings before
11  such a plan could be confirmed, much less implemented. The Court has not yet ruled
12  whether the property the TCC proposes be used to fund its plan, is either the Debtor's
13  property or is free of restrictions so that it can be used to pay Claims. In addition, the
14  Court has made no determination regarding the amount of the Claims, therefore, it is
15  unknown at this time whether the Claims will exceed the value of the  property that is
16  ultimately found to be available to pay them. In fact, the Court has stated that many
17  issues remain to be decided before the TCC's plan could be confirmed.
18         • On February 28, 2006, as amended on March 6, 2006, the Court issued its
19  Opinion regarding the Debtor's request that it estimate disputed and unliquidated Tort
20  Claims to provide the basis for determining the amount of funding that the Debtor will
21  need to make available for payment of such Claims under its Plan. In that opinion, the
22  Court stated that such estimations must be made by the District Court if the estimations
23  will be used to establish the maximum amount of funds the Debtor will be required to
24  contribute for payment of the Claims, and that further hearings will be held to determine
25  the methodology that the Court will recommend be used by the District Court in
26  estimating those Claims. The Debtor intends to proceed with estimation of the Claims

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1   pursuant to the procedures to be established by the Court and the District Court, as it

2   believes estimation of the Claims offers the only viable, cost-effective approach that will

3   permit confirmation of a plan and payment of Claims without undue delay. As discussed

4   below, such estimates will provide the Debtor with a basis for funding its plan in the

5   aggregate amount the District Court determines will be sufficient to pay all Claims in full,

6   and will avoid the delay inherent in waiting for resolution of the property litigation to

7   determine how much property could be made available to pay the Claims. Although

8   there may be some risk the District Court's estimates will be low, which would result in

9   insufficient funds being made available to pay all the Tort Claims in full, the Debtor

10   believes the benefit to Claimants of a plan that will provide assured funding in an

11   amount the District Court believes will be sufficient to pay all the Claims in full, without

12   having to wait for the property litigation to be resolved before a funding source can be

13   established, far outweighs the risk to Claimants that the District Court's estimates might

14   be wrong.

15   **IV.**   **OVERVIEW OF THE PLAN.**

16     **A.**     **General Structure Of The Plan.**

17       The Plan provides for the reorganized Debtor (the "Reorganized Debtor") to

18   provide funds in an amount that the District Court determines will be sufficient to pay all

19   Claims in full based on (1) the settled or agreed amount of the Claims which are

20   resolved prior to the Confirmation Date, and (2) for those Claims that have not been

21   resolved prior to the Confirmation Date, for the District Court to estimate the amount

22   which it determines is likely to be awarded for such Claims through later settlements,

23   arbitrations, or trials. The Plan provides for the establishment of a Claims Resolution

24   Facility to assume liability for, and to resolve and pay Tort Claims, including Future

25   Claims. The Plan provides that the Reorganized Debtor will provide funding to the

26   Claims Resolution Facility in an aggregate amount that the District Court determines will

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1 be sufficient to pay all Tort Claims in full, including Future Claims, and any portion of

2 such Claims for punitive damages.

3     **B.**     **Estimated Distributions To Creditors.**

4     The following is a summary of the projected recoveries for each of the holders of

5 Allowed Claims under the Plan:

| Class/Nature of Claim | Treatment | Approximate Amount of Claims | Dates and Approximate Amount of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 1 Non-Tax Priority Claims | Unimpaired | $2,920 | In full when such Claims become due, or if already due, on or as soon as practicable following the Effective Date or if later, the Allowance Date | 100% |
| Class 2 Administrative Convenience Claims | Unimpaired | $60,795 | In full on or as soon as practicable following the Effective Date or if later, the Allowance Date | 100% |
| Class 3 Umpqua Bank Secured Claim | Impaired | $361,800 | 180 consecutive equal monthly installments, including principal and interest at the non-default contract rate, commencing within 30 days following the Effective Date, or if later the Allowance Date | 100% |
| Class 4 Perpetual Endowment Fund Secured Claim | Impaired | $5,131,807 | 180 consecutive equal monthly installments, including principal and interest at the non-default contract rate, commencing within 30 days following the Effective Date, or if later the Allowance Date | 100% |

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11     Doc 3736     Filed 06/12/06

| Class/Nature of Claim | Treatment | Approximate Amount of Claims | Dates and Approximate Amount of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 5 Key Bank Guaranty Claim | Impaired | $20,218,730 | Reorganized Debtor will assume the Key Bank guaranty obligation and pay according its terms, subject to revisions to the guaranty agreement that will permit the Reorganized Debtor to cure any default and continue making any payments required of the principal obligor on the underlying obligations secured by the guaranty before the guaranty obligation would become due and payable. | N/A |
| Class 6 General Unsecured Claims | Impaired | $461,505 | 12 consecutive equal monthly installments, including principal and interest at the Plan Interest Rate, commencing within 30 days following the Effective Date, or if later the Allowance Date | 100% |
| Class 7 Present Tort Claims | Impaired | Approximately $2 million in settled Present Tort Claims (as of 3/28/06) plus an additional amount for Unresolved Present Tort Claims to be estimated by the District Court | Allowed Present Tort Claims to be paid by Claims Resolution Facility after such Claims become Allowed and as distributions are authorized by the District Court. Any Claims for Punitive Damages will be subordinated to the payment of compensatory damages thus it is unknown when distributions might be made for Punitive Damages. | 100% |

**Page 15 of 62 -** DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

| Class/Nature of Claim | Treatment | Approximate Amount of Claims | Dates and Approximate Amount of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 8 Future Claims | Impaired | To be estimated by the District Court | To be paid by Claims Resolution Facility after such Claims become Allowed and as distributions are authorized by the District Court. Any Claims for Punitive Damages will be subordinated to the payment of compensatory damages, thus it is unknown when distributions might be made for Punitive Damages. | 100% |
| Class 9[1] Supplemental Unresolved Present Tort Claims | Impaired | N/A – Included in Class 8 | To be paid by Claims Resolution Facility after such Claims become Allowed and as distributions are authorized by the District Court. Any Claims for Punitive Damages will be subordinated to the payment of compensatory damages, thus it is unknown when distributions might be made for Punitive Damages. | 100% |
| Class 10 Retiree Benefit Claims | Unimpaired | $404,000 | To be assumed and paid by the Reorganized Debtor when due in accordance with the terms of the benefit plans providing for payment of such Claims | 100% |
| Class 11 Donor Claims | Unimpaired | N/A | Reorganized Debtor to comply with Canon Law and civil law regarding the donors' intent and any restrictions on the use and disposition of donated property. | N/A |
| Class 12 Beneficiary Claims | Unimpaired | N/A | Reorganized Debtor to comply with Canon Law and civil law regarding the use and disposition of property held in trust or otherwise for the benefit of the Parishes, parishioners, and others. | N/A |

---

[1] Currently included in Future Tort Claims Class. Will only become a Class if the Court's Order to include such Claimants in the class of Future Tort Claimants is reversed on appeal.

**Page 16 of 62 -** DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD MODIFIED PLAN OF REORGANIZATION

| Class/Nature of Claim | Treatment | Approximate Amount of Claims | Dates and Approximate Amount of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 13 Oregon Insurance Guaranty Association | Impaired | $2,641,071 | If Allowed, to be paid by the Reorganized Debtor in 60 consecutive equal monthly installments, including principal and interest at the Plan Interest Rate, commencing within 30 days following the Effective Date, or if later the Allowance Date | 100% |

## V.  DEBTOR'S RECOMMENDATIONS.

The Debtor recommends that all Creditors who are entitled to vote, vote to accept the Plan.  The Debtor believes its Plan provides the best alternative to resolve and pay Claims as soon as possible, and is in the best interest of all Creditors and other interested parties.  Until a plan is confirmed, the Debtor expects the Tort Claimants Committee will continue to litigate with the Debtor over whether the Parish churches, schools, and personal property are available to pay Claims against the Debtor.  The Debtor asserts that such property is not available to pay Claims because, among other reasons, such property was given for religious and charitable purposes for the benefit of the Parishes, parishioners, and others who benefit from the use of such property.  The Debtor asserts that it only holds legal title to the Parish property and not the equitable or beneficial interests.  The Tort Claimants Committee disputes this and asserts that all such property is the Debtor's, primarily because the Debtor is the only civilly incorporated entity (with the exception of one Parish), and title to most of the real property is held in the name of that civil corporate entity.  As previously stated, the Court has ruled that the Parishes do not have a separate civil legal existence from the Debtor, and cannot sue or be sued or be the beneficiaries of a trust.  The Debtor and other

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1  defendants in the property litigation have filed appeals regarding the Court's ruling on

2  the status of the Parishes and it is unknown when a decision from the appellate court

3  can be expected.  However, if the Debtor's Plan is confirmed, which provides for funding

4  to pay Claims in an amount the District Court estimates will be sufficient to pay all the

5  Claims in full, the Court's decision on the separateness of the Parishes, or the

6  availability of parish property to pay claims will become irrelevant, and an appeal of the

7  Court's decision on those issues will no longer be necessary.

8        If the Debtor's Plan is not confirmed, and the appellate court were to rule that the

9  Parish property is not available to pay Claims, the Debtor might have little incentive at

10  that point to offer an amount that would be sufficient to pay the estimated amount of all

11  Claims as it has offered to do under the Plan.  In fact, if none of the Parish assets, but

12  only the Unrestricted Archdiocesan Property described in Section VII below were

13  available to pay Claims, there would be only approximately $21.5 million available for

14  unsecured creditors, resulting in payments to creditors of possibly only 50% or less of

15  their Allowed Claims based on the Debtor's estimates of the amount of the Claims.

16        This amount does not include any amounts that the Debtor may recover in the

17  litigation against its insurers.  Although the Debtor believes that the insurers owe it

18  substantial amounts (see Section VI.C.1(d), infra) which may be used toward payment

19  of insured claims up to policy limits, the insurers are vigorously defending the insurance

20  coverage actions, there is risk in all litigation, and it may be a long time before the

21  Debtor recovers any insurance proceeds.  Including insurance proceeds in the funds

22  that are available to pay claims may increase the distribution to unsecured creditors;

23  however, the additional amount that may be available from insurance cannot be

24  determined with any certainty at this time.

25        In contrast, the Debtor's Plan as currently proposed offers funding which the

26  District Court estimates will be sufficient to pay all Claims in full regardless of what

**Page 18 of 62 -** DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  assets are ultimately determined to be available to pay such Claims, including certain

2  insurance proceeds. In the absence of confirmation of a plan such as that proposed by

3  the Debtor, which provides significantly more money for creditors than the Debtor could

4  be forced to pay if the Debtor were successful in the Parish and school property

5  litigation, all Claims would likely need to be resolved and the property litigation

6  concluded before it could be determined how much could be paid on each Claim. The

7  payments under the Debtor's plan are not contingent on the Tort Claimants Committee

8  successfully litigating the Parish, school, and other restricted property issues, which

9  would be necessary for any other plan to provide payments anywhere approaching the

10  amounts the Debtor has committed to pay pursuant to the Debtor's Plan. In fact, if the

11  Tort Claimants Committee is unsuccessful in the property litigation, and without

12  significant payments from the Debtor's insurers, unsecured creditors would likely

13  receive only a portion of the allowed amount of their Claims.

14        In contrast, the Debtor's Plan provides for funding to pay Tort Claims based on

15  the District Court's estimate of the amount of such claims without the risk of an adverse

16  ruling for the Tort Claimants Committee in the Parish and school property litigation.

17  Finally, distributions can commence under the Debtor's Plan as individual Claims are

18  resolved without having to wait potentially years for all Claims (including Future Claims

19  which may not come forward for many years) to be resolved and the Parish and school

20  property litigation to wind its way through the appellate courts before creditors can begin

21  receiving distributions on their Claims. The Debtor's Plan provides for payment of all

22  Tort Claims by the Claims Resolution Facility once they are resolved, with the District

23  Court determining the timing and amount of distributions to Claimants from the funds

24  contributed by the Reorganized Debtor to the Facility for the payment of such Claims.

25  For those Claimants who do not want to settle their Claims and insist on trying their

26  Claims to a jury, that option remains available under the Plan, with payments to be

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11   Doc 3736   Filed 06/12/06

1 made to such Claimants from the funds contributed by the Reorganized Debtor to the

2 Claims Resolution Facility after the jury renders its verdict, assuming there is no appeal

3 and the District Court determines that such payment will not jeopardize payments to

4 other Tort Claimants who have not yet resolved their Claims.

## VI. THE ARCHDIOCESE OF PORTLAND IN OREGON.

### A. The History and Mission of the Archdiocese.

7      The Roman Catholic Church is a hierarchical religious organization governed by

8 its own laws and customs and protected by the "establishment" and "free exercise"

9 clauses of the United States Constitution, the Oregon Constitution, and other applicable

10 laws, rules, and regulations regarding the free exercise of religion in the United States of

11 America and the State of Oregon. The Church's own laws are written in the Code of

12 Canon Law. Canon Law defines the organization of the Church, the roles and powers

13 of the various entities which comprise the Church as a whole, and the duties of the

14 various persons and entities participating in the Church.

15      The Archdiocese of Portland in Oregon (the "Archdiocese") is one such entity

16 and was initially created as a Vicariate–Apostolic on December 1, 1843. It became an

17 archdiocese in 1846 under the name "Archdiocese of Oregon City." The Archdiocese is

18 the second oldest archdiocese in the United States, the oldest being Baltimore. The

19 Archdiocese is presided over by an archbishop. The first archbishop was Francis

20 Norbert Blanchet, who served in that capacity from 1846 until 1880. John G. Vlazny is

21 the current archbishop, having served since 1997. The Archbishop provides

22 ecclesiastical guidance to all Catholics within a geographical area extending from the

23 crest of the Cascade Mountains on the east to the Pacific Ocean on the West, and from

24 the southern Washington border on the north to the northern California border on the

25 south.

26      In 1874, the decision was made to form a religious *corporation sole* under

**Page 20 of 62** - DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  Oregon law to conduct the secular affairs of the Archdiocese.  That corporation was
2  initially incorporated under the name "Roman Catholic Archbishop of the Diocese of
3  Oregon."  After a number of name changes and the merger with another religious
4  corporation in 1994, the surviving corporation's name became "Roman Catholic
5  Archbishop of Portland in Oregon, and successors, a corporation sole," which it remains
6  to this day.  The Archdiocese's main offices are located in the Pastoral Center, 2838 E.
7  Burnside St., in Portland.

8      In addition to the Archdiocese itself, many other Catholic entities exist within
9  western Oregon, including parishes, universities, hospitals, monasteries, and various
10 other religious, teaching, and charitable organizations and institutions.  There are an
11 estimated 380,000-plus Roman Catholics who are served by 124 Parishes and 24
12 missions in western Oregon.

13    **B.**    **Organizational Structure Of The Archdiocese**.

14      The Archdiocese is structured and operates in accordance with Canon Law and
15 applicable civil law.  Among other things, Canon Law establishes that the Roman
16 Catholic Church is comprised of "juridic persons."  According to Canon Law, a "juridic
17 person" is an artificial person similar to a corporation in civil law.  Each diocese and
18 parish affiliated with the Church is considered a separate juridic person. An ordinary (the
19 bishop or archbishop in larger dioceses known as archdioceses) is given the
20 responsibility to supervise the juridic persons in the geographical area covered by the
21 diocese.  A juridic person is an artificial person, distinct from all natural persons or
22 material goods, constituted by competent ecclesiastical authority for an apostolic
23 purpose, with a capacity for continuous existence and with canonical rights and duties
24 like those of a natural person (e.g., to own property, enter into contracts, sue or be
25 sued).

26

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1      A parish is a certain community of the christian faithful whose pastoral care is

2 entrusted to a pastor under the authority of the diocesan bishop. Once a parish has

3 been established, it becomes a juridic person. The pastor (not the bishop) represents

4 the parish in all juridic affairs in accord with the norm of law. The pastor is to see to it

5 that the goods of the parish are administered in accordance with the norms of the

6 canons.

7      All church property, whether held in the name of the Debtor, the Archbishop, a

8 Parish, or a school, has been acquired with charitable donations made by parishioners,

9 religious organizations, charitable foundations, and others. As such, the Debtor asserts

10 that much of the property titled in its name is held in trust, or is otherwise restricted, for

11 the use and benefit of the Parishes, parishioners, parents, students, and others who rely

12 on the continued use of such property in order to practice their religion and educate their

13 children, and that certain property is specifically designated for a particular purpose and

14 can only be used for that purpose. Consistent therewith, the Debtor asserts that it must

15 comply with the duties imposed on it as a trustee, and in compliance with any

16 restrictions imposed on Parish and school property, or any other trust or restricted

17 property.

18      Contrary to the Debtor's view, the Tort Claimants Committee asserts that the

19 Parishes and schools have no legal existence separate from the Debtor (which

20 assertion has been confirmed by the Court) and that all Parish and school property is

21 property of the Debtor's bankruptcy estate (which the Court has determined to be the

22 case for the real property of nine parishes and Regis High School), is not held in trust or

23 restricted in its use (which has not been determined by the Court although it has ruled

24 that any asserted beneficial interests of the parishes, parishioners, donors, and others in

25 the real property of the nine parishes and Regis High School is avoidable), and that all

26 such property is available to pay Claims against the Debtor (which has not been

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1   determined by the Court). These issues alone have generated heavily contested

2   litigation in this Case. Although the Court has ruled in favor or the TCC on certain of

3   these issues, the Debtor believes these rulings, and any appellate rulings subsequent

4   thereto, regarding the property of the estate or its availability to pay Claims will be

5   rendered moot if the Plan is confirmed because the Plan will provide funding that is

6   anticipated to be sufficient to pay all Claims in full without regard to whether the Parish

7   and school property is available to pay those Claims.

8       C.   **The Debtor's Assets And Liabilities.**

9           1.   **Assets.**

10      There are four main categories of property in which the Debtor holds some type

11  of interest. The first category is property the Debtor owns outright without any

12  restrictions or encumbrances ("Unrestricted Archdiocesan Property"). The second

13  category is property owned by the Debtor which the Debtor asserts contains restrictions

14  on use that prevent the Debtor from using such property to pay Claims against the

15  Debtor ("Restricted Archdiocesan Property"). The third category is property that the

16  Debtor asserts is held in trust, or is restricted, for the use of Parishes, parishioners,

17  schools, or others that prevents such property from being used to pay Claims against

18  the Debtor (collectively "Parish and School Property"). The fourth category is the

19  proceeds of the Debtor's claims against its insurers relating to the Tort Claims

20  ("Insurance Recoveries") of which any recovery would be available to pay Claims.

21          (a)   **Unrestricted Archdiocesan Property.** The Unrestricted

22  Archdiocesan Property is described on Exhibit 1, and includes the Pastoral Center

23  Building and associated real property, the Casa Del Rey Apartments, certain houses

24  and vacant land, and certain assets held in the General Operating Fund, the Insurance

25  Fund, and the Property Fund. The Debtor believes the current estimated fair market

26

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1 value of the Unrestricted Archdiocesan Property is approximately $24,529,238 as of

2 February 28, 2006.

3      **(b)    Restricted Archdiocesan Property.**  The Restricted

4 Archdiocesan Property is described on Exhibit 2, and includes the Annual Catholic

5 Appeal Fund, the Priest Retirement Fund, the Archdiocese Catholic Education

6 Endowment Fund, the Perpetual Endowment Fund, the Archdiocesan Cemeteries and

7 all associated operating funds, the Restricted Fund, and the Charitable Gift Annuity

8 Fund.  The Debtor believes the current estimated fair market value of the Restricted

9 Archdiocesan Property is approximately $93,159,916 as of February 28, 2006.  The Tort

10 Claimants Committee asserts that at least the Perpetual Endowment Fund containing

11 approximately $36 million is property of the estate and is available to pay claims against

12 the Debtor.  The Debtor disputes this and asserts that the Perpetual Endowment Fund

13 is a valid charitable trust, with the beneficiaries of that trust being an ever changing

14 group of people including parishioners, the poor, the sick, and the hungry who benefit

15 from the mission of the Church.  The dispute over the Perpetual Endowment Fund is

16 currently the subject of the Tort Claimants Committee's Fourth Motion for Partial

17 Summary Judgment discussed above and in Section IV.C.2. below.  If the Committee

18 should prevail on its motion, approximately $36 million would become available as a

19 source to pay claims against the Debtor and the Pastoral Center and Casa Del Rey

20 Apartments would no longer be encumbered with the Perpetual Endowment Fund's

21 liens and would be available to be sold to pay Claims.  The Committee further asserts

22 that approximately $15.2 million raised for the Annual Catholic Appeal Fund or held in

23 the Priest Retirement Fund, the Restricted Fund, and the Charitable Gift Annuity Fund

24 are all property of the estate; however, the Committee has not included those assets as

25 part of the property litigation.

26

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1            **(c)**     **Parish and School Property.**  The Parish and School

2    Property is described on Exhibit 3, and includes all Parish churches, schools, and

3    cemeteries, Central Catholic High School, Regis High School, Marist High School, and

4    all Parish and school bank and investment accounts, including such entities' funds and

5    investments in the Archdiocesan Loan and Investment Program and the Catholic

6    Education Endowment Fund.  The value of the cash and investments in these accounts

7    totals approximately $71,297,341 as of June 30, 2005.  Approximately $23.8 million of

8    this amount is held in Parish bank accounts and is constantly being used and

9    replenished to support Parish and school operations, $15.5 million is held in parish

10   Catholic Education Endowment Fund accounts, and $23.2 million is held in Parish ALIP

11   accounts.  The Debtor only receives Parish financial reports annually in the fall of each

12   year for the preceding fiscal year; however, the Debtor believes it unlikely that the stated

13   amounts have changed significantly since June 30, 2005.  No current appraisals exist

14   for the real property and it would be very difficult to provide a reliable estimate of the

15   value of such property.  This is because the property can likely only be used for

16   churches and schools without significant cost to the purchaser to demolish or convert

17   the buildings on the property.  There is only a limited market for church and school

18   property.  In addition, many of the churches and schools are in residential

19   neighborhoods with restricted zoning which could prevent the property from being used

20   for any other purpose.  The tax appraised value as stated in the Debtor's Statement of

21   Financial Affairs lists the value of the real property at approximately $389,820,856.

22           **(d)**     **Insurance Recoveries.**  The Debtor, the Parishes, the

23   schools, and other entities are insured under certain insurance policies that the Debtor

24   asserts provides coverage for the Tort Claims.  Some of the Insurance Policies are

25   occurrence policies, which means that if the act occurred during a policy year,

26   regardless of when the claim is made, then the claim is covered by the applicable

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1    Insurance Policy. The remaining policies are "claims made" policies, which means that

2    the relevant time period for determining coverage is not the date of occurrence, but the

3    date the claim is first made.[2]

4          The Insurance Companies are defendants or plaintiffs in adversary proceedings

5    pending in the Court to determine the insurers' liability for and the amount of coverage

6    available to the Debtor for the Tort Claims. Certain insurers are paying the Debtor's

7    defense costs to resolve the Tort Claims and other insurers have refused to pay

8    defense costs. All the insurers have reserved their rights with respect to whether there

9    is coverage for the Tort Claims. The Debtor contends that it has various claims against

10   the Insurance Companies related to coverage and additional claims arising out of

11   certain of the Insurance Companies' actions with respect to coverage and settlement of

12   the Tort Claims.

13         At this time the Debtor does not have a reliable estimate of the total value of the

14   Insurance Claims. The Debtor believes that it is owed approximately $20 million from

15   insurers on account of prepetition settled claims (of this amount, the Debtor paid

16   approximately $18 million prepetition, and approximately $2 million remains unpaid). In

17   addition, the Debtor believes it is entitled to substantial additional coverage for the

18   remaining Tort Claims, including any Future Claims that may be filed. This additional

19   coverage would include amounts due for defense costs and for payment of the

20   remaining Tort Claims. Because many of the underlying Tort Claims have not been

21   liquidated, and the number and nature of Future Claims is unknown, it is very difficult for

22   the Debtor to make projections regarding the value of the claims for insurance

23   coverage. If, hypothetically, these Tort Claims were all liquidated at an amount that

24   would reach the policy limits of each of the insurance policies, and the Debtor were to

25

26   _____

     [2] Although these policies are "claims made" policies, they are limited to claims made for acts which
     occurred after the issuance of the policies.

**Page 26 of 62** - DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  prevail on every one of its legal theories regarding coverage, the value of the claims and

2  coverage available to pay them could be in excess of $100 million. However, the

3  Debtor does not believe that it will realistically recover in excess of $100 million from its

4  insurers. The Debtor further believes that the claims will be liquidated at amounts

5  substantially below the policy limits of the applicable insurance policies; however, the

6  Debtor recognizes that all litigation involves risk and thus cannot assure such outcome.

7       (e)    **Additional Potential Sources of Funding**.

8       (1)    **Oregon Catholic Press**. The Debtor has historically

9  received annual charitable contributions from the Oregon Catholic Press ("OCP")

10  averaging approximately $670,000 to $850,000 per year since the year 2000. The

11  Debtor anticipates that it will continue to receive similar annual payments. However,

12  such contributions are made solely at the discretion of OCP, which could determine not

13  to make any further contributions to the Debtor at any time. OCP is and has long been

14  a separate non-profit corporation with its own board of directors.

15       (2)    **Archdiocesan Cemeteries**. The Debtor operates

16  three Archdiocesan cemeteries, these being Mt. Calvary Cemetery, Portland;

17  Gesthsemani Cemetery, Portland; and Mt. Calvary Cemetery, Eugene. These

18  cemeteries are currently generating revenues exceeding expenses of approximately

19  $750,000 to $950,000 per year from the sale of gravesites, crypts, and niches.

20  However, at some point there will no longer be any gravesites, crypts, or niches to be

21  sold and the cemeteries will cease to be profitable. This is because the cemeteries will

22  continue to incur expenses for the perpetual care of the graves, grounds, and buildings.

23  Those who purchase gravesites, crypts or niches are promised that these burial sites

24  will be cared for in perpetuity. Accordingly, the excess revenues being generated from

25  current sales must be retained so as to be available to fund the cemetery operations

26  when there is no longer any sales revenue. The Debtor believes these funds are

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1 subject to a valid trust for cemetery purposes and cannot be used to pay Claims against

2 the Debtor. The Tort Claimants Committee disputes this, at least regarding the ability of

3 the Debtor to use the excess yearly revenues. The Committee contends that the future

4 income stream could be sold to generate a lump sum of as much as $5 million to pay

5 Claims. The Court has not made any determination regarding the funds held for

6 cemetery use or the ability of the Debtor to use the excess revenues being generated

7 from cemetery operations. The Debtor does not expect these funds, even if the Court

8 found them to be available, to be necessary for funding its obligations to pay Claims

9 under the Plan.

10        2.   **Liabilities**.

11          **(a)**   **Administrative Claims.** The Debtor anticipates that it will

12 owe approximately $3.1 million in unpaid administrative expenses on the Effective Date

13 (assuming an Effective Date of September 1, 2006), consisting primarily of legal fees

14 and expenses owing to the Debtor's, the Tort Claimants Committee's, and the Future

15 Claimants Representative's attorneys, accountants, consultants, experts, and other

16 advisors.

17          **(b)**   **Non-Tax Priority Claims.** Allowed Non-Tax Priority Claims

18 are estimated to total approximately $2,920 consisting of tenant deposits at the Casa

19 Del Rey Apartments.

20          **(c)**   **Administrative Convenience Claims**. Administrative

21 Convenience Claims are estimated to total approximately $60,795. These consist

22 primarily of trade creditor claims totaling less that $1,000.

23          **(d)**   **Umpqua Bank.** Umpqua Bank's Secured Claim, which is

24 secured by liens on the real property located at 1610 NE Couch Street and 1623 W.

25 Burnside in Portland, Oregon, is estimated to total approximately $361,800. The Debtor

26

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

believes the estimated fair market value of the property securing this claim to be approximately $2.1 million. This loan is not in default.

(e) **Perpetual Endowment Fund.** The Perpetual Endowment Fund's Secured Claim, which is secured by liens on the Pastoral Center and the Casa Del Rey Apartments, is estimated to total approximately $5,131,807. The current tax appraised real market value of the property securing this Claim is $7,175,676. This Claim is the result of a loan made by the Perpetual Endowment Fund to the Debtor in July of 2003 to replenish funds in the Debtor's Insurance program that had been used to pay Tort Claims. The loan is a form of investment for the Perpetual Endowment Fund in that it provides a market rate of interest, with the Debtor's principal obligation secured by adequate collateral to protect the PEF in the event the Debtor should fail to make the required payments. This loan is not in default.

The Debtor asserts that the Perpetual Endowment Fund is a valid charitable trust containing cash and investments totaling approximately $36.1 million plus the loan to the Debtor. As such, the assets in the Perpetual Endowment Fund would not be considered property of the estate and available to pay the Claims of creditors in this case. The Tort Claimants Committee disputes this and asserts that the Perpetual Endowment Fund is not a valid trust and the fund's assets are property of the estate. The Committee asserts that the Debtor is the settlor, the trustee, the sole beneficiary, and has the power to amend, modify, or terminate the trust and distribute the assets in the trust to the Debtor. The Debtor contends that a corporation other than the Debtor was the settlor and the original trustee of the trust, the Debtor is now the successor trustee, the Debtor is not the sole beneficiary, and the Debtor does not have the power to modify, amend, or terminate the trust. These issues are currently being litigated pursuant to the Committee's Fourth Motion for Partial Summary Judgment. If the Committee is correct, the Perpetual Endowment Fund's Claim could be disallowed and

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1 the assets in the Perpetual Endowment Fund could become available to pay claims.

2 Furthermore, the Perpetual Endowment Fund's liens against the Pastoral Center and

3 Casa Del Rey Apartments could be extinguished and those properties would no longer

4 be encumbered by such liens.  This could result in approximately $42 million of disputed

5 property becoming available to pay Claims in this case.  If on the other hand the Debtor

6 were to prevail, none of the Perpetual Endowment Fund's assets would be available

7 and the Pastoral Center and Casa Del Rey apartments would have little value to

8 creditors because they would continue to be encumbered by the Perpetual Endowment

9 Fund's liens.

10        **(f)**     **Key Bank.** Key Bank's Claim results from the Debtor's

11 guaranty of loans made to Assumption Village, LLC ( senior housing/assisted living

12 project), Trinity Court, LLC (OSU Newman Center and student housing project), and

13 Village Enterprises, LLC ( Villa St. Margaret) ( senior apartment project) for construction

14 loans  to build those projects, which loans are secured by letters of credit issued by Key

15 Bank.  The unpaid balance on these loans currently totals approximately $20,218,730.

16 Neither the underlying borrower's obligations on these loans nor the Debtor's guaranty

17 obligations to Key Bank are in default.

18       The Debtor has obtained information from Key Bank that it has current appraisals

19 showing the value of the properties to be worth approximately $15 million.  If this is

20 correct, Key Bank's Claim could be under secured by as much as $5 million.  The

21 Debtor has been informed by Village Enterprises that it believes the bank's appraisals

22 on some of the property is below the true fair market value.  Furthermore, Village

23 Enterprises has obtained additional guaranties that provide additional security for the

24 Key Bank obligation, thus even if the appraisal values are correct, the Debtor's

25 exposure is likely less than $5 million.

26

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

The Debtor's guaranty agreements with Key Bank currently provide that the Debtor will pay Key Bank in the event of a default by the underlying borrowers. Those guaranty agreements will be modified to provide the Reorganized Debtor with the opportunity to cure any default in the underlying obligations which would result in a default under the guaranty agreements before Key Bank will be entitled to enforce its rights under the guaranty agreements. This will provide for greater assurance that, in the event of the underlying borrowers' default, the Reorganized Debtor will not have to immediately pay $20 million to Key Bank, but will have the opportunity to continue making payments to and liquidate the collateral before having to pay any deficiency to Key Bank. In addition, the Reorganized Debtor will have the option to provide loans to Assumption Village, Trinity Court, and Village Enterprises in the event they should be unable to make any payments on the underlying obligations, which the Reorganized Debtor would almost certainly do, at least for a period of time to allow decisions to be made by the borrowers regarding the property and whether or not the property should be sold to pay off the underlying obligations.

(g) **General Unsecured Claims.** General Unsecured Claims are estimated to total approximately $461,505. These claims consist primarily of trade claims against the Debtor which were unpaid as of the Petition Date.

(h) **Allowed Present Tort Claims**. Allowed Present Tort Claims consists of three claims that were settled prepetition totaling approximately $2,001,603. If any Claims are allowed between now and the Effective Date, they will be added to this number.

(i) **Unresolved Present Tort Claims.** Unresolved Present Tort Claims allege damages of over $500 million. In addition to Tort Claims alleging child sex abuse, these Claims, include torts allegedly committed while the Claimant was an

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1    adult, and Claims of Co-Defendants[3] for indemnity or contribution for the underlying Tort

2    Claims. The Debtor has filed or will file motions to estimate these Claims for purposes

3    of voting and for confirmation of the Plan. In its motion to estimate unresolved present

4    child sex abuse claims, the Debtor proposed that such Claims be valued for voting and

5    confirmation purposes at $182,230 each, except for Claims based on alleged abuse

6    committed by former priests Maurice Grammond and Thomas Laughlin, which Claims

7    would be valued at $631,211 for Claims against Maurice Grammond and $773,443 for

8    Claims against Thomas Laughlin. Using this methodology as of March 28, 2006, the

9    estimated amount of Unresolved Present Tort Claims for child sex abuse totals

10   approximately $30,518,139, plus approximately $7,000,000 in tentatively resolved

11   Claims. The Debtor estimates the Unresolved Present Tort Claims which are not based

12   on child sex abuse at approximately $500,000. Thus, the Debtor's estimated value of all

13   Unresolved Present Tort Claims is currently approximately $38,000,000. The Court has

14   stated that further work will need to be done to determine the actual methodology to be

15   used in estimating these Claims, and has asked the Debtor and Tort Claimants

16   Committee to submit further proposals in that regard. These proposals are due to be

17   filed by May 31, 2006 and a hearing to consider the proposals scheduled for June 16,

18   2006.

19           **(j)**    **Future Claims.** Future Claims are those Tort Claims for

20   child abuse meeting certain criteria which were not asserted as of the April 29, 2005

21   Claims Bar Date. The Court has appointed Hamilton Rabinovitz & Aschuler ("HR&A") to

22   assist the parties and the Court in estimating these Claims and the Plan provides for the

23   Reorganized Debtor to provide sufficient funds to pay the estimated amount of the

24   Future Claims as determined by the Court. HR&A has provided a preliminary report

25   including its conclusions to the Debtor, the Tort Claimants Committee, and the Future

26

---

[3] These Claims are discussed in more detail on Exhibit "4" hereto.

**Page 32 of 62** - DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  Claimants Representative.  This report will be finalized and creditors and interested

2  parties will have an opportunity to review such report and contest the findings and

3  conclusions contained in such report at or prior to the estimation hearing.  Upon the

4  HR&A estimation report becoming finalized, the Debtor expects to file a motion asking

5  the Court to estimate the aggregate amount of Future Claims for confirmation purposes.

6         **(k)     Supplemental Present Tort Claims**.  There are currently no

7  Supplemental Present Tort Claims.  These Claims are currently included in the definition

8  of Future Claims and will only arise if the Court's decision to include in the category of

9  Future Claimants those adult Tort Claimants alleging child abuse who remember the

10  abuse occurred, but who have not discovered their injuries or the causal connection

11  between their injuries and the abuse, is reversed on appeal.  At the present time these

12  Claims are merely duplicative of certain Claims within the Future Claims class and will

13  not be entitled to vote or considered for confirmation purposes.

14         **(l)     Retiree Benefit Claims**.  Retiree Benefit Claims are

15  estimated to total approximately $404,000.

16         **(m)     Donor Claims.**  These claims consists of the claims filed by

17  parishioners, donors, and others who have made donations to the Debtor, the parishes,

18  or the schools claiming their donations or the property purchased with their donations

19  are subject to donor imposed restrictions which would prevent such property from being

20  utilized to pay claims against the Debtor.  Under the Debtor's plan, no Archdiocesan or

21  parish real or personal property containing donor imposed restrictions will be utilized to

22  fund the plan without the consent of the donors as required by civil and Canon Law;

23  therefore, these claims will remain contingent and no payment will be required on these

24  claims.  These claims will only become an issue if restricted assets are utilized to fund

25  the plan without the requisite donor consent.  The Debtor believes confirmation of its

26  plan will not result in any such claims becoming non-contingent and payable.  The

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  Debtor does not believe any facts exist which would cause any Donor Claims to be due

2  and payable upon Confirmation of the Plan.

3        **(n)    Beneficiary Claims.**  These claims consists of the claims

4  filed by parishes, parishioners, and others who claim some beneficial interest or rights in

5  parish, school, or other charitable trust property.  Under the Debtor's plan, no parish or

6  school real or personal property will be utilized to fund the plan without the consent of

7  the parishes and others as required by civil and Canon Law; therefore, these claims will

8  remain contingent and no payment will be required on these claims.  These claims will

9  only become an issue if parish assets or trust assets are utilized to fund the plan without

10  the requisite consent of the beneficiaries holding rights and interests in such property.

11  The Debtor believes confirmation of its plan will not result in any such claims becoming

12  non-contingent and payable. The Debtor does not believe any facts exists which would

13  cause any Beneficiary Claims to be due and payable upon Confirmation of the Plan.

14  **VII.    DESCRIPTION OF THE PLAN.**

15        The following description of the Plan is for informational purposes only and does

16  not contain all provisions of the Plan.  Creditors should not rely on this description for

17  voting purposes but should read the Plan in its entirety.  This summary of the Plan does

18  not purport to be complete.

19  THE PLAN IS CONTROLLING IN THE EVENT OF ANY
   INCONSISTENCY BETWEEN THE CONTENTS OF THE PLAN AND
20  THIS DISCLOSURE STATEMENT.

21        **A.    Classification And Treatment Of Claims Under The Plan.**

22              **1.    Claim Amounts.**

23        Until allowed by the Court, certain Claims against the Debtor are in

24  unliquidated amounts.  Accordingly, the amounts of Claims specified in this Disclosure

25  Statement reflect only the Debtor's estimates based on information available to it.

26  Additionally, the amounts of Claims specified in this Disclosure Statement do not

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1    include all Claims that may arise from the rejection of certain executory contracts or

2    other contingent or unliquidated Claims against the Debtor.

3            **2.    Effective Date of the Plan.**

4            The "Effective Date" of the Plan determines when the performance of

5    many of the obligations under the Plan are due. The Effective Date will occur on the

6    first business day following entry of the Court's order confirming the Plan.

7            **3.    Classification Generally.**

8            The Plan divides Claims against the Debtor into thirteen separate Classes

9    which the Debtor believes complies with the requirements of the Bankruptcy Code.

10    Unless otherwise expressly stated in the Plan, the respective treatments under the Plan

11    of Allowed Claims are in full discharge and satisfaction of those Allowed Claims. Except

12    as provided in the Plan, all Claims against the Debtor arising prior to entry of the

13    Confirmation Order will be discharged as of the Effective Date pursuant to Bankruptcy

14    Code §1141(d).

15            **4.    Unclassified Claims.**

16            **(a)    Administrative Claims.** The Administrative Claims consist

17    of the fees of the Chapter 11 Professionals and other Claims that would be allowable as

18    Administrative Claims pursuant to Bankruptcy Code § 503. The Debtor anticipates the

19    unpaid amount of these Claims will total approximately $3.1 million on the Effective

20    Date (if occurring in September 2006). The holder of an Allowed Administrative Claim

21    will receive, in full satisfaction of such Claim, (a) a single cash payment in the Allowed

22    amount of the Claim as soon as reasonably practicable after the Effective Date (or the

23    Allowance Date if the Administrative Claim is not an Allowed Claim on the Effective

24    Date); or (b) as otherwise agreed in writing by the holder of the Allowed Claim or

25    ordered by the Bankruptcy Court. Every Allowed Administrative Claim for an expense

26    of operation of the Debtor incurred in the ordinary course of such operations will be paid

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1 fully paid in cash in the ordinary course of business (including any payment terms

2 applicable to any such expense). Administrative Claims requiring Court approval, such

3 as the fees of professionals retained during the Bankruptcy Case, will not be paid until

4 entry of a Final Order allowing such Claims.

5       **5.       Unimpaired Claims.**

6           **(a)       Class 1:  Non-Tax Priority Claims**.  Holders of Allowed

7 Non-Tax Priority Claims shall receive payment from the Reorganized Debtor of the full

8 amount of their Allowed Claims at such time as their Claims become due and payable.

9           **(b)       Class 2:  Administrative Convenience Claims**.  Holders of

10 Allowed Administrative Convenience Claims shall receive, on or as soon as reasonably

11 practicable after the Effective Date, or, if later, the Allowance Date, payment from the

12 Reorganized Debtor of the full amount of their Allowed Claims.

13           **(c)       Class 10:  Retiree Benefit Claims**.  The holders of Allowed

14 Retiree Benefit Claims shall not be impaired and shall not have their rights altered by

15 this Plan.  Allowed Retiree Benefit Claims shall be paid, performed, and honored by the

16 Reorganized Debtor in full, when due, in accordance with their terms notwithstanding

17 any other contrary provision of this Plan; provided, however, that the rights of the

18 holders of such Claims shall be subject to modification or termination as provided by the

19 terms of the existing benefit plans, consistent with applicable law.

20           **(d)       Class 11:  Donor Claims**.  Holders of Allowed Donor Claims

21 shall retain their Claims against the Reorganized Debtor, and this Plan shall leave

22 unaltered the legal, equitable, and contractual rights to which such Claims entitle the

23 holders thereof.

24           **(e)       Class 12:  Beneficiary Claims**.  Holders of Allowed

25 Beneficiary Claims shall retain their Claims against the Reorganized Debtor, and this

26

**Page 36 of 62 -** DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1   Plan shall leave unaltered the legal, equitable, and contractual rights to which such

2   Claims entitle the holders thereof.

3        **6.    Impaired Claims**.

4             **(a)    Class 3: Umpqua Bank**.  Umpqua Bank ("Umpqua") will

5   have an Allowed Secured Claim for approximately $361,800, plus any interest, fees,

6   and other charges accrued on such Claim as authorized by the terms of the Debtor's

7   promissory note and other related documents (the "Umpqua Loan Documents").

8   Umpqua's Allowed Secured Claim will be paid in full, together with interest accruing

9   from and after the Effective Date at the non-default contract rate, in 180 equal monthly

10   installments of principal and interest commencing on the first day of the first month

11   following the Effective Date and continuing on the first day of each month thereafter until

12   paid in full.  Umpqua shall retain its security interest and lien on all collateral securing its

13   Claim, which security interest and lien shall be subject and subordinate only to such

14   security interests and liens as were perfected and had priority over the liens and

15   security interests of Umpqua on the Petition Date.  The Reorganized Debtor shall

16   execute and deliver to Umpqua such notes, loan agreements, security agreements,

17   financing statements, control agreements, and the like as may reasonably be requested

18   by Umpqua.  The Umpqua Loan Documents shall contain such terms and provisions as

19   are ordinary and usual for loans made by Umpqua in the amounts provided in this Plan.

20             **(b)    Class 4: Perpetual Endowment Fund**.  The Perpetual

21   Endowment Fund (the "Endowment Fund") will have an Allowed Secured Claim for

22   approximately $5,131,807, plus any interest, fees, and other charges accrued on such

23   Claim as authorized by the terms of the Debtor's promissory note and other related

24   documents (the "Endowment Fund Loan Documents").  The Endowment Fund's Allowed

25   Secured Claim will be paid in full, together with interest accruing from and after the

26   Effective Date at the non-default contract rate, in 180 equal monthly installments of

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1 principal and interest commencing on the first day of the first month following the

2 Effective Date and continuing on the first day of each month thereafter until paid in full.

3 The Endowment Fund shall retain its security interest and lien on all collateral securing

4 its Claim, which security interest and lien shall be subject and subordinate only to such

5 security interests and liens as were perfected and had priority over the liens and

6 security interests of the Endowment Fund on the Petition Date. The Reorganized

7 Debtor shall execute and deliver to the Endowment Fund such notes, loan agreements,

8 security agreements, financing statements, control agreements, and the like as may

9 reasonably be requested by the Endowment Fund. The Endowment Fund Loan

10 Documents shall contain such terms and provisions as are ordinary and usual for loans

11 made by the Endowment Fund in the amounts provided in this Plan.

12        **(c)**   **Class 5: Key Bank.** Key Bank shall retain its Guaranty

13 Claim against the Debtor, subject to all agreements between Key Bank and the Debtor

14 regarding such Claim being amended to provide that the Reorganized Debtor will be

15 given notice and an opportunity to cure any monetary or nonmonetary defaults in the

16 underlying obligations which would entitle Key Bank to exercise its rights under its

17 agreements with the Debtor.

18        **(d)**   **Class 6: General Unsecured Claims**. Each holder of an

19 Allowed General Unsecured Claim will receive payment from the Reorganized Debtor

20 equal to 100% of such Allowed General Unsecured Claim in 12 equal monthly

21 installments of principal and interest at the Plan Interest Rate, commencing within 30

22 days following the later to occur of the Effective Date or the Allowance Date.

23        **(e)**   **Class 7: Present Tort Claims**. At Closing, the

24 Reorganized Debtor will, in full release, satisfaction and discharge of all Present Tort

25 Claims, execute and deliver the Claims Resolution Facility Agreement to the Depository

26 Trustee, together with the initial payments, promissory notes, letters of credit, and other

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1    security documents required thereunder, thereby establishing the Claims Resolution

2    Facility for the liquidation and payment of all Present Tort Claims, which provides,

3    subject to its terms, for total payments by the Reorganized Debtor of up to the full

4    estimated amount of all Present Tort Claims as determined by the District Court. This

5    means that the Reorganized Debtor will provide funding to the Facility only up to the

6    aggregate amount of the District Court's estimate. The Debtor fully expects the District

7    Court's estimate to be adequate, and potentially in excess of, the amount needed to pay

8    all Claims in full. However, if the District Court's estimate is low and the actual value of

9    the Claims turns out to be more than the estimate, the Reorganized Debtor will not

10   provide additional funding to make up the difference. Thus, it is theoretically possible

11   that Present Tort Claimants could receive less than full payment of their Claims, or

12   potentially no payment in the unlikely event the Facility should run out of money before

13   all Claims are resolved and paid. To guard against that possibility, the Claims

14   Resolution Facility Agreement requires that the District Court authorize any distribution

15   to Claimants, taking into account the alleged amount of Unresolved Claims still pending

16   before distributions can be made to Claimants holding resolved Claims. This is to

17   ensure that those Claimants whose Claims are the last to be resolved will be treated

18   fairly and that funds will remain available to pay such Claims once they are finally

19   resolved.

20          Class 8 also includes the Claims of Co-Defendants who assert Claims for

21   contribution or indemnity against the Debtor as a result of a Tort Claim being asserted

22   against such Co-Defendant. Such Co-Defendant Claims are subject to disallowance

23   pursuant to Section 502(e) of the Bankruptcy Code. Thus, if the underlying Tort Claim

24   is disallowed the Co-Defendant's Claim will also be disallowed. In addition, the Co-

25   Defendant's Claim will be disallowed if it is contingent, or if such Co-Defendant asserts

26

**Page 39 of 62 -** DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1    a right of subrogation to the rights of the underlying Tort Claimant under Section 509 of

2    the Bankruptcy Code.

3            **(f)**    **Class 9: Future Tort Claims**.  At Closing, the Reorganized

4    Debtor will, in full release, satisfaction and discharge of all Future Tort Claims, execute

5    and deliver the Claims Resolution Facility Agreement together with the initial payment,

6    promissory notes, letters of credit, and other security documents required thereunder to

7    the Depository Trustee, thereby establishing the Claims Resolution Facility for the

8    liquidation and payment of all Future Tort Claims, which provides, subject to its terms,

9    for total payments by the Reorganized Debtor of up to the full estimated amount of all

10   Future Tort Claims as determined by the District Court.  As with Present Tort Claimants,

11   Future Claimants face the same theoretical possibility of receiving less than full payment

12   or potential non-payment of their Claims in the event the District Court's estimate is too

13   low (see Section 6.(e) above).

14           **(g)**    **Class 10: Supplemental Present Tort Claims**.  There are

15   currently no Claims in this class for the reasons described in Section VII.C.2.(j) above.

16   Nevertheless, at Closing, the Reorganized Debtor will, in full release, satisfaction and

17   discharge of all Supplemental Present Tort Claims, execute and deliver the Claims

18   Resolution Facility Agreement together with the initial payment, promissory notes,

19   letters of credit, and other security documents required thereunder to the Depository

20   Trustee, thereby establishing the Claims Resolution Facility for the liquidation and

21   payment of all Supplemental Present Tort Claims, which provides, subject to its terms,

22   for total payments by the Reorganized Debtor of up to the full estimated amount of all

23   Supplemental Present Tort Claims as determined by the District Court.  As with Present

24   Tort Claimants and Future Claimants,  Supplemental Present Tort Claimants face the

25   same theoretical possibility of receiving less than full payment or potential non-payment

26

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1  of their Claims in the event the District Court's estimate is too low (see Section 6.(e)

2  above).

3          (h)    **Class 13: Oregon Insurance Guaranty Association**.

4  Oregon Insurance Guaranty Association asserts a Claim for $2,641,071.42 against the

5  Debtor based on pre-petition payments made by OIGA to pay settled Tort Claims that

6  were insured by insolvent insurance companies.  OIGA made such payments under a

7  reservation of rights.  Its Claim against the Debtor is based on such reservation and

8  OIGA's assertion that it has no liability for payment of the Tort Claims as the guarantor

9  of the insolvent insurers' obligations.  The Debtor believes that OIGA's Claim should be

10  disallowed.  If, however, the Claim is ultimately Allowed, OIGA will receive payment

11  from the Reorganized Debtor equal to 100% of its Allowed Claim in 60 equal monthly

12  installments of principal and interest at the Plan Interest Rate, commencing within 30

13  days following the later to occur of the Effective Date or the Allowance Date.

14          B.    **Punitive Damages Will Be Subordinated to Payment of**
                  **Compensatory Damages**.

15          If any Tort Claimant establishes a right to Punitive Damages, payment of

16  Punitive Damages will be subordinated to payment of all other Tort Claims, to the extent

17  they are not for Punitive Damages.  At Closing, the Reorganized Debtor will, in full

18  release, satisfaction and discharge of all Punitive Damages, execute and deliver the

19  Claims Resolution Facility Agreement together with the initial payment, promissory

20  notes, letters of credit, and other security documents required thereunder to the

21  Depository Trustee, thereby establishing the Claims Resolution Facility for the

22  liquidation and payment of all Punitive Damages, which provides, subject to its terms,

23  for total payments by the Reorganized Debtor of up to the full estimated amount of all

24  Punitive Damages as determined by the District Court.  Because such Punitive

25  Damages must be subordinated to the payment of the compensatory portion of all Tort

26  Claims, such Punitive Damages will not be paid until the District Court determines that

**Page 41 of 62** - DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1    sufficient funds are available in the Facility to pay such claims without jeopardizing

2    payment in full of the compensatory portion of all other Tort Claims, including Future

3    Claims. Because the Future Claims Bar Date will not occur for 15 years from the

4    Effective Date, it is possible the District Court will not authorize any payments for

5    Punitive Damages for many years, if at all, prior to the Future Claims Bar Date and the

6    resolution of all Future Claims.

7        The Debtor believes the likelihood of Punitive Damages being awarded to any

8    Claimant to be relatively small. This is because Punitive Damages are generally only

9    available to punish and deter future wrongdoing. The Debtor contends that an award of

10    punitive damages would be inappropriate and not available under Oregon law as a

11    deterrent to the prevention of further abuse and would raise serious legal concerns

12    under the First Amendment to the United States Constitution. The Debtor has already

13    suffered tremendous economic loss and has taken steps to prevent any future abuse

14    from taking place. Furthermore, under Oregon law, 60% of any punitive damage award

15    must be paid to the State of Oregon, and up to 20% is paid to the Claimant's attorney,

16    with the Claimants receiving as little as 10% after the tax consequences are considered.

17    Thus, punitive damages provide little economic benefit to Claimants. Nevertheless,

18    despite the Debtor's belief that no Punitive Damages are likely to be awarded to any

19    Claimant, the Debtor's Plan provides for funding of such Claims in the event a Claimant

20    establishes a right to Punitive Damages.

21        C.    **All Unresolved Tort Claims to be Resolved and Paid by Claims**

22    **Resolution Facility.**

23        Archdiocese of Portland Claims Resolution Facility, Inc., ("APCRF") acting as the

24    Claims Resolution Facility, will (a) assume liability for all Tort Claims; (b) provide for

25    payment of Tort Claims that become Allowed Tort Claims under the conditions set forth

26    in the Claims Resolution Facility Agreement; (c) oversee and provide directions to the

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1    Depository Trustee for the collection, investment, and distribution of funds for the benefit

2    of Tort Claimants; (d) pay the costs and expenses of the Claims Resolution Facility; and

3    (e) fulfill all other obligations required of the Claims Resolution Facility, all as set forth

4    more fully in the Claims Resolution Facility Agreement. APCRF will be owned by the

5    Reorganized Debtor and will be managed by a board of directors consisting of three

6    persons to be chosen by the Archbishop upon consultation with the Archdiocesan

7    Finance Council. APCRF's operating expenses will be paid by the Reorganized Debtor.

8    The Depository Trust will be established pursuant to the Claims Resolution Facility

9    Agreement as a Qualified Settlement Fund with the Tort Claimants being the

10    beneficiaries of the Depository Trust. All funds paid by the Reorganized Debtor to the

11    Facility for payment of Tort Claims will be deposited in the Depository Trust. These

12    funds will not be available to APCRF to pay any other expenses. If any funds are left in

13    the Depository Trust after payment of the Tort Claims, such funds will be returned to the

14    Reorganized Debtor.

15        The Claims Resolution Facility Agreement does not require the Facility to provide

16    any Claimant with an appeal bond or other security in the event the Facility elects to

17    appeal any judgment awarded to a Tort Claimant. Although an appeal bond or other

18    security is usually required under state law to protect the judgment creditor in the event

19    the judgment debtor is later unable to pay the judgment, the Debtor does not believe

20    this to be necessary under the Facility. The Facility is required to manage the funds in

21    the Facility for payment of Tort Claims so as to assure that all Tort Claims are fairly and

22    equitably paid. In addition, the District Court must authorize any distributions to Tort

23    Claimants with a view toward preserving the funds and paying Tort Claimants equally.

24    Therefore, an appeal bond or other security should not be necessary under these

25    circumstances.

26        **D.**    **Tort Claims to be Estimated if Not Resolved Prior to Confirmation.**

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Either prior to or as part of the confirmation hearings, the District Court will
estimate for all purposes, the aggregate allowed amount of all Unresolved Present Tort
Claims and the aggregate allowed amount of all Future Claims (including Supplemental
Present Tort Claims). This is necessary to prevent undue delay in the administration of
the estate, and to determine the funding necessary to confirm a feasible plan that is in
the best interest of creditors. On March 6, 2006, the Court issued its Amended
Memorandum Opinion regarding estimation of the Tort Claims. Pursuant to that
Opinion, the Court will conduct further proceedings to determine the methodology for
estimation of the Tort Claims that it will recommend the District Court utilize in
estimating the Claims. The Debtor previously has proposed a methodology based
primarily on the average value of settlements reached for approximately 140 claims
prior to the Debtor's bankruptcy filing. Based on these settlements, the Debtor
proposed that the pending unresolved child sex abuse Claims be estimated with
$631,211 being assigned to each Claim against Fr. Maurice Grammond, $773,443 to
each Claim against Fr. Thomas Laughlin, and $182,230 to each Claim against any
other accused person.

This methodology incorporated the premise that those Tort Claims against the
Debtor involving Co-Defendant religious orders and others be estimated based only on
the portion of prior settlement amounts paid by the Debtor for Tort Claims involving Co-
Defendants. This is because the Debtor has historically paid only a small portion of the
Claims involving Co-Defendants (e.g., 0% to 25%). For instance, a Claimant may bring
a Claim against both the Debtor and a religious order for alleged acts of abuse involving
a religious order priest serving in one of the Parishes within the Archdiocese of
Portland. Because such priest is a member of the religious order and reports to the
religious order and not the Debtor, the religious order has typically paid the majority of
any settlement. If the pending claims were estimated at 100%, and not at the smaller

**Page 44 of 62** - DISCLOSURE STATEMENT REGARDING DEBTOR'S THIRD
MODIFIED PLAN OF REORGANIZATION

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1  percentage actually paid by the Debtor, the estimate of the Debtor's liability for Tort

2  Claims involving Co-Defendants would be inflated, and would not be a fair estimate of

3  the amount of the Debtor's liability for such Claims.

4      In its Memorandum Opinion, the Court stated that it wanted to refine further the

5  Debtor's proposed methodology to take into account not only the previous settlements,

6  but also any relevant jury trial information, as well as other information that might allow

7  for an estimation on a more individualized basis.  Thus, the estimation methodology that

8  will ultimately be utilized by the District Court will be subject to further proceedings and

9  cannot be determined at this time.

10      The Tort Claims also include Claims for contribution or indemnity asserted by

11  nine Co-Defendant religious orders or others entities against whom Tort Claims have

12  been asserted or potentially could be asserted in the future.  A complete list and

13  description of these Claims is included on Exhibit 4 hereto.  Most of these Claims are

14  filed in an unknown amount because neither the underlying Tort Claim, nor the Co-

15  Defendant's liability for such Claim has been resolved.  The Debtor believes these

16  Claims should be estimated at zero, primarily because such Claims will likely be

17  disallowed because the Co-Defendant is the primary defendant on the underlying Tort

18  Claim, or pursuant to Section 502(e) of the Bankruptcy Code, which provides that

19  Claims for contribution or indemnity will be disallowed if (1) the underlying Tort Claim is

20  disallowed, (2) the Claim for indemnity or contribution is contingent, or (3) such Co-

21  Defendant asserts a right of subrogation to the rights of the underlying Tort Claimant

22  under Section 509 of the Bankruptcy Code.  If the District Court were estimate the

23  underlying Tort Claim at 100% of its value without taking into account the probable

24  contribution of the Co-Defendant for payment of such Claim, and also give value to the

25  Co-Defendant's Claims, this would result in double counting the underlying Tort Claim.

26  The only Co-Defendant that has filed a response to the Debtor's motion to estimate the

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1  Co-Defendant Claims is St. Mary's Home.  The Debtor believes the other Co-

2  Defendant's may withdraw their Claims prior to the confirmation hearing, or will do so at

3  the time the underlying Tort Claims are resolved and paid.

4       Finally, it is important for Claimants to understand that the District Court's

5  estimation of the Tort Claims will only establish the aggregate estimated amount of all

6  the Claims to establish the basis for the amount of funding that will be provided by the

7  Reorganized Debtor to pay Claims.  It will not determine the amount of any individual's

8  Claim for distribution purposes.  Claimants will be entitled to settle their Claims or

9  proceed to trial for the purpose of actually liquidating the amount of their individual

10  Claims to determine how much will actually be distributed on their Claims.  Therefore,

11  upon confirmation of the Plan, each Tort Claimant whose Claim has not been Allowed

12  as of the Effective Date will have the actual value of his or her Claim resolved under the

13  Claims Resolution Procedures set forth in the Claims Resolution Facility Agreement.

14  Such Claims will be resolved and paid under the terms of the Claims Resolution Facility

15  Agreement and all case management orders entered by the Court and the District

16  Court.  Each such Tort Claimant shall (a) be subject to the Claims Resolution

17  Procedures, and (b) not receive any payment if (and to the extent) the Claim is

18  Disallowed pursuant to the Claims Resolution Procedures.  All Tort Claimants holding

19  Unresolved Tort Claims shall retain the right to adjudicate their Claims through litigation

20  (including trial by jury), subject, however, to the provisions of the Plan and the Claims

21  Resolution Facility Agreement.

22       As is evident from the above discussion, the Debtor's Plan requires the District

23  Court to enter orders establishing the estimated aggregate amount of allowed claims for

24  the purpose of the Reorganized Debtor's providing funding for claims up to the

25  estimated amount and to permit the Court to determine that all conditions to

26  confirmation have been met.  The Debtor fully expects the District Court to enter such

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1  orders.  Nevertheless, failure of the District Court to enter such orders or for the

2  Reorganized Debtor to provide funding in the amount of such estimates will prevent

3  confirmation of the Plan.

4  **E.    Reorganized Debtor's Obligations to Claims Resolution Facility to be**

5  **Funded by Line of Credit and Secured by Letters of Credit.**

6  The Reorganized Debtor's obligations to the Claims Resolution Facility will

7  consist of the amount necessary to pay (1) the operating expenses of the Facility,

8  including defense costs for resolution of the Tort Claims, and (2) the amount, not to

9  exceed the District Court's estimate, that is necessary to pay the Allowed amount of the

10  Tort Claims in full, including the Future Claims and any Punitive Damages.  The

11  Reorganized Debtor will obtain a line of credit in a sufficient amount to fund the District

12  Court's estimate of the Claims.  This line of credit will be secured by irrevocable letters

13  of credit provided to the Claims Resolution Facility equal in amount to the District

14  Court's estimation.  As the Reorganized Debtor makes payments to the Facility to pay

15  Claims, these letters of credit will be reduced in a corresponding amount.

16  The Debtor has not yet secured either the line of credit or the letters of credit

17  because it is currently unknown how much funding will actually be necessary.  This

18  amount can only be determined once the District Court has issued its estimate of the

19  amount of the Claims.  Nevertheless, the Debtor and its financial advisor, Mesirow

20  Financial, have discussed the line of credit funding mechanism with a number of

21  prospective lenders and the Debtor is confident it will be able to obtain the necessary

22  funding once the District Court provides its estimate of the Claims.  Depending on the

23  amount of funding that will be necessary, the Parishes may be required to provide a

24  portion of the collateral base for the line of credit, consisting of parish real property and

25  investments.  The Debtor has had lengthy discussions with the Parishioners Committee

26  regarding these funding issues and based on those discussions the Debtor believes it

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1  will be able to obtain the necessary Parish consent to use the Parish property, if

2  necessary, as collateral to secure the line of credit and obtain the letters of credit for the

3  Facility.

4      Although the Debtor believes it will be able to obtain the necessary funding for

5  the Plan, there is a possibility it will be unable or unwilling to do so if the District Court's

6  estimates are substantially higher than the Debtor's current estimates.  As stated above,

7  the Debtor has estimated the present known Tort Claims at approximately $38 million.

8  It has not made any formal estimate of the amount of the Future Claims or Punitive

9  Damages; however, based on the Debtor's belief that Punitive Damages are unlikely to

10  be awarded to any Claimant, and based on preliminary estimates of value for the Future

11  Claims, the Debtor believes that the required funding will be possible with the Parishes

12  and parishioners' support.  If the required amount of funding is not provided, the

13  Debtor's current Plan would not be confirmable without first determining the value of the

14  property of the estate that is available to pay claims, or the actual liquidated amount of

15  the Claims.  Because of the possibility that Future Claims will continue to be asserted

16  for many years, and the delay inherent in resolving the property of the estate litigation, it

17  could be years before an alternative plan could be proposed and confirmed.

18      F.    **Claims Resolution Facility to Receive Insurance Recoveries Paid by**

19  **Insurance Companies.**

20      Except for rights relating to Tort Claims that Debtor settled and paid prior to the

21  Petition Date, the Debtor will assign its rights that have accrued for covered losses

22  relating to the Tort Claims to the Claims Resolution Facility, including the right to receive

23  all Insurance Recoveries thereon.  APCRF may be joined as a co-plaintiff with the

24  Debtor in any existing action for Insurance Coverage.  APCRF will be entitled, in its sole

25  discretion, to pursue or not pursue the Insurance Claims (except for Insurance Claims

26  relating to Tort Claims that the Debtor paid prior to the Petition Date) against the

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

Case 04-37154-tmb11    Doc 3736    Filed 06/12/06

1 Insurance Companies.  Upon resolution of such Insurance Claims (except for Insurance

2 Claims relating to Tort Claims that the Debtor paid prior to the Petition Date), all

3 Insurance Recoveries paid by the Insurance Companies will be paid to the Claims

4 Resolution Facility for deposit in the Depository Trust and used to pay Tort Claims.

5   The Plan is intended to be "insurance neutral," meaning that all claims and

6 defenses of the Debtor, the Reorganized Debtor, any additional insureds, the Claims

7 Resolution Facility, and the Insurance Companies relating to the Insurance Claims, and

8 all rights (whether contractual or statutory) of the Debtor, the Reorganized Debtor, any

9 additional insureds, the Claims Resolution Facility, and the Insurance Companies

10 relating to the Insurance Policies, shall remain unaffected by the Plan and the

11 Confirmation Order.  To accomplish this goal, the Plan provides that: (i) all claims and

12 defenses of the Debtor, the Reorganized Debtor, any additional insureds, the Claims

13 Resolution Facility, and the Insurance Companies relating to the Insurance Claims, and

14 all rights (whether contractual or statutory) of the Debtor, the Reorganized Debtor, any

15 additional insureds, the Claims Resolution Facility and the Insurance Companies

16 relating to the Insurance Policies, shall remain unaffected by the Plan, any of the Plan

17 Documents, and the Confirmation Order, (ii) no provision of the Plan, any of the Plan

18 Documents, or the Confirmation Order shall in any way operate to, or have the effect of,

19 impairing the Debtor's, the Reorganized Debtor's, any additional insured's, the Claims

20 Resolution Facility's, or the Insurance Companies' legal, equitable, or contractual rights

21 relating to the Insurance Policies and Insurance Claims in any respect; (iii) the rights of

22 the Debtor, the Reorganized Debtor, any additional insureds, the Claims Resolution

23 Facility, and the Insurance Companies shall be determined under the Insurance

24 Policies, any action regarding Insurance Coverage, any settlement agreement with

25 respect to Insurance Claims, and non-bankruptcy law, as applicable, (iv) for the

26 purposes of determining Insurance Coverage, no provision of the Plan, any of the Plan

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205

1   Documents, or the Confirmation Order shall constitute a judgment, settlement, or other

2   resolution of any individual Tort Claim, nor have any effect of res judicata, issue

3   preclusion, or of collateral estoppel, on any individual Tort Claim, (v) the Reorganized

4   Debtor and the Claims Resolution Facility will honor the obligations of the Debtor under

5   the Insurance Policies and applicable non-bankruptcy law as those obligations pertain

6   to the resolution, settlement, and payment of Insurance Claims (including, without

7   limitation, any duty to cooperate in the defense of claims and suits, to the extent that

8   such duty exists), and (vi) objections to Tort Claims may be filed by the Reorganized

9   Debtor, the Claims Resolution Facility, any Claimant, the Insurance Companies, or any

10   other party in interest.  Furthermore, the Claims Resolution Facility provides that (i) all of

11   the rights and obligations of the Insurance Companies, APCRF, as successor to the

12   accrued rights of the Debtor for covered losses (except for rights relating to Tort Claims

13   that the Debtor paid prior to the Petition Date), and the Reorganized Debtor (for rights

14   relating to Tort Claims that the Debtor paid prior to the Petition Date) shall be

15   adjudicated in any coverage action in accordance with the requirements of the

16   Insurance Policies and applicable law, (ii) Tort Claimants may proceed to resolve their

17   Tort Claims in binding arbitration only if agreed to by both APCRF and those Insurance

18   Companies who are providing a defense of such Claims, and (iii) APCRF and the

19   Reorganized Debtor will honor the obligations of the Debtor under the Insurance

20   Policies and applicable non-bankruptcy law as those obligations pertain to the

21   resolution, settlement, and payment of Insurance Claims (including, without limitation,

22   any duty to cooperate in the defense of claims and suits, to the extent that such duty

23   exists).

24       By including this "insurance neutrality" language in the Plan, the Debtor and

25   APCRF necessarily are seeking a determination that the Debtor's assignment of its

26   rights that have accrued for covered losses relating to the Tort Claims to the Claims

Sussman Shank LLP
ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400
Portland, or 97205